041114/01245/TPD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

| | |
|---|---|
| RONALD BURT, #N-60788, | |
| Plaintiff, | |
| v. | Case Number  3:13-cv-794-NJR-DGW |
| SAM NWAOBASI, RICK HARRINGTON, ANGELA CRAIN, MICHAEL MOLDENHAUER, LAKEISHA HAMBY, JOHN TROST, CHAD FRIERDICH, and WEXFORD HEALTH SOURCES, INC., | Judge Nancy J. Rosenstengel Magistrate Judge Donald G. Wilkerson |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED**

COME NOW Defendants, SAMUEL NWAOBASI, M.D., JOHN TROST M.D., and WEXFORD HEALTH SOURCES, INC., by and through their attorneys, CASSIDAY SCHADE LLP, and pursuant to Federal Rule of Civil Procedure 56 and SDIL-LR 7.1(D), hereby submit their Memorandum in Support of their Motion for Summary Judgment, stating as follows:

**INTRODUCTION**

Plaintiff, an inmate with the Illinois Department of Corrections who was, at all times relevant, incarcerated at the Menard Correctional Center ("Menard"), brought this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his Eighth Amendment rights as a result of an alleged failure to treat his neck and back pain which was diagnosed as mild degenerative disk changes. Specifically, Plaintiff claims that Dr. John Trost ("Dr. Trost") and Dr. Samuel Nwaobasi ("Dr. Nwaobasi") were deliberately indifferent to his medical needs because they failed to refer him to a specialist, failed to refer him for an MRI and failed to refer him for surgery. Additionally, Plaintiff alleges a *Monell* claims against Wexford Health Sources, Inc.,

("Wexford") for maintaining a policy of providing medical treatment only when it is "absolutely necessary," so that Wexford could save money and that the policy sanctions inadequate medical care for inmates.

## UNDISPUTED MATERIAL FACTS

1.     Plaintiff's most recent incarceration commenced in 1992, and he is currently serving a life sentence. (Ex. 9, Burt Dep. 44). Currently, Plaintiff works out periodically, typically more than once a month. (Ex. 9, Burt Dep. 49:9-53:13). His workouts involve exercises for arms, shoulders, legs, and abs. For abs, Plaintiff does sit-ups. Until sometime in 2016, Plaintiff did situps by "interlocking his hands behind his neck." (Ex. 9, Burt Dep. 51:10-18). In 2016, Plaintiff told a healthcare professional that situps "were causing problems," and was instructed to cross his hands in front of his chest to avoid pulling on his neck. (Ex. 9, Burt Dep. 51:21-52:6).

2.     On October 8 and 15, 1996, Plaintiff was seen by medical personnel for complaints of knee and neck pain due to a fall in the shower on October 6, 1996. On October 24, 1996, an x-ray of Plaintiff's cervical spine was taken. The x-ray report noted no fractures but contained an impression of torticollis and scoliosis. (Ex. 4, Ex. 1 BURT SELECTED (MR) 49). Scoliosis is a disease that causes a curvature of the spine and does not typically cause pain. (Ex. 5, Petkovich Dep. 24:12-25:20). Torticollis is a muscle contraction in the neck that typically occurs with flexion, extension and rotation causing the head to tilt.  (Ex. 4; Ex. 5, Petkovich Dep. 31:10-12). The impression of scoliosis is not supported by any other x-ray taken subsequent to 1996. (Ex. 4). Moreover, the impression of torticollis, which is a muscle condition, is not a radiological finding, and does not belong in a radiological report. (Ex. 4).

3.       On May 13, 2009, Plaintiff slipped on a puddle of water and allegedly injured his neck and back. He was brought by wheelchair to the healthcare unit and examined. Plaintiff did not have bruises or lacerations. Moreover, an x-ray of the thoracic spine taken on July 8, 2009, resulted in negative findings. (Ex. 2, Nwaobasi Dep. 96:1-7).

4.       Plaintiff alleges that "he has been suffering continuous, severe, and excruciating back and neck pain since at least 2002." (Doc. 205, ¶11). However, Plaintiff makes no allegations against either Dr. Nwaobasi or Dr. Trost that occurred prior to November 3, 2012. (*See* Doc. 205, ¶ 35).

5.       On July 8, 2009, an x-ray of Plaintiff's thoracic spine was taken and was negative for fractures, dislocation and arthritis. (Ex. 2, Nwaobasi Dep. 87:1-16, Ex. 1 BURT SELECTED (MR) 014).

6.       On November 3, 2012, Plaintiff was seen by Dr. Nwaobasi and the doctor performed a jacket review (a review of medical records) for continuation of Motrin for Plaintiff's back pain. (Ex. 2, Nwaobasi Dep. 78:21-82:18, Ex. 1 BURT SELECTED (MR) 22). Plaintiff complained about back pain and scoliosis. (Ex. 2, Nwaobasi Dep. 81:7-11). Dr. Nwaobasi never saw Plaintiff prior to this encounter and because he wanted to substantiate scoliosis as the origin of Plaintiff's complaints of back pain, the doctor ordered an x-ray of Plaintiff's thoracal, lumbar and sacral spine.[1] Dr. Nwaobasi performed a physical examination of Plaintiff's neck. (Ex. 9, Burt Dep. 93:22-95:24). Additionally, Dr. Nwaobasi ordered a three week prescription of Motrin 400 mg., to be taken as needed with meals.

---

[1] Thoracal spine is a part of the spine located relative to the upper back and abdomen. Lumbar spine is a part of the spine located relative to the lower back. Sacral spine refers to the large irregular triangular shaped bone made up of the five fused vertebrae below the lumbar region. (https://www.spine-health.com/conditions/spine-anatomy, last visited June 1, 2017).

7.     On November 7, 2012, Dr. Nwaobasi noted in the medical records that a "recent x-ray of the l/s (lumbosacral) spine does not show evidence of scoliosis, and discontinued the x-ray order. (Ex. 2, Nwaobasi Dep. 85:20-21). In deposition, Dr. Nwaobasi could not identify which "recent" x-ray he reviewed to decide that another x-ray to assist in the diagnosis of scoliosis was not needed—since the only x-rays preceding the November 3, 2012, examination were the x-rays from July 8, 2009 and October 24, 1996. (Ex. 2, Nwaobasi Dep. 96:1:7; Ex. 1, BURT SELECTED (MR) 49). This lack of certainty about the discontinuation of the x-ray ordered on November 3, 2012 is not material because as will be explained in (UMF ¶¶ 12, 51, 53), *infra* three doctors have determined that Plaintiff does not have scoliosis. Additionally, an x-ray of Plaintiff's lumbar and sacral spine was, in fact, taken on December 4, 2013 which disclosed minor degenerative disk changes. (*see* UMF, ¶ 18), *infra*. As discussed below, no change in Plaintiff's treatment was made as a result of that finding, nor was any necessary.

8.     On December 1, 2012, Plaintiff was seen by Dr. Nwaobasi for a follow up of the November 3, 2012 visit. (Ex. 2, Nwaobasi Dep. 96:8-98:24, Ex. 1 BURT SELECTED (MR) 23). Dr. Nwaobasi noted that Plaintiff was complaining of a history of cervical pain. The doctor further noted that there were no recent x-rays of the cervical spine, and that the x-rays were needed to determine if Plaintiff has scoliosis, and assess the degree of scoliosis if Plaintiff had it. Dr. Nwaobasi suspected that Plaintiff might have possible degenerative osteoarthritis and scoliosis of the spine, and therefore ordered an x-ray of the cervical spine. (Ex. 2, Nwaobasi Dep. 112:6-113:6, Ex. 1 BURT SELECTED (MR) 23). The x-ray was meant to either support or rule out the potential diagnosis of degenerative osteoarthritis and/or scoliosis. (Ex. 2, Nwaobasi Dep. 112:3-17). Additionally, Dr. Nwaobasi prescribed Motrin 600 mg to be taken with meals three

times per day for two months. This was an increase in the dosage of Plaintiff's pain medication. (Ex. 9, Burt Dep. 98:18-20) Finally, Dr. Nwaobasi ordered a follow up in two months.

9.      Plaintiff does not believe that Dr. Nwaobasi failed to do anything, or did anything wrong in his course of treatment of Plaintiff's condition up to December 1, 2012. (Ex. 9, Burt Dep. 99:1-15). Plaintiff believes if Dr. Nwaobasi did anything wrong, it was after he received Plaintiff's x-rays and "found out what was wrong." (Ex. 9, Burt Dep. 99:6-7). Plaintiff faults Dr. Nwaobasi for failing to refer him to an outside treating specialist and failing to refer him to Dr. Trost. (Ex. 9, Burt Dep. 201:3-23).

10.      On December 5, 2012, Plaintiff had an x-ray of his cervical spine taken. (Ex. 1, BURT SELECTED (MR) 48), (Ex. 3, Trost Dep. 75:12-20). The findings on the x-ray report state that "there is a narrowing of the disc at C4-C5 level suggestive of degenerative process." "The precervical soft tissues are not thickened and there is no gross evidence of an acute regional bony fracture or dislocation." (Ex. 1, BURT SELECTED (MR) 48).

11.      Plaintiff was not seen by a doctor for the two month follow up after his appointment with Dr. Nwaobasi. Dr. Nwaobasi does not know why Plaintiff was not scheduled to see him. However, Dr. Nwaobasi is not responsible for scheduling a patient's appointment. That is the responsibility of the scheduling nurses. (Ex. 2, Nwaobasi Dep. 118:21-25). Nevertheless, if there is something urgent, the patient can be brought back to be seen by a doctor. (Ex. 2, Nwaobasi Dep. 122:3-5).

12.      Reviewing the December 5, 2012 x-ray, Dr. Nwaobasi observed that Plaintiff had an early onset of arthritis, "that is narrowing of the disc spaces between the fourth and the fifth" vertebrae. (Ex. 2, Nwaobasi Dep. 150:20-151:2). There was no evidence of scoliosis. While there was some curvature, scoliosis would be a much more severe condition than what was observed

on the x-ray. (Ex. 2, Nwaobasi Dep. 152:4-6). Dr. Nwaobasi further observed that the degenerative "process" in Plaintiff's neck is not severe at all. The doctor categorized the degenerative process in Plaintiff's neck as "mild." (Ex. 2, Nwaobasi Dep. 160:16-19).

13.     Cost cutting measures or concerns played no role in Dr. Nwaobasi's choices of medical care provided to Plaintiff. Based on presentation and symptoms, at no point in time did Plaintiff need a CT scan, an MRI or a referral to a specialist. (Ex. 2, Nwaobasi Dep. 160:23-161:11). Additionally, based on presentation and severity of symptoms, Plaintiff did not require a referral to a physical therapist. (Ex. 2, Nwaobasi Dep. 161:23-162:4).

14.     On July 17, 2013, Nurse Practitioner Moldenhauer ("N.P. Moldenhauer") saw Plaintiff for a follow up of the December 1, 2012, appointment. N.P. Moldenhauer reviewed and then discussed Plaintiff's December 12, 2012, x-ray results. (Moldenhauer Dep. 79:5-80:17, 82:6-83:25). Additionally, N.P. Moldenhauer had Plaintiff perform a straight leg raise test and bend at the waist. N.P. Moldenhauer noted that Plaintiff performed the leg raises "without difficulty"[2] and "bent well" at the waist. (Ex. 10, Moldenhauer Dep. 50:4-25, Ex. 1, BURT SELECTED (MR) 28). Plaintiff remembers that N.P. Moldenhauer had him perform both tests. (Ex. 9, Burt Dep. 111:10-112:24). N.P. Moldehanuer prescribed Motrin 400 mg. three times per day, to be taken as needed for pain. (Ex. 10, Moldenhauer Dep. 62:3-24).

15.     N.P. Moldenhauer looks for evidence of sciatic pain with a patient performing the straight leg raise test. Sciatic pain or "sciatica" is pain, numbness and tingling that runs down one or both legs, past the gluteal, down the leg. If a patient has sciatic pain, the patient usually complains about it, and if the pain is severe enough, the patient cannot perform the test. Plaintiff did not complain of any pain, and was able to perform the test. Moreover, if N.P. Moldenhauer

---

[2] Performing the test "without difficulty" means that Plaintiff in a standing position could raise his leg greater than 45 degree to 90 degree angle, without any difficulty. (Moldenhauer Dep. 87:1-11).

observed facial grimacing or other signs of pain, he would have recorded that observation in Plaintiff's medical records. (Moldenhauer Dep. 87:18-90:3). Specifically, N.P. Moldenhauer's practice is to write "facial grimace" with a description of whatever activity a patient is performing at the time of the observed grimace. (Moldenhauer Dep. 90:11-14).

16.     N.P. Moldenhauer looks for signs of pain and records any abnormal observations. For example, N.P. Moldenhauer looks for facial grimacing when a patient gets up and down from the examination table. Though he does not chart all of his observations, N.P. Moldenhauer does record any abnormal findings that he notices. (Moldenhauer Dep. 64:6-21). N.P. Moldenhauer can refer patients to a medical doctor for complaints of pain, but needs more than just subjective complaints. A "body assessment" has to be done. (Moldenhauer Dep. 62:3-24). The purpose of the "body assessment" is to determine if the assessment supports the level of pain a patient claims he is in. (Moldenhauer Dep. 70:8-11).

17.     On November 26, 2013, Plaintiff was seen by Nurse Hamby for complaints of continuing back pain. (Ex. 11, Hamby Dep. 42:3-23, Ex. 1, BURT SELECTED (MR) 032). Plaintiff reported that his pain is a result of a "broken neck in 1987 or 1988." (Ex. 11, Hamby Dep. 42:3-23). (Plaintiff was referring to a motorcycle accident that he had in 1988 where he was hit by a car while riding a motorcycle. Plaintiff never sought medical treatment for the motorcycle accident because he was out on parole at the time of the accident and was driving without a license. (Ex. 9, Burt Dep. 34:6-37:11)). Plaintiff self-rated his pain to Nurse Hamby as a 10+, meaning that he was, in the worst pain of his life. (Ex. 9, Burt Dep. 121:1-10). According to Plaintiff, his self-reported 10+ level pain was allegedly present during his examination by Nurse Hamby. (Ex. 9, Burt Dep. 122:1-13). Nurse Hamby noted that Plaintiff did not have a limitation with his cervical movement. Nurse Hamby did not notice any facial grimacing or

guarding behavior such as Plaintiff holding his neck. (Ex. 11, Hamby Dep. 43:20-23, 57:25-58:9). If she would have observed that behavior, she would have noted the observation in Plaintiff's medical record. (Ex. 11, Hamby Dep. 46:9-17). Nurse Hamby, gave Plaintiff 200 mg of Ibuprofen to be taken three times per day as needed, told him to avoid sporting activities until the pain has been gone for at least two weeks, told him to begin gentle strengthening exercises, and referred him to a doctor. (Ex. 11, Hamby Dep. 48:9-24, 62:6-25). Nurse Hamby did observe any objective indications of Plaintiff's subjective self-reported pain level.

18.     On December 4, 2013, x-rays of Plaintiff's thoracic and lumbar spine were taken. The three views of thoracic spine "demonstrate no compression fracture or subluxation." (a bone break of any size is referred to a as fracture; subluxation is a slight misalignment of the vertebrae). Moreover, the three view of lumbar spine "demonstrate minor degree of degenerative change at L5-S1 level." "There is no spondylosis or spondylolisthesis."[3] (Ex. 4).

19.     Dr. Trost saw Plaintiff for complaints of cervical pain on December 24, 2013. (Ex. 3, Trost Dep. 72:14-73:1). Plaintiff appeared to be alert, in no acute distress, had an intact range of motion in his neck. Dr. Trost reviewed the radiology report from the December 5, 2012 x-rays, and determined that Plaintiff had "some mild narrowing at the C4-5" vertebrae. Dr. Trost assessed Plaintiff as having degenerative disk disease at C4-C5. (Ex. 3, Trost Dep. 73:12-74:15). Dr. Trost reviewed the December 5, 2012, radiological report prior to making his assessment. (Ex. 3, Trost Dep. 73:12-75:25). Dr. Trost prescribed cervical exercises and Meloxicam to be taken as needed. (Ex. 1, BURT SELECTED (MR) 38). Meloxicam is a non-steroidal anti-

---

[3] Spondylosis is a broad term that refers to some type of degeneration in the spine. Most often, the term spondylosis is used to describe osteoarthritis of the spine, but it is also commonly used to describe any manner of spinal degeneration. http://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (last visited on April 22, 2017). Spondylolisthesis is a condition in which a defect in a part of the spine causes vertebra to slip to one side of the body. Typical symptoms of spondylolisthesis include back pain and/or leg pain. http://www.spine-health.com/video/spondylolisthesis-symptoms-and-causes-video (last visited on April 22, 2017).

inflammatory drug ("NSAID") similar to Ibuprofen used to treat different musculoskeletal issues like degenerative disk disease of the spine. (Ex. 3, Trost Dep. 112:6-25).

20.     Dr. Trost asked Plaintiff to perform range of motion exercises which involved Plaintiff rotating or extending his cervical spine. (Ex. 3, Trost Dep. 109:5-7). If Plaintiff, while performing range of motion tests, exhibited any signs of pain, Dr. Trost would have noted that finding in Plaintiff's medical record. Moreover, if the range of motion exercises elicited any pain, Plaintiff would have avoided performing those exercises and his range of motion would have been limited. Dr. Trost did not observe any limitation in Plaintiff's range of motion. (Ex. 3, Trost Dep. 110:1-6). Dr. Trost prescribed Meloxicam to continue the therapeutic treatment Plaintiff was already receiving. (Ex. 3, Trost Dep. 9-25).

21.     Dr. Trost saw Plaintiff again on March 27, 2014. (Ex. 1, BURT SELECTED (MR) 41). Plaintiff told Dr. Trost that he had relief with Mobic (Mobic is a name brand version of Meloxicam). (Ex. 3, Trost Dep. 113:1-5; Ex. 9, Burt Dep. 161:24-162:1). Additionally, Plaintiff had a normal range of motion in his neck. (Ex. 1, BURT SELECTED (MR) 41; Ex. 3, Trost Dep. 78:11-16), and assessed Plaintiff as having mild degenerative disk disease. (Ex. 3, Trost Dep. 80:3-8).[4] Dr. Trost continued Plaintiff's Mobic prescription for another 6 months. (Ex. 3, Trost Dep. 78:18-21).

22.     Dr. Trost saw Plaintiff again on October 6, 2014 for complaints of numbness and tingling in the right leg for three days in duration. (Ex. 3, Trost Dep. 80:15-81:16). This complaint was not connected to Plaintiff's previous complaints of cervical pain. (Ex. 3, Trost Dep. 114:4-11). The complaints were "two entirely separate entities." (Ex. 3, Trost Dep. 114:4-

_____

[4] Dr. Trost's medical record indicates an assessment of osteoarthritis of the cervical spine, but in his deposition Dr. Trost explained that the osteoarthritis diagnosis was less than accurate and that the true and correct term would have been degenerative disc disease. (Trost Dep. 80:3-8).

11). Dr. Trost checked vital signs and performed a neurovascular exam (a neurological examination and a vascular examination – performed to assess nerve function and blood circulation to the body). Plaintiff's vital signs were normal and he did not have any deficits or abnormal findings in his neurological examination or his vascular examination. (Ex. 3, Trost Dep. 115:19-24). Dr. Trost performed a test for muscle strength and muscle reflexes. (Ex. 3, Trost Dep. 116:6-23). Dr. Trost ordered a follow up in one week.  (Ex. 3, Trost Dep. 81:12-82:4)

23.     If a patient exhibits symptoms that are due to nerve impingement, the symptoms follow a particular pattern. It is called dermatomal distribution. Impingement of the nerve at the L5-S1 level will cause a specific location and type of pain. The pain will follow a typical distribution that will not vary. Therefore, Dr. Trost can determine whether a patient's subjective complaints of numbness and tingling are actually present based on how a patient describes his or her pain. (Ex. 3, Trost Dep. 117:2-118:4).

24.     Based on Plaintiff's explanation of his tingling, numbness, and pain, Dr. Trost determined that nothing but a follow up appointment in one week was required on October 6, 2014. (Ex. 3, Trost Dep. 118:5-118:11).

25.     Plaintiff saw Dr. Fuentes on October 14, 2016, for a follow up from the October 6, 2014, appointment. (Ex. 3, Trost Dep. 118:14). Dr Fuentes noted that Plaintiff had a good steady gait and was neurologically intact. (Ex. 3, Trost Dep. 85:10-11). She ordered an x-ray of the lumbar sacral spine ("LS") spine. (Ex. 3, Trost Dep. 85:19-22).

26.     Plaintiff's lumbar spine x-ray was taken on October 16, 2014. The findings were mild degenerative disc disease at L5-S1 level. No compression fracture or subluxation was seen. (Ex. 1, BURT SELECTED (MR) 045).

27.     The findings of degenerative disk disease in the lower spine and degenerative disk disease in the cervical spine are separate things and have nothing in common except that they are both part of Plaintiff's spine. (Ex. 3, Trost Dep. 87:5-7).

28.     Besides subjective complaints of pain, patients can exhibit objective signs of pain. Outward appearance of pain involves facial grimacing, reduced pulse rate, pulse-elevated perspiration, and perspiration. If Dr. Trost observes any objective appearance of pain, he notes those observations in the patient's medical records. A lack of any notation relating to pain in the medical record means that Dr. Trost did not observe any pain. (Ex. 3, Trost Dep. 107:2-20).

29.     Plaintiff's symptoms of back and neck pain were not characteristic of nerve impingement because his complaints of pain did not include pain radiating down his arm, loss of sensation in his arm or weakness of muscle in the arm. (Ex. 3, Trost Dep. 49:21-50:8).

30.     Dr. Trost is not aware of nerve impingement that manifests itself as radiating pain in the arm. (Ex. 3, Trost Dep. 51:17-21).

31.     If Dr. Trost sees a patient for complaints of back or neck pain with tingling and numbness, he performs a "thorough physical examination" which includes a deep tendon reflex test. (Deep tendon reflex tests are designed to observe an involuntary muscular response elicited by a rubber hammer tapping the associated tendon – an improper or an absent response could indicate a spinal cord or nerve root damage. https://www.spineuniverse.com/exams-tests/neurological-exams-sensory-nerves-deep-tendon-reflexes, (last visited on June 1, 2017)). Additionally, Dr. Trost requests that the patient perform different maneuvers designed to show if those maneuvers elicited back or neck pain. (Ex. 3, Trost Dep. 59:4-60:24). This physical examination is designed to show the doctor if there are any objective medical findings that support the subjective complaints of pain, tingling and numbness. (Ex. 3, Trost Dep. 59:20-60:6).

32.     In the absence of "muscle weakness, numbness, deep tendon reflex diminishment, [or any other] actual physical objective findings"—if the patient only has pain, Dr. Trost does not suggest an MRI. (Ex. 3, Trost Dep. 62:20-25). Subjective complaints of pain alone are not an indication for an MRI. (Ex. 3, Trost Dep. 62:20-25). Due to plaintiff's lack of objective findings on a physical examination, the yield of finding anything that would be surgically treatable after an MRI is "extremely low." (Ex. 3, Trost Dep. 69:12-22).

33.     Evidence-based medicine ("EBM") is an approach to medical practice intended to optimize decision-making by emphasizing the use of evidence from well-designed and well-conducted research. *Wikipedia,* https://en.wikipedia.org/wiki/Evidence-based_medicine (last visited on April 18, 2017). Plaintiff's symptoms and objective findings did not indicate a necessity for an MRI, and EBM dictates that any findings from an MRI would not change how Plaintiff was to be medically treated.  (Ex. 3, Trost Dep. 71:2-8).

34.     Dr. Trost would never recommend anyone for surgery based solely on subjective complaints of neck and back pain. A doctor has to consider the risks associated with major surgery and specifically back surgery. The universe of complications of surgery such as infection, bleeding, blood clots in the leg, pneumonia, have to be considered in addition to specific complications related to back surgery such as paralysis of a certain muscle group or even both lower extremities. Dr. Trost would not recommend anyone for surgery based on mild disc degeneration of the C4-C5 or the L5-S1 vertebrae. (Trost Dep 121:12-123:16).

35.     Additionally, Plaintiff does not remember if he has seen any medical provider for back pain in 2015, and believes he has not seen a medical provider for back pain in 2016. (Ex. 9, Burt Dep. 193:13-20).

36.     Plaintiff does not remember how many times or when he was seen by Dr. Nwaobasi and claims that he would have to "go back and look at every single record that there's been in order to know." (Ex. 9, Burt Dep. 78:18-19; *see also* Ex. 9, Burt Dep. 81:2-5). If a medical visit is not in a medical record, Plaintiff has no independent memory of the encounter. (Ex. 9, Burt Dep. 82:6-19).

37.     Plaintiff does not remember actual dates when he saw Dr. Trost or how many times he saw him. Plaintiff is relying on the medical records to inform him of the dates he saw Dr. Trost (Ex. 9, Burt Dep. 146:22-147:16).

38.     On March 7, 2017, Defendants sent Plaintiff Dr. Trost's Request for Production, again attaching 1,843 pages of medical records and requesting Plaintiff to produce any additional medical records not included in the 1,843 pages. Plaintiff has not produced a single additional page. (Group Ex. 6, Dr. Trost's Request for Production dated March 7, 2017, ¶2; Plaintiff's Response to Dr. Trost's Request for Production, ¶ 2).

39.     Plaintiff's complaints against Dr. Trost, albeit contradictory, are as follows: (1) Dr. Trost stopped Plaintiff's or was responsible for stopping Plaintiff's medications; (2) failed to renew Plaintiff's medications; (3) Dr. Trost is incompetent; (4) failed to respond to notes Plaintiff forwarded to the healthcare unit; (5) failed to refer Plaintiff to a specialist; (6) failed to Tramadol to Plaintiff  (Ex. 9, Burt Dep. 172:6-173:23, 179:5-9, 182:8-2; 198:10-14, 222:23-225:15).

40.     Plaintiff admits that he does not hand his notes personally to Dr. Trost; rather, he places them in a medical box or hands them to nurses. (Ex. 9, Burt Dep. 183:4-20).

41.     Plaintiff admits that when he saw Dr Trost on December 24, 2013 and March 27, 2014, he was prescribed medication. His complaints against Dr. Trost do not pertain to those medical visits. (Ex. 9, Burt Dep. 214:17-215-7).

42.     Plaintiff also complains that he was not given "real pain medication." (Ex. 9, Burt Dep. 218:10). Plaintiff claims that he was told that Wexford refuses to allow "them" (meaning doctors) to give inmates certain medication like Tramadol. And at the same time claims that he knows that other inmates are receiving it. (Ex. 9, Burt Dep. 218:4-219:13). Plaintiff further claims that he knows that doctors do not like giving Tramadol because they claim that inmates use it to get high. (Ex. 9, Burt Dep. 218:10).

43.     Plaintiff admits that Dr. Trost has discretion to prescribe certain medication and one of his complaints about Dr. Trost, is that he did not prescribe Tramadol to Plaintiff.  (Ex. 9, Burt Dep. 222:23-225:15).

## WEXFORD'S POLICY

44.     Plaintiff claims that he knows that Wexford maintains an unconstitutional policy because Wexford is "doing it in [Plaintiff's] other issues." (Ex. 9, Burt Dep. 240:16-17). Plaintiff further claims that he heard from Dr. Trost and Dr. Nwaobasi that Wexford does not allow doctors to prescribe certain medication and refer inmates to surgeries unless the condition is life threatening. (Ex. 9, Burt Dep. 243:3-13). However, Plaintiff does not know which medication prescriptions are prohibited. (Ex. 9, Burt Dep. 244:14-245:14).

45.     Plaintiff has never seen or read an actual policy containing limitations or prohibitions pertaining to medical care. (Ex. 9, Burt Dep. 245:19-22).

46.     Dr. Nwaobasi testified in deposition regarding Wexford's policies of when to refer patients to outside treating specialists. He stated, "[w]ell, what I can say then is that

14

generally the only advice as to refer somebody only when it is absolutely and not to refer somebody out, you know, that type of – but, as I said, I'm the one on the heat." (Ex. 2, Nwaobasi Dep. 31:15-19).  When asked about whether referring a patient only when it was "absolutely necessary" was a Wexford policy, Dr. Nwaobasi stated,

> I would say generally it is not something written down, but the idea that as much as possible you don't refer patients if you do not have to. But as I said, as a physician, I'm the one going to answer for what happens to that patient. So when I feel the patient is to be referred out, I refer out. (Ex. 2, Nwaobasi Dep. 11:18-12:4).

47.     Dr. Nwaobasi clarified that his understanding of Wexford's policy is that "if it is something that we can handle, its ok for us to handle them. But only refer the patient if we cannot handle them." (Ex. 2, Nwaobasi Dep. 32:19-22). Responding further Dr. Nwaobasi stated, "I mean, if it's something we can handle, they encourage us to handle it, you know. If it is something outside our capability or more serious, then as a physician, I have to send the patient out." (Ex. 2, Nwaobasi Dep. 34:12-16).

48.     Wexford never interfered with what Dr. Nwaobasi did in terms of referring patients to a specialist. (Ex. 2, Nwaobasi Dep. 11:18-12:4). Wexford never placed any constraints on medical staff regarding the types of treatment that could be provided to inmate patients. (Ex. 2, Nwaobasi Dep. 46:6-47:2). Dr. Nwaobasi's referral decisions were based purely on his medical judgment and assessment. (Ex. 2, Nwaobasi Dep. 35:8-16, 46:21-23).

49.     Dr. Roderick Matticks was one of Wexford's Corporate Representatives in this case. (*See* Ex. 7, Notice of Deposition of Wexford/Dr. Matticks.)

50.      Dr. Roderick Matticks is the Lead Regional Medical Director of Illinois. He is responsible for training and supervision of clinical faculty at approximately half of prisons in Illinois. (Ex. 8, Matticks Dep. 11:18-12:4). Part of his duties is to train medical directors on the

provision of medical care and Wexford's policies and procedures. (Ex. 8, Matticks Dep. 14:20-23). Dr. Matticks never told healthcare practitioners to treat based on "absolute necessity." The standard of "absolute necessity" is inconsistent with the training provided to "medical directors and others with respect to Wexford's policies for administration of health services to inmates." (Ex. 8, Matticks Dep. 77:18-19, 78:10-15) Wexford's policy regarding referrals to outside specialists is that a referral should be made if it is medically necessary.

51.   Dr. Matticks reviewed Plaintiff's x-ray reports and he also concluded that Plaintiff does not have scoliosis. (Ex. 8, Matticks Dep. 84:1-2).

### DEFENDANTS' EXPERT WITNESS

52.   Dr. Frank Petkovich is Defendants' retained expert witness who reviewed Plaintiff's medical records and x-ray films and opined as to Plaintiff's medical condition and the propriety of his doctors' treatment decisions as those decisions related to Plaintiff's alleged neck and back pain. Dr. Petkovich's opinion is expressed to a reasonable degree of medical certainty in a written report. (Ex. 4).

53.   After review of Plaintiff's x-ray films taken on December 5, 2012, and December 4, 2013, Dr. Petkovich determined that Plaintiff does not currently have scoliosis, and therefore could not have had it earlier, because scoliosis is not a condition that corrects itself. (Ex. 4). The October 24, 1996, Scoliosis diagnosis in his chart was incorrect. (Ex. 4). Moreover, Torticollis—which is a condition where muscles in the neck exhibit flexion, extension or twisting causing the head to tilt, is not a radiological finding and does not belong in the October 24, 1996, radiological report. Symptoms of torticollis, to the extent noted in the October 24, 1996, radiological report, would have been consistent with Plaintiff's neck pain due to his fall on October 6, 1996. (Ex. 4).

54.     Dr. Petkovich noted that the x-rays of the cervical and thoracic lumbar spine show only very mild degenerative changes, which are consistent with a person of Mr. Burt's age. The degenerative changes are not severe enough to cause the problems or pain that requires anything other than an occasional mild analgesic such as Ibuprofen. (Ex. 4, Page 3). Plaintiff's subjective complaints of excruciating pain are not supported by objective findings contained in the medical records.  (Ex. 5, Petkovich Dep. 64:19-65:2).

55.     Dr. Petkovich also noted that there is no indication for Plaintiff's need of any type of cervical exercises. To the extent that any exercises are to be performed by Plaintiff, the exercises  prescribed by Dr. Trost are sufficient, and the intensive exercise regimen that would be given in physical therapy would not accomplish anything more than the exercises prescribed by Dr. Trost.

56.     Because Plaintiff only has mild degenerative disk changes, with no objective physical findings to show any type of neurological deficit, Dr. Petkovich sees absolutely no need for surgical intervention of Plaintiff's spine. (Ex. 4; Ex. 5, Petkovich Dep. 134:18-135:2).

## LEGAL STANDARD

### A.  Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If Defendants meet their burden in showing there is an absence of evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In determining and evaluating a motion for summary

judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant.  *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).  Yet not every conceivable inference must be drawn, only reasonable inferences.  *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312-13 (7th Cir.1986).  Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. at 380-81 (holding that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction…").

**B.  Deliberate Indifference Standard**

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 105-106

(1976).  To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs.  See *Farmer*, 511 U.S. at 83; *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999). Deliberate indifference involves a two-part test.  The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard.  *Sherrod v. Lingle*, 223 F.3d 605, 619 (7th Cir.2000).  The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks."  *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992).

A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  *Foulker v. Outagamie County*, 394 F.3d 510, 512 (7th Cir. 2005). Additionally, a medical condition is serious where the failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  Indications of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  *Gutierrez*, 111 F.3d at 1373; see also *Jackson v. Pollion*, 2013WL5778994 (cautioning against finding an objectively serious condition absent corroborating medical evidence).

When assessing claims of deliberate indifference against a medical professional, the "professional judgment standard" applies.  *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  Under this standard,

a medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). A medical professional may only be held to have displayed deliberate indifference if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not base the decision on such a judgment." *Sain*, 512 F.3d at 895. The decision must be such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (*citing Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). "The decision as to which medication to prescribe, given that both were appropriate for treatment. . . , requires an exercise of medical judgment which the Court will not second guess." *Toliver v. Ahmed*, 2008 U.S. Dist. LEXIS 21078, Case No. 04-cv-309-JPG, at *7 (S.D. Ill. March 18, 2008). "An inmate suffering with a chronic condition can no more be guaranteed a pain free life than anyone else can." *Id.* The mere fact that an inmate continues to suffer from the effects of the condition does not mean that doctors acted with deliberate indifference to it. *See id.*

Plaintiff also asserts a *Monell* claim against Wexford. (Doc. 205, ¶¶ 53-55). In order to establish a *Monell* claim, Plaintiff must put forth evidence showing (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled it constitutes a custom or practice; or (3) the constitutional injury was caused by

a person with final policymaking authority. *Waters v. City of Chicago,* 580 F.3d 575, 581 (7th

Cir. 2009) (quoting *Estate of Sims ex rel. Sims vs v. County of Bureau,* 506 F.3d 509, 515 (7th

Cir. 2007).

As articulated by the Seventh Circuit, where a private corporation has contracted to

provide essential government services, such as health care for prisoners, the private corporation

cannot be held liable under Section 1983 unless the constitutional violation was caused by an

unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Department of*

*Corrections*, 746 F.3d 782, 789; *see also Monell v. Department of Social Services of City of New*

*York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Accordingly, in order for Plaintiff

to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy,

custom, or practice of deliberate indifference to medical needs, or a series of bad acts that

together raise the inference of such a policy. *Id.* at 796. "Also, a plaintiff pursuing a policy or

practice claim must show that policymakers were aware of the risk created by the custom or

practice and must have failed to take appropriate steps to protect the plaintiff." *Holtz v. Coe*, No.

14-CV-367-NJR-DGW, 2016 U.S. Dist. LEXIS 131387, at \*25-26 (S.D. Ill. Sep. 26, 2016)

(citing *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

## ARGUMENT

**A. Plaintiff's mild degenerative disk changes are a "common ailment" not a serious medical need and therefore, Defendants were not deliberately indifferent.**

In order to show deliberate indifference, Plaintiff must have a serious medical need and

Defendant's choices not to refer him to a specialist, for an MRI, or for surgery, must be

"blatantly inappropriate." Here, Plaintiff's condition, mild degenerative disk changes, is not

serious and no reasonable jury could conclude that Dr. Nwaobasi's and Dr. Trost's decision not

to refer him to a specialist, for an MRI, or for surgery is "blatantly inappropriate." *Pyles v.*

*Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). On the contrary, Plaintiff suffers from a common ailment, and therefore the Court should find no deliberate indifference.

In *Pyles v. Fahim,* the Seventh Circuit found no deliberate indifference in defendants' refusal to refer an inmate who complained about constant excruciating back pain to a specialist. *Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014). In *Pyles*, the plaintiff injured his back because he slipped on wet stairs at Menard Correctional Center. *Id.* at 404. During the course of plaintiff's treatment, x-rays were taken which revealed no fractures but mild arthritic changes to his back. *Id.* at 404. The plaintiff's treating physician did not refer the plaintiff to a specialist and did not order an MRI. *Id.* at 411. Moreover, other treating physicians also did not order MRIs for the plaintiff. *See id.* at 406. The Court found that both treatment decisions were not deliberate indifference, but were a valid exercise of medical judgment. *See id.* at 411. The Court stated that an "MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a 'classic example of a matter for medical judgment,'" and was implicitly endorsed by other treating physicians. *Id.* Moreover, the Court found that the treating doctor's decision not to refer the plaintiff to an outside specialist supports a claim of deliberate indifference only if that choice is "blatantly inappropriate." *Id.* Because the plaintiff suffered from back pain, a common ailment, a jury could not conclude that the treating doctor's choice not to refer the plaintiff to a specialist or for an MRI was "blatantly inappropriate," and the Court found in favor of the treating doctor.

The instant case is materially indistinguishable from *Pyles.* Here, both Dr. Trost and Dr. Nwaobasi exercised their medical decision not to refer Plaintiff to a specialist, for an MRI or for surgery. Their reasoning is well documented in the attached medical records, and their deposition testimony. Plaintiff's multiple x-rays show only mild disk degeneration, and Plaintiff has not

shown any neurological deficit on multiple physical exams. Plaintiff has been diagnosed with mild degenerative disk disease, and surgery for this condition is not warranted.

Moreover, Dr. Petkovich, an Orthopedic Surgeon—which would be the type of a doctor that Plaintiff would be referred to—opined to a degree of medical certainty that Plaintiff's treatment by both doctors was appropriate. According to Dr. Petkovich, Plaintiff's condition, which is very common among most people over the age of 40, should be treated with mild analgesics such as Ibuprofen. Plaintiff who is complaining of a chronic, yet common, condition, cannot complain that he does not have a pain free life, and certainly cannot claim that Dr. Trost and Dr. Nwaobasi were deliberately indifferent to his medical condition because they could not fully alleviate his pain. *See Toliver v. Ahmed*, 2008 U.S. Dist. LEXIS 21078, Case No. 04-cv-309-JPG, at *7 (S.D. Ill. March 18, 2008). ("An inmate suffering with a chronic condition can no more be guaranteed a pain free life than anyone else can." "The mere fact that an inmate continues to suffer from the effects of the condition does not mean that doctors acted with deliberate indifference to it.").

### B. Plaintiff cannot show that Dr. Nwaobasi was deliberately indifferent to his medical needs.

This Court should grant summary judgment in Dr. Nwaobasi's favor. Plaintiff has not offered any fact evidence, opinion evidence, or witness testimony, whatsoever, demonstrating that Dr. Nwaobasi was deliberately indifferent. Dr. Nwaobasi saw Plaintiff or interacted with his medical records on three occasions: November 3, 2012, November 7, 2012 and December 1, 2012.

On November 3, 2012, Dr. Nwaobasi saw Plaintiff for complaints of neck pain. He performed a physical examination of Plaintiff's neck and prescribed Motrin 400mg to be taken as needed for three weeks and ordered an x-ray of Plaintiff's thoracal, lumbar and sacral spine.

Plaintiff does not fault Dr. Nwaobasi for any treatment decisions made on that date. (UMF, ¶ 6). Moreover, Dr. Petkovich, Defendants' medical expert, reviewed Plaintiff's medical records and opined that Plaintiff's condition should be treated with mild analgesics, such as Ibuprofen. (UMF, ¶ 54). Plaintiff has no expert to challenge the medical reliability of this opinion.

On November 7, 2012, Dr. Nwaobasi cancelled Plaintiff's x-ray of thoracic and lumbar spine, because he believed that recent x-rays existed and showed no evidence of scoliosis. In deposition, Dr. Nwaobasi could not explain what x-ray he reviewed to make that determination. Assuming *arguendo* Dr. Nwaobasi was incorrect, and the x-ray ordered on November 3, 2012 should not have been cancelled, the mistake had no bearing on Plaintiff's treatment or diagnosis. The purpose of the x-ray was to substantiate Plaintiff's complaints of scoliosis, and the references to scoliosis that were made in Plaintiff's medical records. Because x-rays taken on December 5, 2012 (of the cervical spine), and December 4, 2013 (of the lumbar and sacral spine), show no scoliosis (as determined by both Dr. Nwaobasi, Dr. Petkovich and Dr. Matticks), cancellation of the November 3, 2012 x-rays that would have led to the same conclusion, slightly earlier, resulted in no delay in Plaintiff's treatment, or had any impact on the decisions pertaining to Plaintiff's treatment. (UMF, ¶ 7).

On December 1, 2012, Dr. Nwaobasi saw Plaintiff again as a follow up of the November 3, 2012 visit. (UMF, ¶ 8). Dr. Nwaobasi noted that Plaintiff was complaining of a history of cervical pain and that there were no recent x-rays of the cervical spine and that they were needed to assess the degree of scoliosis, if any. Dr. Nwaobasi suspected that Plaintiff might have possible degenerative osteoarthritis and/or scoliosis of the spine, and therefore ordered x-rays of the cervical spine. The x-ray was meant to either confirm or rule out the potential diagnoses of degenerative osteoarthritis or scoliosis. Additionally, Dr. Nwaobasi prescribed Motrin 600 mg to

be taken with meals three times per day for two months. This was an increase in the dosage of Plaintiff's pain medication. Finally, Dr. Nwaobasi ordered a follow up in two months. Dr. Nwaobasi did not see Plaintiff again for complaints of neck and back pain. (UMF, ¶ 11). While it is unclear why Plaintiff was not scheduled for a two month follow up with a doctor, Dr. Nwaobasi cannot be held responsible for scheduling discrepancies, because scheduling is the responsibility of scheduling nurses. (UMF, ¶11); *see also* _Jones v. Cullinan_, No. 09 C 03916, 2013 U.S. Dist. LEXIS 46465, at *25-26 (N.D. Ill. Mar. 31, 2013) (a doctor is not held responsible for scheduling delays if he was not personally involved in scheduling).

Plaintiff will likely argue that Dr. Nwaobasi applied the standard of "absolute necessity" to his treatment decisions of Plaintiff's condition—specifically the decision not to refer Plaintiff to an outside specialist because it was not absolutely necessary—and the application of that standard is deliberate indifference. (*See* Doc. 205, ¶ 53). Plaintiff will likely support the argument with conjecture that while referring Plaintiff to an outside specialist was not "absolutely necessary," it was, in fact, "medically necessary." Had Dr. Nwaobasi used the correct standard, Plaintiff would have been referred to a specialist, and the lack of a referral to a specialist because it was not "absolutely necessary," is evidence of Dr. Nwaobasi's deliberate indifference to Plaintiff's needs.[5] However, this argument elevates nomenclature above substance, and ignores the basis of Dr. Nwaobasi's actual treatment decisions pertaining to Plaintiff's condition. In deposition, Dr. Nwaobasi explained that his understanding of Wexford's policy is that if treatment to a patient can be provided without an outside referral, the patient should be treated inside the confines of the prison. However, if a patient's condition cannot be treated inside the prison, then the patient should be sent out. (UMF, ¶47). Therefore, regardless

---

[5] And Wexford's deliberate indifference for maintaining an unconstitutional policy which mandates treatment only in cases of "absolute necessity."

of what Dr. Nwaobas chose to call the standard of treatment, his treatment decisions were always based on his medical judgment. Specifically, whether he could treat the patient. Moreover, as explained *infra*, Dr. Nwaobasi's treatment decisions were nearly identical to those of Dr. Trost, and their propriety was confirmed by Dr. Petkovich. Plaintiff has not provided any medical opinion to the contrary, and therefore cannot claim that Dr. Nwaobasi was deliberately indifferent.

**C. Plaintiff cannot show that Dr. Trost was deliberately indifferent to his medical needs.**

This Court should grant summary judgment in Dr. Trost's favor. Plaintiff has not offered any fact evidence, opinion evidence, or witness testimony, whatsoever, demonstrating that Dr. Trost was deliberately indifferent. Dr. Trost saw Plaintiff on three occasions: December 24, 2013, March 27, 2014 and October 6, 2014.

Dr. Trost saw Plaintiff for complaints of cervical pain on December 24, 2013. (UMF, ¶ 19). Dr. Trost reviewed the December 5, 2012, radiological report prior to making his assessment of Plaintiff's condition. Plaintiff appeared to be alert, in no acute distress, had an intact range of motion in his neck. Dr. Trost determined that Plaintiff had "some mild narrowing at the C4-5" vertebrae and assessed Plaintiff as having degenerative disk disease at C4-C5. Dr. Trost prescribed cervical exercises and Meloxicam to be taken as needed. During the examination, Dr. Trost asked Plaintiff to perform range of motion exercises which involved Plaintiff rotating or extending his cervical spine. If Plaintiff, while performing range of motion tests, exhibited any signs of pain, Dr. Trost would have noted that finding in Plaintiff's medical record. Moreover, if the range of motion exercises elicited any pain, Plaintiff would have avoided performing those exercises and his range of motion would have been limited. Dr. Trost did not observe any

26

limitation in Plaintiff's range of motion. The prescription of Meloxicam was meant to continue the therapeutic treatment that Plaintiff was already receiving. (UMF, ¶ 20)

Dr. Trost saw Plaintiff again on March 27, 2014. Plaintiff told Dr. Trost that he had relief with Mobic. Additionally, Plaintiff had a normal range of motion and assessed Plaintiff as having degenerative disk disease and continued Plaintiff's Mobic prescription for another 6 months. (UMF, ¶ 21).

Dr. Trost saw Plaintiff again on October 6, 2014, for complaints of numbness and tingling in the right leg for three days in duration. This complaint was not connected to Plaintiff's previous complaints of cervical pain. Dr. Trost checked Plaintiff's vital signs and performed a neurovascular exam. Plaintiff's vital signs were normal and he did not have any deficits or abnormal findings in his neurological examination or his vascular examination. In the neurological examination, Dr. Trost performed a test for muscle strength and muscle reflexes. If Plaintiff exhibited symptoms that were due to nerve impingement, the symptoms would have followed a particular pattern, called dermatomal distribution. Impingement of the nerve at the L5-S1 level would cause a specific location and type of pain. The pain would follow a typical distribution that would not vary. Observing Plaintiff's explanation of pain and tingling, Dr. Trost could determine whether a Plaintiff's subjective complaints of numbness and tingling were actually present based on how Plaintiff described his or her pain. Based on Plaintiff's explanation of his tingling and numbness, Dr. Trost determined that a follow up appointment in one week was required on October 6, 2014. (UMF, ¶ 22-24).

Plaintiff will likely argue, that Dr. Trost was also deliberately indifferent to Plaintiff's medical needs because (1) Dr. Trost stopped or was responsible for stopping Plaintiff's medications; (2) Dr. Trost failed to renew Plaintiff's medications; (3) Dr. Trost is incompetent;

(4) Dr. Trost failed to respond to notes Plaintiff forwarded to the healthcare unit; (5) Dr. Trost failed to refer Plaintiff to a specialist; (6) Dr. Trost failed to prescribe Tramadol to Plaintiff. (UMF, ¶ 43). However, none of these claims are evidence of deliberate indifference.

Pertaining to Plaintiff's complaints regarding his medication, Plaintiff admitted that Dr. Trost prescribed medications to Plaintiff each time he saw him. (UMF, ¶ 45). Plaintiff's follow up complaint is that Dr. Trost did not prescribe a specific medication, Tramadol. However, Plaintiff's disagreement with what medication should be prescribed is not cognizable as a claim of deliberate indifference. *See Toliver v. Ahmed*, 2008 U.S. Dist. LEXIS 21078, Case No. 04-cv-309-JPG, at *7 (S.D. Ill. March 18, 2008).

Finally, Plaintiff's claim that Dr. Trost should have referred Plaintiff to a specialist fails because Plaintiff did not require a referral. This claim is simply a disagreement with treatment decision which is not deliberate indifference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Dr. Trost did not refer Plaintiff to a specialist for an MRI or for surgery, because he felt that those referrals were not warranted based on Plaintiff's actual physical examination findings, radiological evidence, and Plaintiff's diagnosis of degenerative disk disease. (UMF, ¶¶ 32-33). The propriety of Dr. Trost's treatment decisions was confirmed by Dr. Petkovich. Plaintiff has not provided any medical opinion to the contrary, and therefore cannot claim that Dr. Trost was deliberately indifferent.

### D. Plaintiff cannot show that there are missing medical records that show that Defendants were deliberately indifferent to his medical needs.

Plaintiff has indicated in his deposition and discovery responses, that some medical records are missing from those that have been produced. Plaintiff may argue that those allegedly "missing" medical records show that Defendants were deliberately indifferent to Plaintiff's medical condition. However, the argument is unreasonable. Plaintiff has not been able to show

28

anything more than vague self-serving claims that additional medical records that have not been produced in this litigation demonstrate that Dr. Trost and Dr. Nwaobasi were deliberately indifferent to his medical needs.  On March 7, 2017, Dr. Trost sent Plaintiff a Request for Production again attaching 1,843 pages worth of medical records and requesting Plaintiff to produce any additional medical records not included in the 1,843 pages. Plaintiff has not produced a single additional document.

The medical records contain three entries made by Dr. Nwaobasi pertaining to Plaintiff's complaints of neck and back pain. Those entries were made on November 3, 2012, November 7, 2012 and December 1, 2012. Likewise, the medical records contain three entries made by Dr. Trost pertaining to Plaintiff's complaints of neck pain and back pain. Those entries were made on December 24, 2013, March 27, 2014 and October 6, 2014. Plaintiff's counsel deposed Dr. Nwaobasi and Dr. Trost and did not ask any questions about any other treatment dates, nor showed Dr. Nwaobasi or Dr. Trost any other medical records that were authored by either doctor. Simply put, Plaintiff has not inquired about any other dates when Plaintiff was treated by Dr. Nwaobasi or Dr. Trost. Plaintiff admits that he has no memory of any medical visits with either doctor that were not covered by the six, above referenced, medical entries. Plaintiff does not remember how many times he has seen Dr. Nwaobasi or Dr. Trost or when those medical visits occurred.

Moreover, Plaintiff does not remember if he was seen by any medical provider for complaints of neck pain and back pain in 2015 and believes he has not seen a medical provider for back pain in 2016. It is grossly unfair and prejudicial to allow Plaintiff to create a factual dispute by arguing that there are medical records that show additional medical visits which are indicative of Defendants' deliberate indifference to his medical needs—especially, when

Plaintiff's has not been able to show even a scintilla of evidence, besides bare allegations, that additional medical records exist.

The 1,847 pages (which include four x-ray reports) and x-ray film which was reviewed by Defendants' medical expert show a complete account of Plaintiff's medical condition and treatment. To the extent that Plaintiff may argue that there is a factual dispute arising out of missing medical records that have only been vaguely alluded to in Plaintiff's deposition, the Court should not consider those vague references and rule based on the substantial developed record in the case.

### E.  Plaintiff failed to state a *Monell* claim against Wexford.

Plaintiff claims that Wexford had an unconstitutional policy that caused Plaintiff's constitutional deprivation. Plaintiff claims that this policy is evident in a number of ways. First, Plaintiff claims that Wexford has a policy of providing medical treatment only when it is "absolutely necessary." (Doc. 205, ¶ 53). Second, Plaintiff claims that this policy exists so that Wexford could save money. (Doc. 205, ¶ 53) Finally, Plaintiff claims that Wexford sanctions inadequate medical care for inmates. (Doc. 205, ¶ 55). However, Plaintiff has not been able to show or articulate any facts that form a basis for these conclusory allegations.

 Dr. Roderick Matticks, is Wexford's Lead Regional Medical Director of Illinois. He is responsible for training and supervision of clinical faculty at approximately half of prisons in Illinois. Part of his duties is to train medical directors on the provision of medical care and Wexford's policies and procedures.  Dr. Matticks never told healthcare practitioners to treat based on "absolute necessity." That standard is inconsistent with the training provided to "medical directors and others with respect to Wexford's policies for administration of health services to inmates." Wexford's policy regarding referrals to outside specialists is that a referral should be made if it is medically necessary. (UMF, ¶ 50).

In order to prevail against Wexford, Plaintiff must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *See Shields*, 746 F.3d at 796. Additionally, Plaintiff must show that the policymakers were aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him. *See Holtz*, No. 14-CV-367-NJR-DGW, 2016 U.S. Dist. LEXIS 131387, at *25-26 (S.D. Ill. Sep. 26, 2016). Here, Plaintiff was appropriately treated for degenerative disk disease. The propriety of Plaintiff's treatment is supported by the opinion of Dr. Petkovich, who provides the same treatment to his patients that was provided to Plaintiff. (*See* Ex. 5, Petkovich Dep. 55:4-18). Dr. Trost's and Dr. Nwaobasi's refusal to refer Plaintiff to a specialist or for an MRI is not evidence of some unconstitutional policy, but rather an exercise of their medical judgment.

Plaintiff will also likely argue that Wexford's policy of providing treatment only when it is "absolutely necessary" caused his injury because pursuant to this policy he was denied treatment. Contrary to this argument, Dr. Matticks testified that "absolute necessity" is not a standard that is utilized by Wexford's medical staff and that he instructs Wexford's medical staff to provide care that is medically necessary. (UMF, ¶ 56). But assuming, *arguendo*, that Wexford had a policy of providing medical treatment that was absolutely necessary, that policy was never applied to Plaintiff. Plaintiff was not referred to a specialist, because that referral was not "medically" necessary. "Absolute" necessity was not a factor which impacted Dr. Nwaobasi's or Dr. Trost's treatment decisions. As explained *supra*, multiple physicians, besides the two Defendant doctors, reached this conclusion. Plaintiff has not provided any contradictory medical evidence. In fact, no medical evidence has been proffered that Plaintiff's treatment was inappropriate. Plaintiff's claims that he is still in pain, are not enough to show deliberate

indifference. *Toliver v. Ahmed*, 2008 U.S. Dist. LEXIS 21078, Case No. 04-cv-309-JPG, at *7 (S.D. Ill. March 18, 2008) ("The mere fact that [an inmate] continues to suffer from the effects of the condition does not mean that [doctors] acted with deliberate indifference to it."). Therefore, the Court should find that Wexford did not have an unconstitutional policy and that Wexford's policies were not deliberately indifferent to Plaintiff's medical needs.

## CONCLUSION

Therefore, for all the aforementioned reasons, the Court should find that Defendants Dr. Trost, Dr. Nwaobasi and Wexford were not deliberately indifferent to Plaintiff's medical needs and should grant summary judgment in their favor.

WHEREFORE, for the above reasons, SAMUEL NWAOBASI, M.D., JOHN TROST, M.D., and WEXFORD HEALTH SOURCES, INC., respectfully request this Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By:   /s/ Edward A. Khatskin
       One of the Attorneys for Defendant, SAMUEL
       NWAOBASI, M.D., JOHN TROST, M.D., and
       WEXFORD HEALTH SOURCES, INC.

Edward A. Khatskin
ARDC No. 6319840
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
ekhatskin@cassiday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2017, I electronically filed the foregoing Motion for Summary Judgment for Deliberate Indifference to a Serious Medical Need with the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of E-Filing" to the following:

ATTORNEYS FOR DEFENDANTS, ANGELA CRAIN, CHAD FRIERDICH, and RICHARD HARRINGTON:
Max Boose
Illinois Attorney General
500 South Second Street
Springfield IL 62706
(217) 785-4555
(217) 524-5091 (Fax)
mboose@atg.state.il.us


ATTORNEYS FOR PLAINTIFF
Ronald A. Norwood, Esq.
Benjamin A. Lipman, Esq.
Lewis Rice LLC
600 Washing Avenue
Suite 2500
St. Louis MO 63101
(314) 444-7600
rnorwood@lewisrice.com
blipman@lewisrice.com


/s/ Edward A. Khatskin


8523787 EKHATSKI;EKHATSKI