Page 1

1             IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF ILLINOIS

3

4   RONALD E. BURT, #N-60788,

5                 Plaintiff,

6

7   vs.                    Case No. 13-cv-00794-NJR-DGW

8

9   J. BERNER, et al.,

10                Defendants.

11

12              ~~~~~~~~~~~~~~~~~~

13

14                 Deposition of

15            FRANK O. PETKOVICH, M.D.

16

17                 May 11, 2017

18                 9:31 A.M.

19

20                 Taken at:

21       Petkovich Orthopedic and Spine Care, LLC

22          2821 North Ballas Road, Suite C70

23              St. Louis, Missouri

24

25              J. Bryan Jordan, CCR-MO

**EXHIBIT**
**5**

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
      Lewis Rice LLC, by
3        RONALD J. NORWOOD, ESQ.
         BENJAMIN A. LIPMAN, ESQ.
4        600 Washington Ave., Suite 2500
         St. Louis, MO  63101-1311
5        (314) 444-7600 Phone
         (314) 444-7759 Direct
6        (314) 612-7759 Direct Fax
         norwood@lewisrice.com
7        blipman@lewisrice.com
8  On behalf of the Defendants Sam Nwaobasi, M.D.,
      Michael Moldenhauer, John Trost, Lakesha Hamby and
9  Wexford Health Sources, Inc.:
      Cassiday Schade LLP, by
10       TIMOTHY P. DUGAN, ESQ.
         EDWARD A. KHATSKIN, ESQ.
11       100 North Broadway, Suite 1580
         St. Louis, MO  63102
12       (314) 241-1377 Phone
         (314) 241-1320 Fax
13       tdugan@cassiday.com
         ekhatskin@cassiday.com
14
      On behalf of Defendants Richard Harrington,
15  Angela Crain, Chad Frierdich, Kimberly Butler:
      Illinois Attorney General's Office, by
16       MAX BOOSE, ESQ.
         Assistant Attorney General
17       500 South Second Street
         Springfield, IL  62706
18       (217) 782-1090
         mboose@atg.state.il.us
19
20
21
22
23
24
25

Page 3

1            TRANSCRIPT INDEX
2
3  APPEARANCES ...............................    2
4
5  INDEX OF EXHIBITS ..........................     4
6
7  EXAMINATION OF FRANK O. PETKOVICH, M.D.:
8  BY MR. NORWOOD .............................    6
9  BY MR. DUGAN ...............................  133
10 BY MR. BOOSE ...............................  139
11 BY MR. NORWOOD .............................  141
12 BY MR. BOOSE ...............................  152
13
14 REPORTER'S CERTIFICATE .....................  155
15
16 EXHIBIT CUSTODY
17 EXHIBITS RETAINED BY COURT REPORTER
18
19
20
21
22
23
24
25

Page 4

1            INDEX OF EXHIBITS
2  NUMBER          DESCRIPTION         MARKED
3  Petkovich 1 -- Deft's Rule 26(a)(2) Expert
         Disclosures re: Dr. Petkovich .....   6
4
      Petkovich 2 -- Three pages from Dr.
5        Petkovich's website ...............  66
6  Petkovich 3 -- American Academy of
         Orthopedic Surgery booklet titled
7        "Spine Basics" ....................  86
8  Petkovich 4 -- American Academy of
         Orthopedic Surgery booklet titled
9        "X-rays, CT Scans and MRIs" ........  89
10 Petkovich 5 -- American Academy of
         Orthopedic Surgery booklet titled
11       "Neck Pain" .......................  97
12 Petkovich 6 -- American Academy of
         Orthopedic Surgery booklet titled
13       "Cervical Radiculopathy (Pinched
         Nerve) ............................  109
14
      Petkovich 7 -- American Academy of
15       Orthopedic Surgery booklet titled
         "Herniated Disk" ..................  111
16
      Petkovich 8 -- American Academy of
17       Orthopedic Surgery booklet titled
         "Cervical Spondylosis (Arthritis of
18       the Neck)" ........................  113
19 Petkovich 9 -- American Academy of
         Orthopedic Surgery booklet titled
20       "Lumbar Spinal Stenosis" ..........  116
21 Petkovich 10 -- Spinal Cord Tumor
         Association, Inc., article titled
22       "Tony M.'s Story" .................  127
23 Petkovich 11 -- Report on 10/24/1996 exam of
         Plaintiff by Dr. Silberstein, Bates
24       No. MEN 00643 .....................  27
25

Page 5

1        INDEX OF EXHIBITS (CONTINUED)
2  NUMBER          DESCRIPTION         MARKED
3  Plaintiff's 3 -- Article titled
         "Degenerative Disc Disease Treatment
4        Guidelines" (Marked in previous
         deposition) .......................  122
5
      Plaintiff's 4 -- Article entitled "Cervical
6        Disc Pathology and Artificial Disc
         Surgery" (Marked in previous depo)..  126
7
      Plaintiff's 11 -- Article entitled "Cervical
8        Degenerative Disc Disease" (Marked
         in previous depo) .................  122
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1        FRANK O. PETKOVICH, M.D.,
2 of lawful age, having been first duly sworn to testify
3 the truth, the whole truth, and nothing but the truth
4 in the case aforesaid, deposes and says in reply to
5 oral interrogatories propounded as follows, to-wit:
6            EXAMINATION
7 QUESTIONS BY MR. NORWOOD:
8    Q.   Good morning, sir.  Would you state your
9 name and, I guess, your office address for the record,
10 please?
11    A.   First name is Frank, last name is Petkovich,
12 P-e-t-k-o-v-i-c-h.  I'm a physician, M.D., orthopedic
13 surgeon.  My office address is 2821 North Ballas Road,
14 Suite C-70, St. Louis County, Missouri, 63131.
15    Q.   Thank you, Doctor.  I've handed you a
16 document, Petkovich Deposition Exhibit 1.  Could you
17 identify that item for us?
18    A.   This is a copy of my curriculum vitae as of
19 January 2017.  It has a copy of a report authored by
20 me dated March 3, 2017, after I reviewed medical
21 records and radiographic studies concerning a
22 Mr. Ronald E.--
23    Q.   Burt?
24    A.   --Burt, and there also is a list of
25 depositions of times I have been deposed over the last

Page 7

1 several years.  I'm not sure how far back that goes,
2 and I think that's--that's what is contained here.
3    Q.   Okay, and let me start, I guess, by talking
4 about the cases you've tested.  You've testified in
5 a number of cases over the years; is that correct?
6    A.   Yes.
7    Q.   And it looks like the lion's share of those
8 cases were workers' compensation cases?
9    A.   Yes.
10    Q.   And in those workers' compensation cases,
11 did you testify on behalf of the employer or the
12 employee?
13    A.   I testify to whoever requests me, deposes
14 me.  I don't differentiate whether I'm requested by an
15 employer or employee.  I don't differentiate.
16    Q.   Right, I understand, but is the bulk of them
17 employer-related testimony, do you know, or--
18    A.   Pretty much--
19    Q.   --pretty much even down the middle?
20    A.   I don't keep track of it, sir.
21    Q.   Got you.  No problem at all, and then what
22 about outside of workers' compensation cases?  I saw a
23 couple of personal injury cases.  Is that a small
24 portion of what you do with respect providing expert
25 testimony?

Page 8

1    A.   Well, I really don't keep track of any of
2 that.  The majority--my practice, I've been in
3 practice 37 years, and my practice has been as an
4 orthopedic surgeon, spine surgeon, and I've taken care
5 of a lot of, lot of people, taken care of a lot of
6 work injuries, so I've been deposed many times in
7 work-related conditions but also been deposed for
8 other issues, and I just--I don't keep track of it.
9 We don't differentiate.  We're--right, now I'm, in my
10 office here.  We have a--we're a single-practice
11 office, and we don't--there's a single-taxpayer ID
12 number.  Everything goes into that.  We don't
13 differentiate where it comes from.
14    Q.   Okay, and how much time do you spend,
15 roughly, providing testimony, as opposed to your
16 regular practice?
17    A.   As part of the my practice, probably 15 to
18 20 percent of my practice involves performing
19 independent medical evaluations and/or record reviews.
20    Q.   Okay.  All right.  Now, let's--let me direct
21 your attention to the first page of Petkovich
22 Deposition Exhibit 1, and on that, you state that as
23 of, I assume, the day you put together the report, you
24 had completed approximately 8.5 hours at a rate of
25 $350 per hour?  Is that correct?

Page 9

1    A.   Yes.  Now, where are you reading from, sir?
2    Q.   From the first page of Exhibit 1; first
3 page, right there.  It's right there on the--if you
4 look down at the bottom, the third line up from the
5 bottom, item,--
6    A.   I see.
7    Q.   --Roman VI.
8    A.   Yes, I see what you are saying.
9    Q.   Okay.
10    A.   Yes, that's a list of hours, and I didn't
11 add them up, but it's a list, here, of the hours that
12 I involved, so--
13    Q.   Okay, could you--so you have a separate list
14 that you keep with your handwritten notes?  Is that
15 correct?
16    A.   Well, I just have--I have my office--I have
17 my office charges, and I have the notes when I, when
18 I reviewed the records, I have the summary of the
19 hours involved.
20    Q.   All right, so as we sit here today, how
21 much--how many hours have you expended as it relates
22 to your work associated with this particular case?
23    A.   Let me add it up in my head, here.
24    Q.   Okay.
25    A.   So--

3 (Pages 6 - 9)

Page 10

1       (Pause)
2       I think 8.--eight and a quarter.
3   Q.   Eight and a quarter; okay.
4   A.   Is that what you have?
5   Q.   8.5, give or take.  We round it off, so of
6   that eight and a quarter, could you provide us with a
7   breakdown in terms of what that eight hours
8   represents?
9   A.   The records that I reviewed, I reviewed
10   medical records concerning Mr.--Mr. Burt, Ronald Burt.
11   I initially reviewed records for three and a half
12   hours on February 4,--
13   Q.   Okay.
14   A.   --2017.
15       I then had a conversation with attorney
16   Mr. Edward Khatskin on February 7 for 1.34 hours.
17   Q.   Okay.
18   A.   I then did further record review on March 2,
19   2017, for three hours.
20   Q.   Okay.
21   A.   I then authored a narrative report on March
22   3, 2017.
23   Q.   Okay, and let's talk about your meeting with
24   Mr. Khatskin.  What did you and he discuss during that
25   1.3 or so hours that you met?

Page 11

1   A.   We discussed the medical records that I had
2   reviewed which I had previously reviewed regarding
3   Mr. Ronald Burt.
4   Q.   Okay, and what did he tell you with respect
5   to those medical records, as best you can recall?
6   A.   I'm not sure what he told me versus what I
7   gained from reviewing the records, but we--
8   Q.   As best you can recall.
9   A.   It was going, going through the records--
10   well, after my going through records and discussion
11   with him, that Mr. Burt is a, is a prisoner in the
12   State of Illinois, in the prison system there, and
13   that Mr. Burt had--is 50 years old; that Mr. Burt had
14   been seen at the medical facility, there, a number of
15   times with complaints of pain in his neck and pain in
16   his lower back.
17       He had seen a number of different healthcare
18   providers at that facility and apparently, apparently,
19   he was unhappy with some of his treatment and had a
20   grievance for that reason.
21   Q.   Anything else you can recall about
22   that discussion between you and Counsel?
23   A.   Well, I think, I think what I've just said,
24   that's kind of a synopsis, as I recall.
25   Q.   Okay, anything else that you can recall?

Page 12

1   A.   No, sir, not--not that I can recall offhand.
2   Q.   Okay.  Now, we got your CV and your resumé.
3   Are you considered a specialist?
4   A.   I'm a--I'm an orthopedic surgeon.
5   Orthopedic surgery is a specialty in medicine, as you
6   know, that deals with the musculoskeletal system, so
7   orthopedics is a specialty of medicine that deals with
8   the musculoskeletal system, i.e., the muscles, bones,
9   and joints of the upper and lower extremities and the
10   spine.
11   Q.   Okay.
12   A.   So my educational background, I graduated
13   from St. Louis University Medical School 1973, grew
14   up--before that, I grew up in the City of St. Louis,
15   graduated from the St. Louis Public School System.
16       I then graduated from the University of
17   Missouri-St. Louis 1969, graduated from St. Louis
18   University Medical School in 1973.
19       I then completed an internship and general
20   surgery residency at the University of
21   Illinois-Chicago in '74.
22       I then completed an orthopedic surgery
23   residency at the University of Missouri-Kansas City in
24   1980.
25       I then completed a spine fellowship at

Page 13

1   Tulane University in New Orleans, and then I've been
2   in practice as an orthopedic surgeon and spine surgeon
3   in St. Louis since 1980, July 1980, so my specialty is
4   an orthopedic surgeon.  I have a subspecialty of
5   spinal surgery.
6   Q.   Okay, and what would cause a patient to be
7   referred to you, as opposed to going to, say, a
8   general practitioner?
9   A.   Well, typically, somebody would be referred
10   to me if they had a--if they had a musculoskeletal or
11   spine complaint that had been refractory to treatment
12   by a primary care physician, i.e., general
13   practitioner, family practice physician.
14   Q.   When you say "refractory to treatment," for
15   us lay people, what do you mean by that?
16   A.   Refractory means if someone, if someone
17   had--if someone had persistent problems with, with
18   radiographic and physical examination findings to
19   substantiate their problems and subjective complaints,
20   so if someone had persistent problems, despite
21   conservative management by a primary care physician
22   and they had radiographic evidence and physical
23   findings evidence, then, then they would be referred
24   to a specialist.
25   Q.   What kind of radiographic evidence would,

4 (Pages 10 - 13)

Page 14

1 would typically accompany a referral to you? When you
2 say "radiographic evidence," what do you mean?
3    A.  Well, that's a very, very broad question.
4    Q.  And I'm intending for it to be broad.
5    A.  Okay.  Okay.  Excuse me.  A very broad
6 question, so I don't know whether we're talking about
7 spine conditions, are we talking about extremity
8 conditions--
9    Q.  We'll, let's talk about spine,--
10    A.  Okay.
11    Q.  --since that's what why we're here today.
12    A.  So, okay, I'm sorry, so your question is,
13 again?
14    Q.  When--you referred to patients being
15 referred to you based on subjective complaints,
16 radiographic evidence with respect to certain issues,
17 and so what I'm trying to hone in on for us lay people
18 is when you say "radiographic evidence," what are you
19 referring to.
20    A.  Okay, radiographic evidence could be many,
21 many things.
22    Q.  Okay.
23    A.  Actually, you could have--radiographic
24 evidence could be--we're talking just about the
25 spine--we're talking about the spine specifically?

Page 15

1    Q.  Yes, sir.
2    A.  It could be you could have a fracture, you
3 have a fracture, you could have a dislocation,
4 subluxation of the spine.  Those are both conditions
5 where things are out of alignment.  You could have
6 that.  You've got an instability pattern.  You could
7 have erosion, bony erosion.  You could have lytic
8 lesions.  You could have discogenic-type findings--
9    Q.  And those, when you say "radiographic," just
10 that term, and just to kind of short-circuit it, that
11 could be, I assume, x-rays, MRI's,--
12    A.  Yes.
13    Q.  --CT scans?  Is that right?
14    A.  Yeah, "radiographic" encompasses all of
15 those things,--
16    Q.  Okay.
17    A.  --yes.
18    Q.  All right, and so based on that, a doctor, a
19 non-specialist, for lack of a better term, might refer
20 somebody to you who specializes in spine-related
21 conditions; is that correct?
22    A.  Yes, if, if someone had persistent--if
23 someone was having persistent symptoms and physical
24 findings, et cetera, et cetera, in conjunction with
25 all of that.

Page 16

1    Q.  Okay, and when you say "persistent
2 findings," are you familiar, I mean familiar with the
3 term, "chronic condition"?
4    A.  Yes, I'm familiar with the word, "chronic."
5    Q.  What does chronic mean?
6    A.  Chronic means something that keeps going,
7 that goes on and on, so that's what the word roughly
8 means, chronic as opposed to acute.  Chronic means
9 something that goes on and on.
10    Q.  On and on for how long?  Is there a time
11 measure where you say "Well, this might be chronic"
12 versus nonchronic?  Is there a time frame, six months,
13 something along those lines, that you would look at to
14 determine chronic versus acute?
15    A.  I don't think--I don't think the word
16 "chronic," itself, is really specifically defined.
17    Q.  Okay.  All right, based on your review of
18 Mr. Ronald Burt's medical records, would you define
19 whatever he has been describing over the years as a
20 chronic condition, whatever that condition might be?
21    A.  No.
22    Q.  Okay, so you would not categorize his
23 complaints over some ten-plus years as something that
24 you would state would be a chronic situation.  Is that
25 your testimony today?

Page 17

1    A.  Yes.
2    Q.  Okay.  All right, and as it relates to pain
3 in the back and neck region, what would you describe,
4 or rather, at what point would you describe subjective
5 complaints of back pain and neck pain as a chronic
6 condition?
7    A.  Well, I would take--number one, I wouldn't
8 call--I don't necessarily equate subjective complaints
9 with a condition.
10    Q.  Okay.  All right.
11    A.  So in this case, I would say reading these
12 records, going through Mr. Burt's records, he was seen
13 on numerous occasions with persistent subjective
14 complaints.
15    Q.  Right.  Right.
16    A.  But I would not define that, I would not
17 define him as having a specific condition.
18    Q.  Okay, so if other physicians, his treating
19 physicians, for instance, described his condition as
20 chronic, you would disagree with that assessment.  Is
21 that right?
22    A.  I would not consider what Mr. Burt was seen
23 for as a chronic condition.
24    Q.  All right, and if he were prescribed various
25 prescription drugs to treat whatever subjective

5 (Pages 14 - 17)

Page 18

1 complaints he was providing over the years, you would
2 not consider the fact that he was prescribed those
3 drugs for that condition as treatment for a chronic
4 condition; is that correct?
5      MR. DUGAN:  Object to the form of the
6 question.
7      Go ahead, Doctor.
8      A.  It's my opinion in this case that Mr. Burt
9 was prescribed low-dose antiinflammatory medications
10 because of his subjective complaints of pain in his
11 neck and his back, period.  His radiographic studies
12 show that he has some mild, very mild degenerative
13 disc disease in his cervical spine, C4-5, and--some
14 degenerative cervical disc disease and some
15 degenerative lumbar disc disease at the L5-S1 level,
16 so he has those two areas of some degenerative disc
17 disease.
18      You could use the word "degenerative disc
19 conditions" if you wanted to use that word, but
20 those--that's what he has.
21      Q.  Right.
22      A.  So those are, those are, those are, those
23 are--he has those radiographically.
24      Going through his records, he has no
25 physical findings inconsistent with those radiographic

Page 19

1 findings; normal neurologic examination, no physical
2 findings, so I would--
3      Q.  So--so let me cut you off.  So you are
4 saying then, a degenerative disc condition would--
5 could not or would not qualify as a chronic condition?
6      A.  Well--
7      Q.  Is that your testimony?
8      A.  No, sir.  I'm sorry, first, I think that--
9 let me clarify my--what I'm saying.
10      So I think that in this case, Mr. Burt has
11 some mild degenerative cervical disc disease and some
12 mild degenerative lumbar disc disease.  You could use
13 that, you could say, you could also use the word
14 "condition," so you could say "mild degenerative
15 cervical disc condition,--
16      Q.  Right.
17      A.  --"mild degenerative lumbar disc condition,"
18 you are correct.  You can use--they're
19 interchangeable.
20      Now, if you want me--
21      Q.  Let me cut you off, though, because I'm just
22 trying--I'm really--because we're short on time, and I
23 just want to make sure I get my point out, and I
24 understand you have a lot to say, but I'm focusing on
25 the word "chronic."

Page 20

1      A.  Okay.
2      Q.  Okay?  And the only thing I want to know
3 from your--in your professional opinion based on
4 37-plus years of experience, whether or not
5 degenerative disc condition, whatever might exist in
6 your opinion as it relates to Dr. (sic) Ronald Burt,
7 is a chronic condition.
8      A.  Yes, you--you are correct, those are--those,
9 those are chronic, those degenerative disc conditions
10 are chronic.  They're not--they are non-acute.
11      Q.  Okay.  All right.
12      Now, as it relates to a specialist such as
13 yourself, you consider yourself an orthopedist, or
14 orthopedic surgeon, or how would you describe your
15 area of specialty with respect to a name, just so I'm
16 using the right nomenclature?
17      A.  I'm an orthopedic surgeon with a
18 subspecialty in spinal surgery.
19      Q.  All right, so for a person, specialist such
20 as yourself, under what circumstances could you become
21 involved with a patient?
22      A.  I would be--I would be referred a patient,
23 typically, that has a orthopedic--has an orthopedic
24 condition, that has persistent subjective complaints
25 with radiographic evidence and physical findings

Page 21

1 consistent with a significant problem that continues
2 despite conservative management.
3      Q.  Would you get involved in a case if there
4 were simply subjective complaints of pain and you
5 received an x-ray that indicated there was no
6 indication in the x-ray of any basis for those
7 complaints of pain?  Would you get involved in a case
8 like that?
9      MR. DUGAN:  Object to form.
10      A.  I typically would not be referred a patient
11 like that.  I have had--I have had people come into my
12 office that have self-referred.
13 BY MR. NORWOOD:
14      Q.  Okay.
15      A.  Maybe I've treated members of their family
16 before that have come in to me with subjective
17 complaints not based upon anything else where they've
18 really not seen anybody, in those situations where
19 they have not seen a primary care provider prior to
20 seeing me, yes.
21      Q.  Okay.  All right.  In your opinion, would a
22 specialist be required to assess issues related to
23 arthritis?
24      MR. DUGAN:  Object to form.
25      A.  No, a specialist does not have to diagnose

6 (Pages 18 - 21)

Page 22

1 arthritis.
2 BY MR. NORWOOD:
3    Q.   No, I didn't say diagnose arthritis.  I
4 guess what I'm trying to figure out is, are there
5 occasions in your practice where you are referred
6 individuals who have arthritic conditions?
7    A.   Yes.
8    Q.   All right, and in those circumstances, why
9 would a person with arthritic conditions be referred
10 to you?
11    A.   It would be referred to me if they had
12 persistent subjective complaints and objective
13 physical findings to substantiate those subjective
14 complaints, and radiographic and other clinical
15 studies to substantiate that.
16    Q.   To substantiate arthritis?
17    A.   To substantiate their subjective complaints
18 in conjunction with everything I've said.
19    Q.   All right, so if somebody had arthritis, and
20 they were complaining of pain in the spine and they
21 had a diagnosis of arthritis, under what
22 circumstances, then, would you get involved in a case
23 like that?
24    A.   Well, you are using the word "arthritis,"
25 which is a very, very broad term.  Define, be more

Page 23

1 specific in your question.  What type of arthritis are
2 we talking about?
3    Q.   All right.  Well, let's talk about
4 rheumatoid arthritis.  Is that something, would that
5 be something that would come your way in the spine?
6    A.   Yes.
7    Q.   All right, and under what circumstances?
8    A.   If someone has a, has a established
9 diagnosis of rheumatoid arthritis and they're having
10 issues with their spine, and they've seen their
11 primary care physician, they're having persistent
12 problems, they have physical findings under physical
13 examination and radiographic studies to--to show a
14 problem, then they would be referred to me.
15    Q.   Okay, and--and what about osteoarthritis?
16    A.   Pretty much the same thing.  They're
17 different, very different, but again, someone that had
18 persistent subjective complaints, clinical studies,
19 physical findings, radiographic evidence, et cetera,
20 despite conservative management.
21    Q.   Okay.  What about degenerative disc disease?
22 At what point would someone be referred to you with a
23 diagnosis of degenerative disc disease?
24    A.   Degenerative disc disease is a form of
25 degenerative arthritis.

Page 24

1    Q.   Okay.
2    A.   And if someone has--so if someone had--has
3 degenerative disc disease, if they have persistent
4 subjective complaints, they have objective physical
5 findings on physical examination, meaning neurologic,
6 neurologic findings, and they have radiographic
7 evidence to, to again substantiate--to substantiate
8 some significant degenerative disc disease.
9    Q.   Okay, and so--all right, what about
10 scoliosis?  Would someone be referred to you for
11 scoliosis?
12    A.   Scoliosis is a curvature of the spine.
13 Scoliosis does not typically cause pain, so there are
14 different--there are different types of scoliosis.  Do
15 you want to be more specific in your question?
16    Q.   No, I mean as relates to when you would get
17 involved with any level of scoliosis.
18    A.   Is a--okay, scoliosis, you start off in
19 children with, you know, infantile scoliosis,
20 idiopathic scoliosis, et cetera, in childhood, in
21 adolescence, and that's--that's--that's what most
22 people think of as scoliosis in that age bracket.
23 Those--those patients I don't treat anymore.  I'm
24 referring those to pediatric spine centers, to
25 universities here.

Page 25

1      Adults coming in, sometimes, people--
2 sometimes, people would have severe, advanced
3 degenerative disc changes as part of that degenerative
4 change condition, develop some, some curvature as a
5 result of those degenerative changes, so they would be
6 treated, they would be treated just like anybody else
7 with advanced degenerative disc disease, but that's--
8 they would have some curvature as a result of those
9 degenerative changes, but that's really not what
10 scoliosis is.
11    Q.   How much curvature need there be before one
12 would suggest that it is scoliosis?
13    A.   Well, you can have--you can have--there's
14 not a number you can give as far as a specific degree.
15 I mean, you can have, you can have scoliosis with a,
16 with a, a 10-degree curve, you can get scoliosis with
17 a 70-degree curve.
18    Q.   Right.
19    A.   Scoliosis is a--scoliosis is a disease where
20 you have curvature of the spine.
21    Q.   What about a five-degree curvature?  Would
22 that be considered scoliosis?
23    A.   Well, that's what I'm trying to explain to
24 you.  I don't--that's--you can have, you can have true
25 scoliosis with any degree curve.

7 (Pages 22 - 25)

Page 26

1    Q.  Any degree of curve; okay.
2    A.  But a curve is not--but just having a curve
3  is not necessarily scoliosis.
4    Q.  Okay.
5    A.  So the point is, scoliosis causes curvature,
6  but not all curvature is scoliosis.
7    Q.  Okay, so, then, that someone could look at
8  an x-ray and see some level of curvature and at least
9  suggest that that is an indication of scoliosis?
10     MR. DUGAN:  Object to form.
11   A.  I'm not sure what your question is.
12     MR. NORWOOD:  Could we read that one back?
13     THE COURT REPORTER:  (Reading back)
14     "Q:  Okay, so, then, someone could look
15  at an x-ray and see some level of curvature and at
16  least suggest that that is an indication of
17  scoliosis?"
18   A.  Yes, somebody--you can look at an x-ray and
19  put everything together, you can--you can go through
20  your mind, whoever is reading the x-rays can think
21  that, could question if there's a degree of scoliosis,
22  yes.
23  BY MR. NORWOOD:
24   Q.  I guess my question is, can--can reasonable
25  physicians disagree with respect to whether or not

Page 27

1  it's scoliosis or not scoliosis?  Is that something in
2  the realm of, you know, possible medical disagreement?
3    A.  No, I don't think so.  I don't think that--I
4  think that people, you know, people with experience
5  treating, you know, orthopedic surgeons, spine
6  surgeons, neurosurgeons that are, that are--that are
7  regularly--neuroradiologists that regularly treat
8  these conditions, I don't think there's any--I don't
9  think there's any disagreement.
10   Q.  Okay.
11   A.  I think that you can have--I think there are
12  many types of spine conditions that--many different
13  types that can cause a curvature of the spine.
14   Q.  Okay.  Well, you--you understand in this
15  case, there was a diagnosis of scoliosis; correct?
16   A.  As I recall reading the records, there was a
17  note in, I believe it was nineteen ninety--
18   Q.  Well, let's dig out the note just to
19  expedite things.  Bear with me.  I have the exhibits
20  here, and I'm going to make it really easy for you,
21  because in the interests of time, we want to make sure
22  that we are efficient, and I'm going to hand you
23  Petkovich Deposition Exhibit 11, and I should have
24  extra copies somewhere for the folks.
25     MR. DUGAN:  Is that page 643?

Page 28

1     MR. NORWOOD:  Is that page 643?  Let's see.
2     MR. LIPMAN:  I believe it is.  Would you
3  look on the bottom right?
4     MR. DUGAN:  Doctor, on the bottom right, it
5  says "643"?
6     THE WITNESS:  Yes.
7     MR. DUGAN:  I have it.  You don't need to
8  dig it out.
9     MR. NORWOOD:  Thank you.
10  BY MR. NORWOOD:
11   Q.  All right, so now, what is--is that a
12  document you reviewed as part of the mix in this case?
13   A.  Yes.  I did see this paper, yes.
14   Q.  All right, and--here's an extra copy if you
15  all need that.
16     Now, this is a report, and you referenced
17  this report in your audit--in your expert report,
18  correct?
19   A.  Yes.
20   Q.  All right, and this is a report, it appears,
21  for Ronald Burt; date of the exam, 10/24/96.  Is that
22  correct?
23   A.  Yes.
24   Q.  And it talks about an examination of the
25  C-spine, which is the cervical spine?  Is that

Page 29

1  correct?
2    A.  Yes.
3    Q.  And for us lay people, we're talking about,
4  I guess, a certain portion of the spine that is below
5  the neck; is that correct?
6    A.  Well, it is the neck, the cervical spine.
7    Q.  I'm sorry.  I'm sorry, the neck down to the
8  mid part of the back or thereabout?
9    A.  It's down--it's from the head, so the neck,
10  cervical spine from the base of the head down to the
11  top of the ribcage area, thoracic spine.
12   Q.  Okay.  All right, and the thoracic spine
13  then continues below--and that's the other lower
14  portion of the spine--
15   A.  Yes.
16   Q.  --that goes through the lower back area?
17   A.  So you have the cervical spine which we
18  mentioned, then the thoracic spine is the spine or the
19  ribs, twelve ribs, so twelve thoracic vertebrae, and
20  then you have the lower back, lumbar spine with the
21  five lumbar vertebrae.
22   Q.  Okay.  All right, and so this, though,
23  relates to the neck area?
24   A.  Yes.
25   Q.  All right, and this was done by--I mean a

8 (Pages 26 - 29)

Page 30

1 radiologist, it appears; correct?
2    A.   Yes.  I don't know who this person is.  The
3 report you are referring to is signed by a Michael
4 Silberstein, and I don't know who that is.
5    Q.   But he's--he's identified as a radiologist,
6 correct?
7    A.   Yes.  Yes.
8    Q.   And what is a radiologist?
9    A.   A radiologist--radiology is the, is the
10 specialty in medicine that deals with the reading of,
11 interpretation of radiographic studies.
12    Q.   All right, are you a radiologist?
13    A.   I am not a radiologist.
14    Q.   Okay, and I take it from your--well, let's
15 just take a look at it, all right?  According to this
16 report, it says--and I'll just read it into the
17 record--it's a section that says, "Cervical Spine,"
18 correct?
19    A.   Yes.
20    Q.   And then it says, quote, "There is a mild
21 convex torticollis centered at C3 and a lower
22 cervical/upper thoracic scoliosis convex to the right,
23 centered at C6-C7."
24       Is that a fair reading?
25    A.   Yes.

Page 31

1    Q.   It may not be a fair pronunciation, but is
2 that a fair reading of what's said?
3    A.   Yes, sir.  That, that--you've read the
4 report.
5    Q.   And you disagree with that finding; correct?
6    A.   I would disagree with the impression where
7 he uses the word "torticollis" and "scoliosis."
8    Q.   All right.  Well, let's break that down,
9 first.  Okay, first of all, what is torticollis?
10    A.   Torticollis is a muscle contraction in the
11 neck that typically occurs as a--with, with flexion,
12 extension, rotation.
13       Typically, it's seen in children.
14 Sometimes, children, a lot of times young children,
15 after a difficult delivery, will have some
16 contractures, maybe from sitting in utero, the last
17 parts of pregnan--the last parts of time of pregnancy,
18 and sometimes in small children, you'll see a
19 torticollis where the muscles are not fully developed
20 and will be a little contracted from being in the
21 womb.
22    Q.   Mm-hmm?
23    A.   And so that's, that's where you typically
24 see it, and then it's treated in children.
25    Q.   Okay.

Page 32

1    A.   Now, as far as--so that's, that's what
2 torticollis means, what I said as far as the
3 curvature, et cetera, et cetera, and that's--but
4 that's really not a radiographic finding.  That's a
5 condition, but it's really not a radiographic finding.
6    Q.   Well, but it's contained in this
7 radiographic finding, correct?
8    A.   It is contained in this report, but that's
9 not correct.
10    Q.   What's not correct?
11    A.   Torticollis, torticollis is a condition.
12 Torticollis is not--torticollis is not a radiographic
13 finding.
14    Q.   Okay.  Well, the radiologist back in '96,
15 for some reason, decided to reference that, based upon
16 a review of some x-rays, I assume; is that correct?
17    A.   Yes.  In this case, in this case, I remember
18 from the records, this gentleman, Mr. Burt, apparently
19 had an issue where he fell in the shower--
20    Q.   Right.
21    A.   --and said that he hurt his neck,--
22    Q.   Right.
23    A.   --and then he was seen at the medical
24 department there at the prison, was having some neck
25 pain.  They got x-rays and, you know, I think that he

Page 33

1 very possibly could have had--could have strained his
2 neck, could have had some muscle spasm in those areas
3 that could have caused him with some muscle spasms
4 just like we all, you know, sometimes sleep on the
5 wrong side or whatever, wake up with a little neck
6 pain, a little muscle spasm where we're pulling to one
7 side or the other,--
8    Q.   Right.
9    A.   --and that would, that would explain, even--
10 he's talking about the word "scoliosis" here.  I mean,
11 he may have--
12    Q.   Well, hold on.  Let's stay with torticollis.
13 We're not talking about scoliosis.
14    A.   My point is, sir, my point is that if this
15 man, this history, this incident in the shower, he
16 could have had some muscle spasm that could have
17 caused that--could have caused him to hold his head
18 and neck to one side or the other.
19    Q.   He could have or he could have--something
20 else could have caused it, right?  We don't know as we
21 sit here today; is that correct?
22    A.   Something else could have caused what?
23    Q.   Whatever they saw that indicated to them
24 that this was torticollis.
25    A.   It's not torticollis.

9 (Pages 30 - 33)

Page 34

1   Q.   No, no, I'm saying what they said was
2   torticollis.  I don't know what it is.  I defer to the
3   specialists.  I'm just talking about Dr. Michael
4   Silberstein saw something to suggest that it was
5   torticollis, and you are sort of surmising what may
6   have caused whatever he saw that he thought was
7   torticollis that you disagree with, but suffice it to
8   say that he saw something that indicated to him it was
9   torticollis.  Is that a fair statement?
10      A.   I think, I think--
11      Q.   Is that--just answer my--is that a fair
12  statement, he saw something?
13      A.   I can't--
14         MR. BOOSE:  Objection to speculation.
15      A.   (Continuing)  I can't speak for him--
16  BY MR. NORWOOD:
17      Q.   Okay.
18      A.   --because I don't know, I don't know who he
19  is, I don't know what his--I don't know what his
20  educational background or experience is, I don't know
21  who--
22      Q.   Right.
23      A.   --I don't know who this man is.
24      Q.   Right.  Right.  I understand that, and I'm
25  not asking you to speak for him, because in forming

Page 35

1   your opinion, you are relying on medical records,
2   right?
3       A.   I'm relying on medical records, number one.
4       Q.   Right.
5       A.   I'm relying on my review of the radiographic
6   studies, number two.
7       Q.   Right, and this is one of those radiographic
8   studies.
9       A.   And I'm also reviewing based on my
10  experience.
11      Q.   Okay.
12      A.   I've been in practice 37 years, and I am a
13  founding member of the North American Spine Society,
14  international organization.  I know a lot about spine
15  issues.
16      Q.   And I understand all of that, and I'm not
17  disputing all of that, right?  What I'm suggesting is,
18  and for the record, is that in formulating your
19  opinion, in addition to your 37 years of experience
20  and all of your degrees and such, you are also relying
21  on medical records that have been provided to you by
22  counsel; correct?
23      A.   Yes, sir, I am.
24      Q.   All right, and those medical records, you
25  know, the assumption is that the medical records are

Page 36

1   accurate, right?
2       A.   Yes, you would--you would assume that, yes.
3       Q.   All right, but basically, you have basically
4   indicated that the medical records are replete with
5   misdiagnosis.  Is that a fair statement?
6          MR. DUGAN:  Objection; argumentative.
7   BY MR. NORWOOD:
8       Q.   Let me rephrase the question.  As relates to
9   this report, this is a misdiagnosis, correct?  In your
10  opinion?
11      A.   I would say that the way he's describing
12  this to me, okay, I think he is describing this
13  curvature, this man, this man holding his neck to the
14  side the way he's describing it, to me would be
15  consistent with what I said, you know, a muscle
16  strain, et cetera, et cetera, so the way he's
17  describing that, I really wouldn't disagree with
18  that,--
19      Q.   Well--
20      A.   --but I would disagree with the impression,
21  because I've stated that he's got--he's got an
22  impression, no fractures, okay, which I agree with,
23  he's got torticollis and scoliosis, and you can't make
24  that--you can't make a diagnosis like that based upon
25  looking at these x-rays.

Page 37

1       Q.   Well, but you are disagreeing with him, and
2   you have disagreed with him in your report; correct?
3       A.   I've disagreed--what I'm stating is that
4   there is--what I'm stating is that this man, there,
5   does not have scoliosis,--
6       Q.   Right.
7       A.   --number one.  Number two, he may have had
8   some torticollis, he, he may have had some--been
9   holding his neck to the side when he was initially
10  seen because of a muscle spasm, but that, that's a
11  clinical finding.  I really wouldn't put that under
12  the--
13      Q.   But you are speculating because you were not
14  there and you did not examine this individual in '96.
15  Can we agree with that?
16      A.   Yes, sir, that's true.  We can agree.
17      Q.   All right, so that's speculation on your
18  part.  Is that right?
19      A.   It's more than speculation, but I did not
20  examine him in 1996, and--period.
21      Q.   Okay.
22      A.   But I reviewed the records, all of the
23  records at that time and since that time.
24      Q.   Right.  Okay, and did those records include
25  the 1996 x-ray?

10 (Pages 34 - 37)

Page 38

1    A.   Yes.
2    Q.   Okay.  You reviewed the 1996 x-ray?
3        (Witness peruses documents.)
4    A.   I'm not--I'm looking at my medical records.
5  I don't--I'm not certain that I reviewed that actual
6  x-ray.
7    Q.   Okay.
8    A.   I reviewed subsequent x-rays.
9    Q.   Right.
10    A.   Numerous x-rays, but if you'll wait a
11  minute, I'll see here.
12    Q.   Okay.
13        (Witness continues to peruse documents.)
14    A.   I--no, I do not believe that I actually saw
15  that actual x-ray from 1996.
16    Q.   All right, so that would put you at a little
17  bit of a disadvantage as relates to Dr. Silberstein,
18  who is a radiologist who actually reviewed those
19  x-rays.  Would you agree with that?
20        MR. DUGAN:  Object to form.
21        MR. BOOSE:  I join.
22    A.   No, no, I wouldn't, because I subsequently
23  reviewed--you are talking about these diagnoses of
24  scoliosis and torticollis, I believe.
25  BY MR. NORWOOD:

Page 39

1    Q.   Right.
2    A.   And I subsequently reviewed additional
3  x-rays of the cervical spine for sure taken in
4  December 2012, and I don't show any evidence of--of
5  scoliosis, so--
6    Q.   In your opinion.
7    A.   Well, I mean obviously, it's my opinion.
8  I'm stating it.
9    Q.   Okay.
10    A.   But in my opinion, or in the opinion of
11  anybody else, in the opinion of any of the other
12  treating physicians or the radiologists.
13    Q.   But Dr. Silberstein, in his opinion, he
14  didn't simply state scoliosis, he stated specifically,
15  quote, "a lower cervical/upper thoracic scoliosis,
16  convex, to the right, centered at C6 and C7."  That's
17  fairly specific, isn't it?
18        MR. DUGAN:  Object to form.
19    A.   That's--that's what his report is stating.
20  BY MR. NORWOOD:
21    Q.   Right, and so in his opinion, he saw some
22  level of curvature that he described as convex to the
23  right, centered at C6 and C7, and just so for us lay
24  people, what is C6 and C7?
25    A.   C6-C7 are the lower ends of the cervical

Page 40

1  spine, and then below that, you have T1, which is the
2  top of the thoracic spine.
3    Q.   So he, in his opinion, saw what indicated to
4  him as a radiologist who is identified as an M.D.,
5  who--treating patients at the Illinois Department of
6  Corrections, he disagrees with your assessment;
7  correct?
8        MR. DUGAN:  Form, foundation, argumentative.
9    A.   Well, his report,--
10        MR. BOOSE:  I'm sorry--(Inaudible)
11    A.   --his report speaks for itself.
12        THE COURT REPORTER:  Did you--hang on one
13  sec.
14        Was your objection you joined, Mr. Bruce?
15        MR. BOOSE:  That's correct.
16        THE COURT REPORTER:  Okay.  I didn't hear
17  the word "join."  That's the reason I asked.
18        MR. BOOSE:  Yes, my statement was "Join,"
19  and too, I'm sorry, I'm not hearing you very well on
20  some of these.  I worry I might be not hearing some of
21  the objections.
22        MR. DUGAN:  I don't think you've missed any.
23        MR. BOOSE:  Okay.  Thank you.
24        MR. NORWOOD:  Nothing exciting, anyway.
25  BY MR. NORWOOD:

Page 41

1    Q.   Now, let's go back.  Let me rephrase the
2  question, right?  And I, as a lay person, as a lawyer,
3  you know, we're looking at medical records, and we're
4  listening to your testimony, and looking at your
5  report, and so as a lay person myself, I'm trying to
6  reconcile what you've put in your opinion about the
7  fact that there absolutely, unequivocally, is no
8  scoliosis, and I'm trying to reconcile that with
9  Petkovich Deposition Exhibit 11, where Dr. Silberstein
10  says specifically that there is certain scoliosis
11  based on this convex to the right centered at C6 and
12  C7, so are you saying that Dr. Silberstein is wrong in
13  his report regarding scoliosis?
14    A.   Yes.
15    Q.   Okay, so you disagree with Dr. Silberstein.
16    A.   Yes.
17    Q.   All right, and then it goes further--well,
18  when he talks about convex to the right, centered at
19  C6 and C7, I understand you don't agree with that, but
20  what is he describing as relates to this notion of
21  thoracic scoliosis convex to the right centered at C6
22  and C7?  What is he describing?
23    A.   Convex, when you are describing a true
24  curve, convex as opposed to concave, so convex means
25  to one side, and then concave would be the other side

11 (Pages 38 - 41)

Page 42

1 of that, so if you take a--if you take a piece of
2 rope,--
3    Q.   Right.
4    A.   --if you the hang a piece of rope and push
5 it to one side, it's going to be convex to that side
6 and concave to the other side.
7    Q.   Okay.
8    A.   Right.
9    Q.   So here, he's describing a convex to the
10 right, near C6 and C7?  Is that what he's--
11    A.   Yes.
12    Q.   --purporting to describe?
13    A.   That's what his report says.
14    Q.   Right.  That's what he report said.  Okay.
15 All right.
16        Are you familiar with the term, "medically
17 necessary treatment"?
18    A.   Yes.
19    Q.   And what does medically necessary treatment
20 mean?
21    A.   A very, very broad term, means that
22 something is being done based--based upon being
23 appropriate medical care, necessary, I'm using--it's a
24 hard word, hard to define, but it means, medically
25 necessary means it's something that is necessary for

Page 43

1 medical reasons.
2    Q.   Okay, and is that the same thing as medical
3 necessity?  When we talk about medical necessity, is
4 that the same thing?
5    A.   I've guess I would say that.
6    Q.   All right.  All right, are you familiar with
7 the term--well, let me ask you this way:  Do you know
8 if, during the 2009 through 2014 time frame, whether
9 Wexford had a policy that was either written or
10 unwritten that provided that a physician would refer
11 an inmate to a specialist only if it was absolutely
12 necessary?
13    A.   Well, I'm not familiar with any of their
14 policies.
15    Q.   All right.  All right, so the answer to your
16 question is no, you don't know if they had such a
17 policy--
18    A.   No.
19    Q.   --that required absolute necessity as
20 related to referring patients, inmate patients to a
21 specialist.  Is that correct?
22    A.   Yeah, I'm not familiar with their policies.
23    Q.   All right.  Are you aware of any absolute
24 necessity standard that's used in the medical
25 profession as relates to the treatment of any patient?

Page 44

1        MR. DUGAN:  Object to form.
2        MR. BOOSE:  Join.
3    A.   I don't understand that question.
4 BY MR. NORWOOD:
5    Q.   In your practice, 37 years, have you ever
6 seen anything in any literature or any textbooks that
7 talk about treating a patient only if it is absolutely
8 necessary for a particular condition?
9        MR. DUGAN:  Same objections.
10    A.   Typically, I mean typically, physicians are
11 not going to treat someone unless it is medically
12 necessary.
13 BY MR. NORWOOD:
14    Q.   Well, I agree with you there.  I think we're
15 in agreement.  I'm talking about absolutely necessary.
16 Are you familiar with the term, "absolute necessity,"
17 as relates to providing medical care to patients?
18    A.   Well, I guess I'm--I guess I'm not familiar
19 with what you are asking me.  I'm familiar with the
20 question, "medical necessity"--
21    Q.   Right.
22    A.   --and "absolute necessity," but I think that
23 as I've already stated, I think, is that medical
24 necessity is why someone seeks medical care.
25    Q.   Right, and so to shut this down, then, you

Page 45

1 are not familiar with the term "absolute necessity" as
2 relates to medical practice.  Is that right?
3    A.   I've not--I'm, I'm not familiar with that
4 term exactly.
5    Q.   All right, and to the extent that if some
6 physician was utilizing an absolute necessity standard
7 for deciding whether or not a patient should be
8 treated or referred to a specialist, would you take
9 issue with that?
10        MR. DUGAN:  Object to form.
11        MR. BOOSE:  Join.
12    A.   I've never heard that before.  I think that
13 it's--I think that--I think when somebody should--when
14 someone is referred to a specialist, there should be a
15 reason to refer to a specialist.  There should be a
16 medical reason to refer to a specialist.  As I stated
17 earlier, when someone is seen by a primary care
18 provider, and I think of all the things I've
19 previously said, if they have persistent symptoms,
20 physical examination findings, objective findings, et
21 cetera, et cetera, if they have all that, then they
22 should be referred to a specialist.
23 BY MR. NORWOOD:
24    Q.   All right, do you know if an absolute
25 necessity standard was applied to any of Mr. Burt's

12 (Pages 42 - 45)

Page 46

1 treatment at Menard, based on the records you've
2 reviewed?
3    A.  Based on the records that I've reviewed,
4 Mr. Burt saw a number of different providers at
5 Menard.  I think that he was treated appropriately by
6 them--
7    Q.  I understand that, sir, but let me just ask
8 you--
9    A.  Okay.
10    Q.  I'm focusing on absolute necessity.  Let's
11 stay with me here.
12    A.  Okay.
13    Q.  Do you know if, in that treatment, based on
14 those medical records you reviewed, those physicians
15 at Menard applied an absolute necessity standard with
16 respect to that treatment?  That's the question.
17    A.  No, I, I--no, I don't know that.  I'm not
18 familiar with that term, as I stated.
19    Q.  So if they did, you don't know about it, and
20 it wouldn't change your opinion one way or the other?
21    A.  Yes, sir, you are--you are correct.
22    Q.  Okay.
23    A.  Yes.
24    Q.  So it wouldn't change your opinion if they
25 were applying an absolute necessity standard as they

Page 47

1 were documenting his treatment.  Is that correct?
2       MR. DUGAN:  Object to form.
3       MR. BOOSE:  Join.
4    A.  Again, I'm not--again, I'm not familiar with
5 that term, I'm not familiar with their policies.
6 BY MR. NORWOOD:
7    Q.  Okay.
8    A.  I don't know what else I can say.
9    Q.  I got you.  What is a treatment plan?
10    A.  A treatment plan is a, you know, plan how
11 you are going to treat an individual, a patient.
12    Q.  And is that generally memorialized somewhere
13 in medical records that you maintain?
14    A.  Sometimes.  It depends on--it depends upon
15 the complexity of an issue.  If something is a simple
16 issue, you don't--there's really no--you don't really
17 elaborate, but it depends on what you are dealing
18 with.
19    Q.  Okay, so in certain cases, you might have a
20 written treatment plan that would be documented in
21 your records, and other times, it wouldn't; is that
22 correct?
23    A.  If you had--if you had a complex issue, a
24 complex issue, all the things I discussed, then you
25 might have a--you would have a treatment plan, your

Page 48

1 plan of attack, how you are going to do something.  If
2 you have a simple problem, then there's no need to
3 have a treatment plan because it's very simple.
4    Q.  Now, what--are you familiar with what
5 typically should be done if a portion of a medical
6 record is missing?
7       MR. DUGAN:  Object to form; improper,
8 incomplete hypothetical.
9       MR. BOOSE:  Join.
10    A.  Well, what type, what kind of--
11 BY MR. NORWOOD:
12    Q.  Any kind of portion of a medical record, is
13 there any kind of protocol you should follow if, for
14 some reason, a portion of a medical record turns up
15 missing?
16       MR. DUGAN:  Same objection.
17    A.  Okay, very, very broad question, but I would
18 try to--I would try to look at the records before that
19 period of time, look at the records after that period
20 of time, and try to put everything together.
21 BY MR. NORWOOD:
22    Q.  Okay, and you are aware in this case, there
23 are certain missing medical records?  Is that correct?
24       MR. DUGAN:  Object to form.
25       MR. BOOSE:  Join.

Page 49

1    A.  I'm not--I'm not sure that there are missing
2 medical records, no.
3 BY MR. NORWOOD:
4    Q.  All right.  Well, in your report, you
5 referred to the fact that there was an x-ray that was
6 reviewed by Dr. Nwaobasi that apparently is missing,
7 right?
8    A.  Yes, and I'm not--I'm not certain whether
9 that's--whether that's really missing or whether that
10 was a mistake in stating that, that date, so I'm, I'm
11 not real--I'm not certain if medical records are
12 really missing.
13    Q.  Okay.  All right, but you haven't seen it?
14    A.  I have not seen it.
15    Q.  All right, and neither have we, for the
16 record.
17       Now, in your report, you talk about physical
18 therapy options, and in your opinion, you indicated
19 that physical therapy essentially would be a waste; is
20 that correct?
21    A.  Well, it's a synopsis.  I think physical
22 therapy for Mr. Burt was unnecessary.
23    Q.  Well, so it would be a waste, right?
24       MR. DUGAN:  Object to form.
25    A.  Yeah, I don't like to use--

13 (Pages 46 - 49)

Page 50

1      MR. BOOSE:  Join.
2      A.  (Continuing)  I don't like to use the word
3  "waste," but I think physical therapy for Mr. Burt was
4  unnecessary.
5  BY MR. NORWOOD:
6      Q.  All right, but you suggested that perhaps
7  some exercises that were prescribed to him by
8  Dr. Trost would be sufficient, correct?
9      A.  I think the exercises would be sufficient,
10  certainly, but if I saw, if I saw this gentleman in my
11  office, if I saw Mr. Burt in my office with his
12  physical findings and his radiographic findings as
13  we've discussed, I would have treated him like he was,
14  with a low-dose antiinflammatory medication.  I
15  probably would not even have told him to do any
16  exercises.
17      Q.  Okay.
18      A.  But I think, I think that's okay to do the
19  exercises, but I don't know that it was really
20  necessary.  I think maybe the doctor, here, maybe told
21  him about doing exercises to, you know, pacif--make
22  him--make him happy, whatever, but I don't really
23  think exercises were necessary.
24      Q.  Okay, so--so you believe, in your opinion,
25  that to pacify him, they said do some exercise.  Is

Page 51

1  that your testimony?
2      A.  Perhaps, yes.
3      Q.  Okay.  All right, is that they pacify him by
4  also giving him prescription medicine to deal with
5  this issue?
6      A.  Well, I--if I saw him, if, if I saw Mr. Burt
7  as a patient,--
8      Q.  Right.
9      A.  --I would--and I examined him he had a
10  normal physical examination, his only, his only
11  positive physical findings--we're talking about
12  cervical spine--was this minimally degenerative
13  cervical disc condition, disease at C4-5, some
14  degenerative disc conditions at the L5-S1 level, if I
15  saw somebody like that, I would tell them, you know,
16  this is really a mild condition, you don't really need
17  to do anything about it.  If it bothers you, if it
18  bothers you, you might take a low-dose, over-the-
19  counter, anti-inflammatory medication like ibuprofen
20  or one of those, but you know, I wouldn't do anything
21  else about it.
22      Q.  All right, so basically, "Go to the
23  drugstore, pick up some ibuprofen, and here's your
24  bill."  Is that essentially how you would have treated
25  Dr.--I mean Mr. Burt as relates to his condition?  Is

Page 52

1  that correct?
2      MR. DUGAN:  Object to form.
3      A.  Well, I would have treated him like I said.
4  The last thing I do is send a bill.  I'm not sure what
5  you mean.
6  BY MR. NORWOOD:
7      Q.  Well, okay.  All right, you wouldn't bill
8  him.  All right.  I got you.
9      A.  But it's a very simple thing.
10      Q.  Well, it's simple, right.
11      A.  It's a simple problem, and I think that, you
12  know, I mean people I see people like this all the
13  time.
14      Q.  I got you.
15      A.  If I walk up and down the street and x-rayed
16  every, you know, 50-year-old man walking up and down
17  the street, they're all going to have an element of
18  some mild degenerative disc changes in their cervical
19  spine, their lumbar spine.
20      Q.  Okay, great.
21      A.  Much younger than 50.  We started getting--
22      Q.  Right.
23      A.  We start getting mild degenerative changes
24  in our twenties.
25      Q.  I got you, and just so the record's clear,

Page 53

1  then you would just simply say "Get an over-the-
2  counter medicine and you'll be okay"?  I mean, I'm
3  trying to understand what your suggestion is.
4      A.  Yes, sir, that's--that is what I'm saying.
5      Q.  All right.
6      A.  I think that that--
7      Q.  All right.
8      A.  I think just a low dose over-the-counter
9  should be sufficient.
10      Q.  So to the extent that they gave him
11  something other than a low-dose medication, you would
12  disagree with that particular form of treatment,
13  right?
14      A.  I wouldn't--I wouldn't disagree with it.  I
15  think that they--I think that they probably--I think
16  they probably really, in a way, overtreated him, gave
17  him more than he really needed to pacify him.
18      Q.  Okay, and that's your professional opinion?
19      A.  Yes.
20      Q.  Okay.  All right, and is it ethical to
21  overmedicate someone to pacify them if, somehow, that
22  treatment is not medically necessary?
23      A.  No, it's not unethical in a situation like
24  this, that he was given--he was given, still, low
25  doses of an antiinflammatory medication.  That's

14 (Pages 50 - 53)

Page 54

1 certainly not unethical.
2     Q.  Okay, so--so my question is, though, is it
3 unethical to overtreat a patient who only needs an
4 over-the-counter pain pill?
5         MR. DUGAN:  Object to form; asked and
6 answered.
7         MR. BOOSE:  Join.
8     A.  Yeah, I don't--I wouldn't use the word
9 "overtreatment."
10     Q.  Well, you used the word "overtreatment."
11 That's why I'm using it.  You said he was overtreated.
12 Am I mischaracterizing your testimony?
13     A.  Well, I don't know if I said that
14 specifically, but--
15         MR. NORWOOD:  Well, hold on.  Let's stop.
16         Can we go back and read his answer where he
17 talked about overtreatment, just so we put it all in
18 context, and clarify it, if need be?
19         THE COURT REPORTER:  (Reading back)
20         "Q:  I wouldn't--I wouldn't disagree
21 with it.  I think that they--I think they probably
22 really, in a way, overtreated him, gave him more than
23 he really needed to pacify him."
24 BY MR. NORWOOD:
25     Q.  Okay, so you used the word "overtreatment"--

Page 55

1     A.  You are right.
2     Q.  --and I'm trying to figure out what you
3 meant when you said he was he was overtreated.
4     A.  What I meant was that I think they--my
5 review of the records that they--he was seen on
6 multiple occasions at that medical facility, and he,
7 you know, had subjective complaints and multiple
8 subjective complaints as we've discussed, and so they
9 gave him, you know, the appropriate medication, et
10 cetera, et cetera, so I think that probably was it
11 really necessary for him to continue to take all that?
12 You know, debatable, but in my own practice, I have
13 patients in my practice that I think can get by with
14 mild stuff and that insist upon taking a stronger
15 level of an antiinflammatory medication, and you know,
16 to keep them happy, I do that.  It's not going to hurt
17 them, so anything, anything that he's taking, these
18 are all mild medications.
19     Q.  Okay.  All right.
20     A.  So none of those, none of those are really
21 hurting him.
22     Q.  All right.
23     A.  But does he really need that strong of a
24 dose?  Debatable.
25     Q.  Okay, so we've got a debate about what

Page 56

1 dosage, over-the-counter versus a prescription, right?
2     A.  Well, we're talking about the medications
3 here, we're talking about ibuprofen, we're talking
4 about meloxicam, I think, in this case--
5     Q.  Right.
6     A.  --that we were talking about, and so I mean
7 they're all--
8     Q.  Mobic?
9     A.  Yeah, they're all the same.  They're all
10 nonsteroidal antiinflammatory medications, so the only
11 difference between the over-the-counter and the
12 prescription is the dose, and so--
13     Q.  So you would have done the over-the-counter
14 because in your professional opinion, that's all he
15 needed.
16     A.  I think I would have started him off with an
17 over-the-counter, and it's the same thing I do in my
18 practice, I would start somebody off with a low-dose
19 over-the-counter, I'd give him some samples.  If they
20 came back and said they're still having pain, okay, I
21 would give them a little more.
22     Q.  Okay.
23     A.  And I would, in my practice, I would write a
24 stronger prescription based upon their subjective
25 complaints--

Page 57

1     Q.  All right.
2     A.  --because these are mild, these are mild
3 medications,--
4     Q.  All right.
5     A.  --and that's it.
6     Q.  All right, so now let's talk about that
7 hypothetical patient you just identified.  You first
8 prescribe him with a low dose, he's still having pain,
9 you increase the dose; right?
10     A.  Yes.
11     Q.  And then he's still having pain, so what do
12 you do then?
13     A.  I would tell them--
14         MR. BOOSE:  Objection to form.
15     A.  --if someone had persistent subjective
16 complaints, I would tell them that based upon all of
17 the things I've discussed already, the radiographic
18 studies, his physical examination findings, et cetera,
19 et cetera, he had--all he had were the mild
20 degenerative changes in his cervical and lumbar spine
21 and that there was nothing more to do.
22     Q.  All right.  Now, you are basing this
23 assessment that there's nothing more to do based upon
24 the x-ray, right?
25     A.  No, I'm basing it upon everything, basing it

15 (Pages 54 - 57)

Page 58

1  upon his--
2      Q.   Wait a minute.  Let me rephrase it.  One of
3  the things you rely upon is an x-ray; correct?
4      A.   Yes.
5      Q.   And you and I can agree that an x-ray
6  doesn't pick up everything; is that correct?
7      A.   Yes.
8      Q.   All right, and there's more sophisticated
9  radiological tests that you can do to pick up things
10 that an x-ray wouldn't pick up; is that correct?
11     A.   Yes.
12     Q.   All right, and so an x-ray, as I understand
13 an x-ray--and again, I'm a lay person--it picks up
14 bones and what else?
15     A.   Plain x-rays pick up bony structure,
16 calcified structure, but they also, they not only show
17 the bone but they show the relation of bones to
18 another so they show stability, instability, et
19 cetera, et cetera.
20     Q.   Okay.
21     A.   They can show--they can show on x-rays, they
22 can show if there's any erosion, so we start thinking
23 about is there a tumor, an infection going on, so they
24 show bones, but they--
25     Q.   Right.

Page 59

1      A.   --show, they show a lot.
2      Q.   Well, they should show structural changes in
3  the bone; correct?
4      A.   Yes.
5      Q.   All right.  What about soft tissue?
6      A.   They--they do not show the soft tissue, per
7  se.
8      Q.   Okay.  What about bone spurs?
9      A.   They do show bone spurs.
10     Q.   Would it show bone spurs in all cases?  I
11 mean, regardless of where that bone spur may be in the
12 spine?
13     A.   They show bone spurs very well.  You are
14 saying do they show bone spurs in all cases.  I'm not
15 going to use the word "all cases" because there's
16 exceptions to everything,--
17     Q.   All right.
18     A.   --but to answer your question, yes, x-rays,
19 x-rays do, by and large, show bone spurs.
20     Q.   Okay, and there are occasions where an x-ray
21 might not pick up a bone spur is what you are saying
22 or suggesting, correct?
23     A.   What I'm saying is obviously, it is--
24 obviously, it is possible to have a very mild bone
25 spur--and this is very hypothetical--

Page 60

1      Q.   Right.
2      A.   --that was not picked up on x-ray, yes.
3      Q.   All right.  All right, what are the
4  limitations of an x-ray--
5          MR. DUGAN:  Object to form.
6  BY MR. NORWOOD:
7      Q.   --in terms of what it could show?
8          MR. BOOSE:  Join.
9      A.   Well, when an x-ray doesn't show, it doesn't
10 show soft tissues, okay?  It doesn't show soft
11 tissues, and--
12 BY MR. NORWOOD:
13     Q.   Well, as it relates to the spine, what are
14 we talking about, then?
15     A.   So it doesn't show--in the spine, it doesn't
16 show the muscles, okay?  It doesn't show the--it
17 doesn't show the soft tissues, i.e., the disc, the
18 components of the disc, it doesn't show the neurologic
19 structures, themselves, so it doesn't--it doesn't show
20 what are called the soft-tissue structures of the
21 spine.
22     Q.   All right, so that if, hypothetically,
23 Mr. Burt had an issue that involved soft tissue, it is
24 possible that that might not be reflected on an x-ray,
25 correct?

Page 61

1          MR. BOOSE:  Objection to form and incomplete
2  hypothetical.
3          MR. DUGAN:  Join.
4      A.   You are correct in that it is possible to
5  have a soft tissue condition that is not picked up on
6  the x-rays, yes.
7  BY MR. NORWOOD:
8      Q.   Okay, and the pickup of soft tissue
9  condition, what other types of evaluative tests would
10 you, in your professional opinion, consider to utilize
11 if you suspected that that could be an issue?
12     A.   Now we're talking about the spine again.
13     Q.   Right.
14     A.   So just talking about the spine, if someone
15 had someone's history and physical examination,
16 putting all that together suggested there was
17 something going on other than, other than--other than
18 seen on the x-rays, then I would get an MRI.
19     Q.   All right, and why would you get an MRI?
20     A.   Because an MRI does--"MRI" stands for
21 magnetic resonance image--imaging.  It works--it's not
22 really an x-ray.  It works off of a magnet principle,
23 so the MRI shows the soft tissues, what we talk about
24 the muscles, the discs, themselves, the discs or the
25 cushions between the vertebrae, it shows the

16 (Pages 58 - 61)

Page 62

1 neurologic structures, et cetera.
2    Q.   All right.  What is a CT scan?
3    A.   "CT" scan stands for computer tomography, so
4 tomography means layers, so what a CT does, it shows
5 the--it shows the--it shows the hard structures, the
6 bone, in more detail.  Taking it apart, it'll--like
7 three-dimensionally, it'll show levels going from a
8 top-to-bottom, so a horizontal from top to bottom
9 slices, and then from side to side and from front to
10 back, so--so anyway, so a CT, a CT also shows the hard
11 structures, the bone, and they--but they show that in
12 more detail than plain x-rays.
13    Q.   What about soft tissue?
14    A.   They show--they don't show--they show the
15 soft tissue to a degree, but not as much as an MRI.
16    Q.   Okay, so with respect to soft tissue items,
17 issues, you would rely more heavily on an an MRI than
18 you would a CT scan.  Is that a fair assessment?
19    A.   If I suspected a soft tissue issue, yes, I
20 would rely more on an MRI.
21    Q.   Okay.  Outside of the medical records, have
22 you reviewed anything else associated with this case?
23    A.   Medical records including radiographic
24 studies, no.
25    Q.   Okay, and so you haven't reviewed any

Page 63

1 deposition testimony or anything like that?
2    A.   No.
3    Q.   Okay, and outside of Mr. Khatskin, have you
4 talked to anyone else about this case?
5    A.   Just this morning, talked with Mr. Dugan.
6    Q.   Okay, and how long did you talk to
7 Mr. Dugan?
8    A.   For about half an hour.
9    Q.   And what did you and Mr. Dugan discuss?
10    A.   Just basically discussed my review of the
11 records, my reports, my opinions.
12    Q.   Okay.  All right.  Now, we can agree that
13 Mr. Ronald Burt has been complaining for a very long
14 time about problems with his neck and back.  Is that
15 correct?
16    A.   Yes.
17    Q.   All right, and it goes back to what?
18 Shortly after that incident, and that's reflected in
19 '96, correct?  Slipping in the shower or something
20 along those lines?
21    A.   Yes, that's--to my knowledge, that's the
22 first medical records that I saw.
23    Q.   Right, and I'm just talking about what you
24 saw.  I'm not talking about stuff you haven't seen.
25 I'm just going to limit it to the medical records.

Page 64

1    Q.   How many pages of records did you review, by the way?
2 Do you recall?
3    A.   I have a lot of records on CD.  I have a CD
4 with, I think, over a thousand records.
5    Q.   Okay.
6    A.   Then I have broken down to--with a synopsis
7 of some of the more significant records, so I would
8 say a total of over a thousand pages.
9    Q.   All right.  All right, and so based upon
10 your review of those thousand pages, can we agree that
11 there have been repeated complaints made by Dr. (sic)
12 Burt--I mean Mr. Burt about back and neck pain?
13    A.   Yes.
14    Q.   All right, and in his assessment, his
15 subjective assessment, he's described it as being
16 severe pain in some measure; is that correct?
17    A.   As I recall, in some cases, he referred,
18 Mr. Burt referred to himself as having severe pain.
19    Q.   All right, and so you--well, let me ask you
20 this:  Do you believe that Mr. Burt is exaggerating
21 his pain?
22    A.   It's my opinion that his multiple subjective
23 complaints are not consistent with his objective
24 physical findings, not consistent with his
25 radiographic studies.  I do not believe there's any

Page 65

1 basis for his multiple persistent subjective
2 complaints.
3    Q.   From what you can see from these medical
4 records?
5    A.   Yes.
6    Q.   All right, so, then, in answer to my
7 question, then, you believe he's exaggerating, based
8 upon what you've seen?
9    A.   I don't really like the use that word,--
10    Q.   Well, what term would you use?
11    A.   --but I would say that his--again, I would
12 say that his, his subjective complaints are grossly
13 out of proportion to objective physical findings,
14 radiographic studies, et cetera, et cetera, so I guess
15 in this case, I would say yes, I believe that he is
16 exaggerating his complaints.
17    Q.   All right.  All right, so over the last
18 twenty years, he's basically exaggerated this pain
19 that he describes as severe pain.  Is that your
20 testimony?
21    A.   It appears so, yes.
22    Q.   All right, and you've never seen Mr. Burt;
23 correct?
24    A.   I've never seen him, no.
25    Q.   All right, and--well, let me hand you a

17 (Pages 62 - 65)

Page 66

1  document that--if I can find it, it's--let me hand you
2  Petkovich Deposition Exhibit 2.
3          MR. DUGAN:  Do you have a copy of that,
4  Counsel?
5          MR. NORWOOD:  No, I think I have a copy for
6  you all.  In fact, let me see--I probably--
7          MR. DUGAN:  Is it a medical record or
8  something else?
9          MR. NORWOOD:  I think what I'm going to do,
10  let me swap out, because the problem is, I copied
11  these in color.  Let me swap this out.  Let me hand
12  you the original, and let me hand you all a set of
13  what we have.
14  BY MR. NORWOOD:
15      Q.  And what is Petkovich Deposition Exhibit 2?
16      A.  That is a--it appears to be part of my--with
17  the website for my office which describes my office.
18      Q.  Okay, and one of the sections on this
19  Exhibit 2, you have, "My approach to treating
20  patients."
21      A.  Yes.
22      Q.  All right, and one of the things you say in
23  the second paragraph, you say "As an experienced
24  physician with more than 35 years of specialization in
25  orthopedics, I take a highly personal approach to

Page 67

1  caring for my patients."  Is that correct?
2      A.  Yes.
3      Q.  All right, and that highly personal approach
4  includes actually seeing the patient to assess what
5  they're telling you; is that correct?
6      A.  Yes.
7      Q.  All right, and you, in the third--fourth
8  paragraph, you say, second sentence, "This includes a
9  thorough examination of the patient and work history
10  including causation of the injury."  Do you see that?
11          MR. DUGAN:  Page 1, Doctor, at the very
12  bottom.
13  BY MR. NORWOOD:
14      Q.  (Continuing)  It's on the first page, last
15  paragraph, second sentence.
16      A.  Yes.
17      Q.  All right, and then if we turn to the next
18  page, fourth paragraph, you say, quote, "I believe in
19  meeting patients' individual needs through
20  comprehensive evaluation and treatment designed to
21  help them achieve an active, pain-free lifestyle."  Do
22  you see that?
23      A.  Yes.
24      Q.  And that's one of your primary goals as a
25  physician, to make sure that you conduct a

Page 68

1  comprehensive evaluation of the patient, correct?
2      A.  Yes.
3      Q.  And that your goal is to help them achieve a
4  pain-free lifestyle; is that correct?
5      A.  Yes.
6      Q.  All right, and then in the fifth paragraph,
7  you say, quote, "I work to develop a partnership with
8  my patients," unquote.  Correct?
9      A.  Yes.
10      Q.  What do you mean by that?
11      A.  What I mean is to--to work with them to try
12  to achieve a goal, to try to, if they're having
13  whatever their issue is, to work with them to help
14  them achieve their goal working with them.
15      Q.  And you do that by visiting--I mean having
16  the patients come see you, and you are talking to them
17  and evaluate what they're suggesting to you in order
18  to try to figure out what's going on, right?
19      A.  Yes.  I do, I do whatever is appropriate,
20  yes.
21      Q.  Whatever is appropriate; all right, and you
22  see on my part, this begins with listening, right?
23      A.  Yes.
24      Q.  You listen to those patients, correct?
25      A.  Yes.

Page 69

1      Q.  And why do you listen to the patient?
2      A.  Well, obviously, that's important, getting
3  the history from a, from a patient, from an
4  individual.
5      Q.  I agree with that.  We're just--I'm just
6  going on what your approach is.  Now, that listening
7  includes listening to whatever their subjective
8  complaints are.
9      A.  Yes.
10      Q.  All right, and have you had patients who
11  come in and exaggerate their pain to you?
12      A.  Yes.
13      Q.  All right, and in those cases, what do you
14  do with those patients?
15      A.  Well, if I--if I believe that someone--if
16  someone's subjective complaints are out of proportion
17  to their objective physical findings and radiographic
18  studies as I've discussed, then I will tell them that
19  "Based upon everything we've done, we've worked you
20  up, we've done--we've done all these studies, I've
21  repeatedly examined you, and there's really nothing,
22  nothing else that I think needs to be done or should
23  be done, there's really nothing more that I have to
24  offer you."
25      Q.  Okay, and in that case, then what happens

18 (Pages 66 - 69)

Page 70

1 with that patient?
2     A.  It depends.  Many times, people are
3 satisfied with that.  People, many times, people, you
4 know, sometimes--I mean, you have to understand first
5 of all, I have a specialty-type practice, so a lot of
6 people with basic--with basic complaints that are not
7 substantiated by objective physical findings, et
8 cetera, et cetera, don't come to my office.  They stay
9 at primary care physicians' office, so people that I
10 see, though, to answer your question, you know, I work
11 them up thoroughly, and if I get to the point where
12 there's nothing--I can't find anything there, I will
13 tell them that, and sometimes, sometimes people,
14 sometimes people have a certain amount of anxiety,
15 just fear that they may have something there, and many
16 times when you go through everything, people are
17 relieved, they feel better, they know there's nothing
18 else there and that's it, you know?
19        But--anyway, so the point being is if I, if
20 I get to a point where I can't find anything else
21 there, I will tell them that.
22     Q.  All right, and then in the sixth paragraph,
23 second--third sentence, you say, "Next" --same page,
24 or page 2 of 3, you say, "Next, I want my patients to
25 understand their conditions," correct?

Page 71

1     A.  Now, what paragraph are you looking at, sir?
2     Q.  I am the sixth paragraph on page 2 of 3,
3 third sentence.
4     A.  Okay, I see it.
5     Q.  Okay, you say, "I want my patients to
6 understand their conditions," correct?
7     A.  Yes.
8     Q.  And why is that?  Why do you want your
9 patients to understand their condition?
10    A.  Well, I believe in educating people so they
11 understand, you know, what's going on.
12    Q.  All right, and you go further and say,
13 quote, "...how it developed and how various treatment
14 approaches can improve or repair the problem."  Do you
15 see that?
16    A.  Yes.
17    Q.  And what do you mean by "various treatment
18 approaches"?
19    A.  Well, again, depending upon what we're
20 talking about, sometimes there are treatment options,
21 so there are treatment options, and you explain to
22 people different options, and what's appropriate and
23 what's not appropriate.
24    Q.  All right, and in the last paragraph, you
25 are saying, first sentence, quote, "Our purpose is to

Page 72

1 handle each and every patient visit with care and
2 proficiency."  Correct?
3     A.  Yes.
4     Q.  And why is that?
5     A.  Well, again, you want to do the appropriate
6 thing.  You see, in pretty basic medical care, you
7 want to do the appropriate thing for that person.
8     Q.  Okay.  Now, what is degenerative disc
9 disease?
10    A.  What degenerative disc disease means, it's
11 degeneration within a disc, so what a disc is, we're
12 talking about the spine again, so throughout the
13 spine, between every vertebral body, you have discs,
14 you have intervertebral discs, so a disc is made up of
15 the--I always explain it's like a jelly donut, so a
16 disc has a soft, gelatinous central portion called the
17 nucleus pulposus.  It has an outer fibrous ring called
18 the annulus fibrosis.  You have nucleus pulposus, the
19 annulus fibrosus, and in a small child, the nucleus
20 pulposus is very, very gelatinous, and the outer, the
21 outer ring is elastic tissue.  That's why it's like a
22 jelly donut, and in all of us as we age, we, as we
23 age, our spine ages also, so it's been shown that in
24 our early twenties, people start to develop some, some
25 desiccation.  Desiccation means drying out, so they

Page 73

1 lose some of the water content in their disc, so just
2 gradually, a little bit, so they start to lose some
3 water content in their discs, which is what
4 desiccation means, drying out a little bit, and with
5 that, they can develop a little bit of disc bulging
6 over time, and then sometimes, some little--the
7 annulus fibrosus can develop what's called annular
8 fissuring.
9     Q.  Okay.
10    A.  So that's all part of the degenerative
11 process, so--
12    Q.  Let me stop you for one second and I'll let
13 you continue.
14        The disc bulging, is that something you can
15 see on an x-ray?
16    A.  You can't--you cannot see specific disc
17 bulging on x-ray.
18    Q.  Okay, go ahead.
19    A.  But I'm explaining to you what--
20    Q.  Right.  I understand.
21    A.  --what the term, "disc," means.
22    Q.  I understand.  I just wanted to make sure I
23 got that--
24    A.  With that, you are going to see, you are
25 going to start to see--with, with that, you are going

19 (Pages 70 - 73)

Page 74

1 to start to see a little bit of the narrowing at that
2 disc space because of the desiccation, so you get a
3 little bit of drawing, you start to get a little
4 narrowing at that space, and that's what we saw on his
5 x-rays. He's got a little--has a little bit of
6 narrowing at the--I believe the C4-5 level in his
7 cervical spine. He's got some at the L5-S1 level at
8 the lumbar spine, so that's part of the idiopathic--
9 "idiopathic" means when something occurs for no
10 reason, so idiopathic is just part of life.
11    Q.  Right.
12    A.  So he's got some mild degenerative changes
13 in his cervical and lumbar spine which are idiopathic,
14 and that's what degenerative disc--that's what
15 degenerative disc disease or degenerative disc
16 condition means.
17    Q.  Does he have any disc bulging?
18    A.  That by definition, if you have--I
19 think by definition, if you have some degenerative
20 disc disease, you are going to have some bulging--
21    Q.  Okay.
22    A.  --of that disc, a slight amount of bulging,
23 as part of that degenerative process.
24    Q.  Do you know the extent of the bulging as it
25 relates to Mr. Ronald Burt?

Page 75

1    A.  I don't know the exact--no, I don't know the
2 exact extent of it.
3    Q.  Okay.
4    A.  It's got to be--it's got to be very mild
5 because of his physical findings,--
6    Q.  Okay.
7    A.  --so I would say that he probably does have
8 some bulging with those degenerative, with those mild
9 degenerative changes, but the bulging has to be pretty
10 mild with his normal neurologic exam.
11    Q.  How would you go about determining the
12 amount of bulging?
13    A.  If you had a reason to really want to know
14 how much bulging, you would have to get an MRI.
15    Q.  All right, and would you consider the
16 diagnosis--is this the right term for, for Mr. Ronald
17 Burt--degenerative disc disease?  Is that a correct
18 diagnosis?
19    A.  Yes.  I would use, I would use--I would use
20 as a diagnosis what you just said, degenerative disc
21 disease.
22    Q.  And does he have osteoarthritis?
23    A.  That is, degenerative disc disease is a--I
24 was going to say it's a form of osteoarthritis.
25 Really, it's a--they're akin to each other, because

Page 76

1 with that degenerative disc disease, you start to
2 develop some degenerative changes in the facet joints
3 in the back of the spine which are, which are a type
4 of osteoarthritis.
5    Q.  Okay.  Do you know if, in the context of the
6 course of treatment for Mr. Ronald Burt's back and
7 neck problem--problems, whatever they might be, do you
8 know if the folks at Menard referred him to a
9 specialist such as yourself?
10    A.  They--they did not refer him to a
11 specialist.
12    Q.  And why do you say that?
13    A.  Well, on my review of the records, on my
14 review of the records, I do not see where he was
15 referred outside of their system to a specialist.
16    Q.  Okay.
17    MR. DUGAN:  We've been an hour and a half.
18 Can we take five at some point.
19    MR. NORWOOD:  Of course not.  We're on the
20 clock, man.
21    MR. DUGAN:  We're not on the clock, man.
22    MR. NORWOOD:  No, I'm just joking.  Why
23 don't we take a five--minute break, if that's okay.
24    MR. BOOSE:  All right, thank you.
25    THE WITNESS:  Fine.

Page 77

1    (Recess from 10:58 to 11:07
2 BY MR. NORWOOD:
3    Q.  Now, Doctor, what--when a patient comes in
4 to see you, what medical records, prior medical
5 history records would you want to look at, if any?
6    A.  Well, depends upon the person's complaints,
7 obviously, and--well, it would depend upon your
8 history and their complaints.
9    Q.  All right, so if they say they've been
10 complaining for twenty years about back and neck
11 problems, would you want to review those records going
12 back that far?
13    A.  No, not necessarily.
14    Q.  Under what circumstances would you want to?
15    A.  Well, I would go back, I would talk to the
16 person, get a history from them, okay, and then I
17 would, based upon their subjective complaints, you
18 know, then I would examine them, so based upon their
19 subjective complaints and their physical examination,
20 I might get some x-rays, and then I would try to put
21 all that together.  If they had--if I, if I found
22 something unusual in there, then I might ask to look
23 at, you know, prior medical records, et cetera, et
24 cetera.  You know, certain things would be important,
25 like whether they've had prior surgery before,

20 (Pages 74 - 77)

Page 78

1 whatever.
2    Q.  Okay.  With respect to degenerative disc
3 disease, what treatment options would there be for
4 that condition?
5    A.  Well, it depends upon--it depends upon the
6 degree of degenerative disc disease present.  Again,
7 that's a broad, broad question, but it would depend
8 upon the degree of degenerative disc disease, it would
9 depend upon someone's subjective complaints and their
10 objective physical findings.  If someone had, you
11 know, very mild degenerative disc disease changes as
12 Mr. Burt has, then I would have treated him like he
13 was treated, just with a mild antiinflammatory
14 medication.
15    Q.  Over-the-counter medicine?
16    A.  I would start, I would have started off with
17 a mild dose of an antiinflammatory medication.  If he
18 had some persistent subjective complaints despite
19 that, then I would have increased his dose.
20    Q.  Okay.  If a person comes in, a patient, and
21 subjectively presents with severe back and neck pain,
22 and the source of that pain can't be determined from
23 an x-ray, would you order a CT scan or an MRI test to
24 see if something else is present that can't be seen on
25 an x-ray?

Page 79

1       MR. BOOSE:  Objection to form.
2    A.  It would depend upon the history given to me
3 by the individual, and it would depend upon their
4 physical examination findings, and then it would also
5 depend upon the--based on x-rays.
6 BY MR. NORWOOD:
7    Q.  So you would look at the patient, listen to
8 what the patient is saying about his condition, how
9 long he's been complaining about the condition, what
10 you observed based upon your examination, and what's
11 based on the radiological findings that you have, in
12 this case, an x-ray, right?
13    A.  And then--yes, and then I, based upon all of
14 that, I would determine whether or not I thought any
15 further diagnostic evaluation or treatment was
16 necessary.
17    Q.  Such as the CT scan on MRI?
18    A.  Well, yeah, a CT scan and MRI are obviously
19 further radiographic studies,--
20    Q.  Right.
21    A.  --so based upon everything I said, I would
22 make a determination whether or not--whether or not I
23 thought those further studies were indicated.
24    Q.  Now, you've had situations where you've
25 looked at an x-ray and found nothing, and it

Page 80

1 ultimately turned out that there was something else
2 going on that couldn't get picked up by an x-ray;
3 correct?
4    A.  Well, yes, there are certain situations
5 where x-rays don't pick up everything.
6    Q.  Right.
7    A.  Period.
8    Q.  Right.
9    A.  But you have to take that in conjunction
10 with the history and physical examination.
11    Q.  I understand that, but I'm talking about
12 your 37 years of practice, right?  There have been
13 situations where you've looked at an x-ray and you
14 don't see anything, and everything looks normal on the
15 x-ray; correct?
16    A.  Yes.  I wouldn't say that I don't see
17 anything, but I have had situations where people have
18 had issues and had plain x-rays that are unremarkable.
19    Q.  Right.  Okay, unremarkable.  Okay, and then
20 it was only when you did the further testing such as
21 an MRI or CT scan where you found something that was
22 troubling.  Is that a fair statement?
23    A.  It's a fair statement, yes, in conjunction
24 with other, you know, physical findings, et cetera, et
25 cetera.

Page 81

1    Q.  I understand that.  I understand that other
2 physical findings, but what I'm saying is that if you
3 had relied solely on the x-ray, you would have missed
4 something.  Is that a fair statement?
5       MR. DUGAN:  Objection to the form,
6 foundation.
7    A.  Well, I wouldn't rely only on the x-rays.  I
8 mean, you don't rely, you don't rely on one thing.  As
9 part of medicine, you try to put everything together.
10 BY MR. NORWOOD:
11    Q.  Well, I understand that.  What I'm talking
12 about, from the radiological evidence standpoint, you
13 have had cases whereby you've received complaints,
14 you've examined the patient, and you've looked at an
15 x-ray, and based on the x-ray, it didn't mesh with the
16 complaints being given by the patient.  You've had
17 situations like that, haven't you?
18    A.  Yes, I have had situations where people's,
19 where people's x-rays are unremarkable that will have
20 subjective complaints, physical findings that
21 are--that concern me--
22    Q.  Right.
23    A.  --where I have pursued further diagnostic
24 evaluation.
25    Q.  Right, and my point is that in those

21 (Pages 78 - 81)

Page 82

1 circumstances you've just identified--let's focus on
2 those circumstances--had you stopped and relied solely
3 upon the radiological evidence you had in front of you
4 and not done this further radiological evaluation,
5 whatever that might be, you would have missed
6 something. Is that a fair statement?
7      MR. DUGAN: Objection to the form of the
8 question. You are mischaracterizing his prior
9 testimony as to how he looked at the entire situation,
10 the entire patient.
11      Subject to that, Doctor.
12      MR. BOOSE: Join.
13   A. First of all, I wouldn't stop. That's my
14 opinion.
15 BY MR. NORWOOD:
16   Q. Well, no, no, no, no, I understand that. I
17 understand that, but for whatever reason you decide to
18 stop, that "Based upon what I see," that's--"and
19 looking at this x-ray, it looks unremarkable," you
20 wouldn't stop is what you are saying, right?
21      MR. DUGAN: Form, foundation; improper,
22 incomplete hypothetical.
23      MR. BOOSE: Join.
24   A. You are right. If someone had certain
25 physical findings and certain subjective complaints of

Page 83

1 physical findings, even if their x-rays were
2 unremarkable, then I wouldn't stop, I would get
3 further evaluation.
4 BY MR. NORWOOD:
5   Q. Why?
6   A. Because I would be concerned that there was
7 something going on because of the reasons I mentioned,
8 because of the history given to me, their physical
9 examination, et cetera, et cetera.
10   Q. All right. In reviewing the medical
11 records, did you see anything in those records to
12 suggest that Mr. Burt was experiencing numbness or
13 tingling?
14   A. I do remember in some of the records, he had
15 some subjective complaints, I believe, of some
16 numbness or tingling.
17   Q. Do you know a Dr. Robert Colwell?
18   A. No.
19   Q. Okay. What does numbness and tingling add
20 to the equation as relates to spinal complaints?
21   A. Numbness and tingling can mean a lot of
22 different things.
23   Q. Okay.
24   A. Okay, so I mean we could talk about that all
25 afternoon.

Page 84

1   Q. Well, let's talk about it in general for us
2 lay people.
3   A. But numbness and tingling can mean that
4 you've got a--you've got a, a little--you hit your
5 arm, and you bruise a nerve and get some numbness and
6 tingling,--
7   Q. Right.
8   A. --it's no, no big deal.
9   Q. Right.
10   A. But I think--
11   Q. But it can also mean a significant problem
12 as relates to the spine.
13   A. It can, yes.
14   Q. Okay.
15   A. That's what I was going to say, so numbness
16 and tingling can also be consistent with some
17 neurologic issue from the spine. It could be, it can
18 be consistent with some underlying spinal cord or
19 nerve root compression coming out of the spine, it
20 could be consistent with an upper extremity peripheral
21 neuropathy, so it can mean a lot of different things.
22   Q. All right, in order to rule out some of
23 those things, would further radiological testing
24 beyond an x-ray be necessary?
25   A. Not necessarily. As I stated, you can do a

Page 85

1 physical examination on someone, and in doing a
2 physical examination, extremity examination, in this
3 case, that was normal.
4   Q. I'm not talking about in this case, I'm
5 talking about in general, somebody is saying, "I've
6 got pain, and I've got numbness and tingling in my
7 arms," for instance. Would you then, based upon that
8 type of complaint, be concerned?
9      MR. BOOSE: Objection; incomplete
10 hypothetical.
11      MR. DUGAN: I join.
12   A. I would take a further history from that
13 person,--
14 BY MR. NORWOOD:
15   Q. Okay.
16   A. --and then I would do a physical
17 examination.
18   Q. All right, and you do a physical examination
19 and you look at an x-ray, it doesn't--it's an
20 unremarkable x-ray but they complain about numbness
21 and tingling, say, for three days, does that concern
22 you in any way?
23      MR. BOOSE: Same objection.
24   A. Not necessarily.
25 BY MR. NORWOOD:

22 (Pages 82 - 85)

Page 86

1    Q.   What would necessarily concern you in that
2  regard?
3       A.   It would concern me if they had any--any
4  significant motor weakness, any reflex abnormalities,
5  any positive physical findings, any--many things would
6  concern me.  Any weight loss over a period of time, so
7  other things in the history and physical examination
8  might concern me.
9    Q.   Okay.
10         (Pause for perusal of documents.)
11       Let me hand you what's been marked as
12  Petkovich Deposition Exhibit 3.  Have you seen that
13  before?
14       A.   Yeah.  This is something from the American
15  Academy of Orthopedic Surgery.  It's just a little--
16  it's just a little information booklet on spine
17  basics.
18    Q.   Right.
19       A.   So I'm not sure I've seen this exact page
20  before, but there are a lot of these out there.
21    Q.   What is the American Academy of Orthopedic
22  Surgeons?
23       A.   That is an organization that is a--located
24  outside of Chicago, the international headquarters for
25  it, and that's the--all orthopedic surgeons have an

Page 87

1  option to belong to that if they are certified by the
2  American Board of Orthopedic Surgery.
3    Q.   And are you a member of that organization?
4       A.   Yes.
5    Q.   All right, and in fact, you referenced the
6  American Association--I'm sorry, American Academy of
7  Orthopedic Surgeons and this particular website on
8  your website, correct?
9       A.   Yes.
10    Q.   All right, why do you do that?  Why do you
11  refer to them and these particular website
12  publications on your website?
13       A.   Just as a--just as a--to direct individuals,
14  patients that want to look at that website to direct
15  them where to look--
16    Q.   Okay.
17       A.   --for information.
18    Q.   And do you believe that information posted
19  by the American Academy of Orthopedic Surgeons is
20  accurate information?
21       A.   Yes.
22    Q.   All right.  All right, let's take a look at
23  Exhibit Number 3, there, you have, and this talks
24  about the spine basics on the first page?  You see
25  that?

Page 88

1       A.   Yes.
2    Q.   And it breaks up the cervical spine, the
3  thoracic spine, the lumbar spine.  Do you see that?
4       A.   Yes.
5    Q.   And then it talks about the sacrum and the
6  coccyx?
7       A.   Yes.
8    Q.   Do you see that?
9       A.   Yes.
10    Q.   Does that appear to be a fair and accurate
11  depiction of what we've been talking about as it
12  relates to the spine?
13       A.   Yes.
14    Q.   All right, and then on that first page, the
15  last paragraph, it says, quote, "Scoliosis is another
16  type of spinal deformity.  When viewing the spine from
17  the front or back, scoliosis is a sideways curvature
18  that makes the spine look line an 'S' or a 'C,' rather
19  than a straight 'I.'"  Is that correct?
20       A.   Yes.
21    Q.   All right, so--and is that a fair assessment
22  of what you understand scoliosis to be?
23       A.   Yes.
24    Q.   All right, and then if we go to the next
25  page, there's some more extensive depictions of

Page 89

1  various facets of the spinal cord; three in
2  particular.  The two on the right breaks down the part
3  of the lumbar spine.  Does that appear to be a fair
4  and accurate depiction of that lumbar spine?
5       A.   Yes.
6    Q.   All right, and then the lower graphic is, is
7  a sort of sideways cut through the spine?  Is that
8  correct?
9       A.   It's a horizontal cut through the spine--
10    Q.   Horizontal.  I'm sorry.
11       A.   --that shows a--it's actually a horizontal
12  cut through the spine in the mid portion of a disc
13  that anatomically shows what I mentioned earlier, the
14  nucleus pulposus, the annulus fibrosus, where
15  they--where they exist in the spine, and its
16  relationship to the spinal cord and spinal nerves.
17    Q.   Okay.  All right, let me hand you what's
18  been marked as Petkovich Deposition Exhibit 4, and
19  that is also one of those publications from the
20  website of the American Academy of Orthopedic
21  Surgeons; is that correct?
22       A.   Yes.
23    Q.   And this one addresses x-rays, CAT scans,
24  and MRI's.
25       A.   Yes.

23 (Pages 86 - 89)

Page 90

1    Q.  Is that correct?
2    A.  Yes.
3    Q.  All right, and let me read through the first
4  paragraph of this website publication by the AAOS.  It
5  says, quote, "Diagnostic imaging techniques help
6  narrow the causes of an injury or illness and ensure
7  that the diagnosis is accurate."  Is that correct?
8    A.  That's what the first sentence says, yes.
9    Q.  And you agree with that, right?
10   A.  Yes.
11   Q.  I mean, that's what the purpose of those,
12 to--to make sure you have an accurate diagnosis;
13 correct?
14   A.  Yes.
15   Q.  All right, and it goes further in that same
16 paragraph.  It says, "These techniques include x-rays,
17 computer tomography, CT scans, magnetic resonance
18 imaging, MRI."  Correct?
19   A.  Yes.
20   Q.  And then the second paragraph says, "These
21 imaging tools let your doctor 'see' inside your body
22 to get a 'picture' of your bones, organs, muscles,
23 tendons, nerves and cartilage."  Correct?
24   A.  Yes.
25   Q.  And then it goes further and says, "This is

Page 91

1 the way a doctor can determine if there are any
2 abnormalities."  Is that correct?
3    A.  Yes.
4    Q.  And you agree with that?
5    A.  Yes.
6    Q.  All right.  Now, let's go down to the
7 section under CT scans, and the last paragraph says,
8 "You may need a CT scan if you have any problem with a
9 small, bony structure or if you have severe trauma to
10 the brain, spinal cord, chest, abdomen, or pelvis."
11 You see that?
12   A.  Yes.
13   Q.  Do you agree with that?
14   A.  Yes.
15   Q.  Let's go to the next paragraph--next page,
16 I'm sorry, first paragraph.  It says, "A CT scan costs
17 more and takes more time than a regular X-ray."  Do
18 you see that?
19   A.  Yes.
20   Q.  You agree with that?
21   A.  Yes.
22   Q.  It's a more costly procedure, correct?
23   A.  Yes.
24   Q.  Same with an MRI, correct?  More costly?
25   A.  Yes.

Page 92

1    Q.  All right.  Now, let's go to the MRI, last
2  paragraph under MRI.  It says, "An MRI may help your
3  doctor to diagnose your torn knee ligaments and
4  cartilage, torn rotator cuffs, herniated discs, hip
5  and pelvic problems, and other problems."  Do you see
6  that?
7    A.  Yes.
8    Q.  What's a herniated disc?
9    A.  A herniated disc is when I talked about the
10 anatomy of a--of a disc, I talked about the nucleus
11 pulposus being the jelly portion of the donut and the
12 annulus fibrosis being the dough.  What a herniated
13 disc is, is when the nucleus pulposus ruptures or
14 herniates out through the annulus fibrosis, so that's
15 what a herniated disc is.
16   Q.  Okay.
17   A.  So we go through the herniated disc, and
18 when it becomes clinically significant is if it's
19 pushing on a nerve root or the spinal cord.
20   Q.  Are there different degrees of severity as
21 relates to herniated discs?
22   A.  Yes.
23   Q.  And what are those degrees in severity?
24   A.  Well, there's extreme variability in
25 severity.  It's just a small, a small bulge can

Page 93

1 represent a--what the word "herniated" means is, what
2 the word "hernia" means is violation of a border, so
3 if someone has a hernia anywhere in their body, it
4 means you have a tissue plane where the fascial--the
5 tissue has started to bulge and that it's going beyond
6 that border, that contained border, so that's what the
7 word "hernia" means, so a herniated disc--so anytime
8 you have a--anytime you have a bulging disc, when you
9 do have a small bulge, you, by definition, have a
10 little bit of a--of a--that's worn down secondary to
11 the desiccation I talked about, you are going to have
12 to do a little bit of bulging of that wall, so that,
13 you know, some people could argue that's the very
14 early stages of herniation.  It becomes a matter of
15 semantics, but--so that's an early stage, and you can
16 have a--a full-blown clinical disc herniation is when
17 you actually get a, you actually get a protrusion of
18 the nuclear material, nucleus pulposus, out towards
19 pushing on one of the structures we talked about.
20   Q.  Or a nerve?
21   A.  Well, one of the structures meaning a nerve
22 or spinal cord, et cetera.
23   Q.  Is a herniated disc the same thing as a
24 bulging disc?
25   A.  No.  No.

24 (Pages 90 - 93)

Page 94

1    Q.   Okay, what's the difference between those
2  two?
3    A.   Well, it becomes a matter of semantics, as I
4  tried to say.  A bulging disc is just--I think anytime
5  somebody has any degree of desiccation, degenerative
6  changes in a disc, they are, by definition, going to
7  get a little bit of a bulge, okay?  So you could--I
8  mean, somebody could theoretically argue that early
9  bulge, that there's a little bit of the weakening in
10 the wall in order to get the bulge, and some people
11 argue that's--is that theoretically, is that an early
12 herniation because you have a little bit of weakening
13 of that wall, but most, most--most people that treat
14 these problems don't consider that a herniation.
15   Q.   Okay.
16   A.   Most, most--okay, so yes.
17   Q.   Okay, is it fair to say that in the case of
18 herniation, that would be a bulging problem in more
19 extreme fashion?  Is that a fair statement?
20   A.   It's more--a true, a true herniated disc, a
21 true clinical herniated disc is when the nuclear
22 material ruptures or herniates out through the annulus
23 fibrosus and is causing some--causing some effect on
24 the spinal canal, or a nerve root, or the spinal cord.
25   Q.   So it starts as a bulge, and ultimately, it

Page 95

1  bulges out to interfere with one of those other
2  structures.  Is that a fair statement?
3    A.   Well, it doesn't have to start off as a
4  bulge.
5    Q.   Right.
6    A.   It doesn't have to start off as a bulge.
7    Q.   It can rupture and--
8    A.   Somebody could have an acute torsional-type
9  injury to where they have an acute herniation in an
10 otherwise relatively healthy disc.
11   Q.   But it is a bulge of some sort; is that
12 right?
13   A.   I would say that a, a herniated disc is a--
14 is a--I--is a protrusion.
15   Q.   Protrusion?
16   A.   So where the disc is protruding.  It's a
17 protrusion.
18   Q.   So you wouldn't categorize that as a bulge?
19   A.   Well, I wouldn't disagree with that.
20   Q.   All right.
21   A.   I wouldn't disagree with using those terms.
22 That's what I'm saying, the terms become--the terms
23 become a matter--I'm repeating myself--semantics, and
24 you get some people that don't really--you get some
25 physicians that don't really use these words properly,

Page 96

1  that don't treat a lot of these, and it gets
2  confusing.
3    Q.   All right, can you see a herniated disc on
4  an x-ray?
5    A.   You cannot see the soft tissue structures on
6  an x-ray, so you cannot see a--you cannot see a
7  herniated disc on a plain x-ray.
8    Q.   So if you were trying to determine if
9  someone had a herniated disc, what would you do?
10   A.   If I saw someone that I suspected that they
11 had a herniated disc and their subjective complaints
12 and objective physical findings correlated with that,
13 then I would get an MRI.
14   Q.   All right.  Now, the only way you can
15 determine that, you couldn't do it on an x-ray.
16   A.   Well, you can do a myelogram, you can do a
17 myelogram where you put dye in the spine and x-ray--
18   Q.   I understand that's another, that's a
19 different test, right?
20       MR. DUGAN:  Let him finish his answer,
21 Counsel, please.
22       MR. NORWOOD:  Well, he's not answering my
23 question, so let me cut him off, and I'm trying to get
24 from point A to point B.
25 BY MR. NORWOOD:

Page 97

1    Q.   The x-ray, as you indicated, doesn't show
2  soft tissue.
3    A.   Plain x-rays do not show soft tissue.
4    Q.   Plain x-rays, but there are other types of
5  procedures that could show, for instance, a herniated
6  disc, and what I'm trying to figure out is, there's
7  MRI.  What else could you use to determine if someone
8  had a herniated disc?
9    A.   Radiographically, you do MRI.  A CT scan is
10 going to show it, but not in the same detail, but it's
11 going to give an idea, and then another study is doing
12 a myelogram, where you inject some dye in someone's
13 spinal canal, and then following the dye, you either
14 get plain x-rays or a CT scan following that.
15   Q.   Okay.  I got you.  I got you.
16       Okay, let me hand you a document marked as
17 Petkovich Deposition Exhibit 5, and again, that's
18 another publication from the AAOS addressing the issue
19 of neck pain?  Is that correct?
20   A.   Yes.
21   Q.   All right, and at the end of the first
22 paragraph, it says, "For many people, neck pain is a
23 temporary condition that disappears over time."  Is
24 that a fair and accurate statement?
25   A.   Yes.

25 (Pages 94 - 97)

Page 98

1    Q.   And you agree with that?
2    A.   Yes.
3    Q.   All right, then it says, "Others need
4 medical diagnosis and treatment to relieve their
5 symptoms."  Do you see that?
6    A.   Yes.
7    Q.   Do you agree with that?
8    A.   Yes.
9    Q.   All right, and then there's a nice graphic,
10 or a photo or sketch that lays out the brain, the
11 spinal cord, the spinal nerves.  Is that a normal neck
12 assessment of what they describe as a normal neck
13 anatomy?
14    A.   Yes.
15    Q.   All right, and normal, it looks like it's
16 straight, right?  Do you see any curvatures in there
17 in that photo or sketch?
18    A.   No, there are no curvatures in this photo,
19 but as far as straight, the cervical spine, which is
20 what this is a picture of, normally in a sagittal
21 view, a sagittal view, which is a side view, people--
22 it's not straight.  We have what is called lordosis,
23 so everybody's neck, cervical spine in a side view has
24 a certain amount of backward lordosis, which is
25 normal, and then but--

Page 99

1    Q.   This is a side view or a back view?
2    A.   No, no, I'm just saying in a side view--this
3 is a, a front-to-back view.
4    Q.   Right.
5    A.   On a front-to-back view, normally, there is
6 no curvature.
7    Q.   Okay, in a normal spine.
8    A.   Yes.
9    Q.   All right.  Now, it says, "Cause."  Do you
10 see that section on--
11    A.   Yes.
12    Q.   --Exhibit 5?  It says, "Neck pain may result
13 from abnormalities in the soft tissues, the muscles,
14 ligaments and nerves, as well as in the bones and
15 discs of the spine."  Do you see that?
16    A.   Yes.
17    Q.   You agree with that?
18    A.   Yes.
19    Q.   All right.  It says, "The most common causes
20 of neck pain are soft tissue abnormalities due to an
21 injury," and then in parentheses, it has "a sprain or
22 prolonged wear and tear."  Do you see that?
23    A.   Yes.
24    Q.   Do you agree with that?
25    A.   Yes.

Page 100

1    Q.   So the most common neck problems are soft
2 tissue abnormalities; correct?
3    A.   Yes.
4    Q.   All right.  It says, "In rare instances,
5 infection or tumors may cause neck pain."  Do you see
6 that?
7    A.   Yes.
8    Q.   Can you see infections or tumors on an
9 x-ray?
10    A.   Sometimes you can, and sometimes you can't.
11    Q.   All right.  It goes further and says, "In
12 some people, neck problems may be the source of pain
13 in the upper back, shoulders, and arms."  Do you see
14 that?
15    A.   Yes.
16    Q.   All right, and then there's a section that
17 talks about cervical disc degeneration.  What is
18 cervical disc degeneration?
19    A.   Cervical disc degeneration is what I
20 described earlier, degenerative cervical disc disease,
21 also referred to as cervical spondylosis, and what
22 that is is, it means that you have the degeneration of
23 that disc where you are losing some of the water
24 content in there; you start to get some desiccation,
25 some drying, et cetera, et cetera.

Page 101

1    Q.   So does Mr. Ronald Burt have spondylosis?
2    A.   Yes, and this says it right here.
3 Degenerative disc disease is the same thing as
4 spondylosis.
5    Q.   Okay.
6    A.   And that's what--in this article, this
7 article you are referencing right here, it says that
8 in cervical degenerative disc degeneration which
9 typically occurs in people age 40 and older,--
10    Q.   Right.
11    A.   --the normal gelatinous structure center of
12 the disc degenerates and the space between the
13 vertebrae narrows, so that's what I was talking about
14 earlier, the jelly donut.
15    Q.   All right, and then it goes further, says,
16 "As the disc space narrows, added stress is applied to
17 the joints of the spine causing further wear and
18 degenerative disease."  Correct?
19    A.   Yeah.
20    Q.   And you agree with that?
21    A.   Yes.  That's what I was talking to earlier
22 about the facet joints in the back of the spine.
23 That's all part of the degenerative process.
24    Q.   Okay.  It says, "The cervical disc may also
25 protrude and put pressure on the spinal cord or nerve

26 (Pages 98 - 101)

Page 102

1 roots when the rim of the disc weakens." Do you agree
2 with that?
3    A.   Yes.
4    Q.   And this is known as a herniated cervical
5 disc, correct?
6    A.   Yes.
7    Q.   And to make that determination, you would
8 need an MRI.  Is that--or some other type of test
9 beyond an x-ray; correct?
10    A.   Well, no, what determination are you talking
11 about?
12    Q.   A determination of whether or not someone
13 has a herniated cervical disc.
14    A.   Well, it's irrelevant.  I mean, you are
15 examining the person, you are doing--taking a history,
16 you are taking a history, you are doing a physical
17 examination, et cetera, et cetera, so--
18    Q.   Yeah, I understand all that, but I'm just
19 saying--
20       MR. DUGAN:  Let him finish his answer.
21    A.   But everybody--
22       MR. NORWOOD:  But he's not answering my
23 question, so I'm going to stop you, okay?
24 BY MR. NORWOOD:
25    Q.   My question is simple.  I understand all of

Page 103

1 that.  I'm just trying to figure out as we sit here
2 today, if we wanted to figure out if I had a herniated
3 disc, can I determine that with an x-ray.
4       MR. DUGAN:  And he was answering that, and
5 you didn't let him finish.
6       MR. NORWOOD:  No, he wasn't answering me,
7 because I just changed the question, so you--you are
8 wrong.
9       MR. BOOSE:  Object to the--
10       MR. NORWOOD:  I'm changing the question--
11       MR. BOOSE:  --form and foundation--sorry,
12 form and incomplete hypothetical.
13       MR. NORWOOD:  Let me change the question.
14       MR. DUGAN:  All right, let's--
15       MR. NORWOOD:  I withdrew the other
16 question,--
17       MR. DUGAN:  Okay.
18       MR. NORWOOD:  --and I'm going down another
19 path.
20 BY MR. NORWOOD:
21    Q.   Ronald Norwood, Attorney at Law, wants to
22 know if he has a herniated disc, and my question for
23 you is whether I can have an x-ray and make that
24 determination.
25       MR. BOOSE:  Objection as to form and

Page 104

1 incomplete hypothetical.
2 BY MR. NORWOOD:
3    Q.   (Continuing)  Okay, subject to that.
4    A.   Okay, my answer is that I know that this man
5 has this--we're talking about a cervical spine, this
6 mild degenerative cervical disc disease.
7       MR. NORWOOD:  Excuse me.  Let me stop you.
8 I'm going to stop you.  I'm not talking about Ronald
9 Burt, I'm talking about Ronald Norwood, Attorney at
10 Law, who is sitting in this chair, and my question is
11 a simple question, Doctor, so we can move on.  If I
12 wanted to determine today if I had a herniated disc,
13 can I determine that by having an x-ray?
14       MR. BOOSE:  Same objections.
15       MR. DUGAN:  Join.
16    A.   You can't determine that--well, it depends
17 on what your x-rays show.  If your, if your x-rays--if
18 your x-rays show some mild degenerative changes at a
19 disc space level, then by definition, you've got some
20 desiccation there.  By definition, you have some bulge
21 because of that desiccation, and--and what I said
22 earlier, by definition, when you have a bulge, you
23 have a degree of weakening of that wall, and you
24 could--a matter of semantics whether or not you want
25 to call that a herniated disc.  It's not clinically

Page 105

1 what most people treat--most spine surgeons wouldn't
2 call that a herniated disc, but if you want to get to
3 the basic semantics, some people would call all, any
4 bulging disc a degree of herniation.  It becomes
5 clinically insignificant, but some people, some
6 people, if you want to be a purist about everything,
7 you could argue that any bulge whatsoever is a type of
8 a herniation.
9 BY MR. NORWOOD:
10    Q.   And I understand there are purists out
11 there, but I'm asking you, since you are our expert in
12 this case, can you determine whether or not I have a
13 herniated disc by an x-ray?
14       MR. DUGAN:  Asked and answered.
15    A.   If I looked at, if I looked at x-rays that
16 showed to me that there were some degenerative changes
17 there,--
18 BY MR. NORWOOD:
19    Q.   Okay.
20    A.   --that would mean to me there is, by
21 definition, some degenerative bulging of that disc;
22 okay?
23    Q.   Right.
24    A.   And then I would exam--just by those x-rays,
25 I would know that.

27 (Pages 102 - 105)

Page 106

1    Q.  Okay.
2    A.  Whether or not that's clinically
3  significant, then I would want to examine the patient.
4    Q.  Right.
5    A.  And do a--take a history from the patient,
6  do a physical examination of the patient, and then,
7  and then I would want to make a decision whether
8  anything else is necessary.
9    Q.  I understand all of that, but you didn't
10  answer my question, so I just want to make sure we
11  understand your opinion.  You are saying that from
12  that x-ray of Ronald Norwood, if it shows disc
13  degeneration, that would indicate to you that I have a
14  herniated disc.  Is that what you are testifying to
15  today?
16    A.  If you--yes, that's what I'm saying to you,
17  I'm saying that to you today, sir, if you want to use
18  that--if you want to be a purist about everything, I
19  would say "Mr. Norwood, you've got a little bit of--
20  you've got some degeneration here.  I know you've got
21  a little bit of a bulge."
22    You say "What is that?"
23    I would say "Well," I would go through the
24  exam, and you'd say to me, "Well, is that a disc
25  herniation?"  I'd give you the same spiel.  I'd say,

Page 107

1  "You know, it's a matter--you know, some people would
2  argue it's a mild, it's a mild, it's a mild little
3  herniation, but I wouldn't do anything about it."
4    Q.  Okay, so you--
5    A.  If you were my--if I saw you as a patient,
6  that's what I would tell you.
7    Q.  So you would tell me I have a mild
8  herniation.
9    A.  If--I would say because you--yeah, I would
10  say because of that bulge, some people could use the
11  semantics of calling it a small herniation.
12    Q.  All right.  Now, then I would say, "Well,
13  what's the extent of the herniation?"
14    A.  Well, I would want to examine you.
15    Q.  Okay, you examine me, and can you tell the
16  extent of the herniation by that physical examination?
17    A.  Yes.
18    Q.  And how do you do that?
19    A.  You, by--you do that by checking someone's
20  reflexes, because you know, if you've got this level
21  of the disc there, you know what nerves come out at
22  those levels, what nerves are affected by that disc,
23  so--and you, so you, you check their--you check their
24  muscle strength, their reflexes, their sensation over
25  that nerve root distribution, and--

Page 108

1    Q.  Which disc, though, are we talking about?
2  Which disc is herniated?
3    A.  Well, in this case--well, in--in this case,
4  here, in Mr. Burt's example, that there's some mild
5  degenerative changes at C4, at C4-5, so in this case,
6  it's going to be the C5 nerve root, okay?  So you are
7  going to check to see if there's any, if there's any
8  symptoms over that C5 nerve root, are there any
9  physical findings, any--any subjective symptoms, any
10  subjective complaints, any physical findings over that
11  C5 nerve root, and then if there are not, then you are
12  going to say, you know, you are going to say, you
13  know, "You've got this little mild degenerative
14  changes there, you've got a normal physical
15  examination," and you don't do anything about it.  You
16  would treat them with a low-dose antiinflammatory
17  medication.
18    Q.  So I just want to make sure I'm clear on
19  your answer.  Yes, you can determine disc herniation
20  by an x-ray?
21    A.  To a degree.  To a degree, but--to a degree.
22    Q.  Okay.  Fair enough.  Let's--the last--let's
23  close out Exhibit 5.  The last paragraph, it says,
24  "Many patients seek orthopedic care for neck pain
25  because" orthopedics--"orthopedists are specifically

Page 109

1  trained to diagnose, treat, and prevent problems
2  involving the muscles, bones, joints, ligaments and
3  tendons."  You see that?
4    A.  Yes.
5    Q.  Do you agree with that?
6    A.  Yes.
7    Q.  Okay.  Let me hand you Petkovich--Petkovich
8  Exhibit 6, which, for the record, is another
9  publication from the American Association (sic) of
10  Orthopedic Surgeons; correct?
11    A.  Yes.
12    Q.  And this deals with cervical radiculopathy.
13  What is cervical radiculopathy?
14    A.  So this is a publication from the American
15  Academy of Orthopedic Surgeons.
16    Q.  I'm sorry, I must have mispro--
17    A.  Anyway, so what--what radiculopathy means is
18  when a nerve root is being irritated, pinched,
19  irritated, any nerve throughout your body, when it
20  comes out of the spinal, spinal cord, the nerve is
21  being pinched, be it pinched by a--by a discogenic
22  condition, could be pinched by some stenosis,
23  narrowing of the canal, could be pinched, pinched by a
24  number of factors, so that's what radiculopathy is.
25    Q.  Can you tell somebody has a pinched nerve by

28 (Pages 106 - 109)

1 an x-ray?

2    A.   You cannot tell specifically a pinched nerve

3 by an x-ray.

4    Q.   Well, what would you do, what kind of test

5 would tell you if a pinched nerve exists?  What kind

6 of test, diagnostic test?

7    A.   You would take a history of the

8 individual,--

9    Q.   Mm-hmm?

10    A.   --and then you would do a physical

11 examination as I stated,--

12    Q.   Okay.

13    A.   --and depending upon the results of that

14 physical examination, then you may do further

15 diagnostic evaluation if indicated.

16    Q.   What kind of further diagnostic evaluation?

17    A.   Well, if you have, if you have, you know,

18 subjective complaints and physical findings consistent

19 with radiculopathy, then you would get--now, if we're

20 talking about, if we're talking about upper extremity

21 radiculopathy, i.e., the arms, you would look backward

22 into--you'd see if it's coming from the cervical area,

23 so you get an MRI of the cervical spine, then you

24 might also get electrodiagnostic studies at the upper

25 extremity, like a myogram.  That's a nerve conduction

1 velocity study, so those would all be part of a

2 further diagnostic evaluation if indicated.

3    Q.   If indicated; okay.

4        Let me hand you Petkovich Deposition Exhibit

5 7, and that's another publication from the AAOS?  Is

6 that correct?

7    A.   Yes.

8    Q.   And this deals with herniated disc; is that

9 correct?

10    A.   Yes.

11    Q.   With respect to the treatment of a herniated

12 disc, is surgery one of those options that could help

13 with a herniated disc?

14    A.   If someone fails to respond to conservative

15 management and--and has a true disc herniation with

16 consistent physical findings, then surgery is an

17 option, yes.

18    Q.   All right, on the second page, "Cause," it

19 says, "A disc herniates or ruptures when part of the

20 center nucleus pushes through the outer edge of the

21 disc and back toward the spinal canal."  Do you see

22 that?

23    A.   Yes.

24    Q.   And that's what you talked about earlier;

25 correct?

1    A.   Yes.

2    Q.   All right, it says, "This puts pressure on

3 the nerve."  Right?

4    A.   Yes.

5    Q.   And that's accurate; correct?

6    A.   Yes.

7    Q.   It says, "Spinal nerves are very sensitive

8 to even slight amounts of pressure, which can result

9 in pain, numbness, or weakness in one or both legs,"

10 correct?

11    A.   Yes.  That's what this says.  Now, this

12 is--it says, "legs" here because this is referring to

13 the lumbar spine, but it's the same with the cervical

14 spine.

15    Q.   Right, so it could be pain in one or both

16 legs, weakness or numbness in one or both legs, or--is

17 that accurate?  You agree with that?

18    A.   Yes, that's--yes.

19    Q.   All right.  I'm going to go down to--on the

20 third page, it talks about--under the doctor's

21 examination, it says, "To help confirm a diagnosis of

22 a herniated disc, your doctor may recommend an MRI, or

23 magnetic resonance imaging MRI scan.  This test can

24 create clear images of soft tissue like intervertebral

25 discs," correct?

1    A.   Yes.

2    Q.   And that's what you talked about earlier,

3 right?

4    A.   Yes.

5    Q.   The soft tissue distinction, right?

6    A.   Yes.

7    Q.   All right, and then on the last page, it

8 says, "Surgical Treatment."  It says, "Only a small

9 percentage of patients with disc herniations require

10 surgery."  You agree with that, right?

11    A.   Yes.

12    Q.   It says, "Spine surgery is typically

13 recommended only after a period of nonsurgical

14 treatment has not relieved painful symptoms."  Do you

15 see that?

16    A.   Yes.

17    Q.   And you agree with that?

18    A.   Yes.

19    Q.   Okay.  Let me hand you what's been marked as

20 Petkovich Deposition Exhibit 8, and that is another

21 publication from the American--I'm sorry, from the

22 AAOS, dealing with cervical spondylosis, or arthritis

23 of the spine.  Do you see that?

24    A.   Yes.

25    Q.   And does Mr. Ronald Burt have cervical

29 (Pages 110 - 113)

Page 114

1 spondylosis?
2    A.  He does have very mild spondylosis at the
3 C4-5 level.
4    Q.  Okay, and on--if you go to the fourth page,
5 it talks about physical therapy.  Do you see that?
6    A.  Yes.
7    Q.  It says, "Physical therapy is usually the
8 first nonsurgical treatment that your doctor will
9 recommend."  Do you see that?
10    A.  Yes.
11    Q.  Do you agree with that?
12    A.  Yes.  I agree with that if someone is
13 symptomatic.
14    Q.  Of cervical spondylosis?
15    A.  Yes.  If someone has--if someone has
16 cervical spondylosis and their history and physical
17 examination are significant, then I believe that
18 physical therapy at that time is--is important, can be
19 important.
20    Q.  Okay.  Well, this says, "Physical therapy is
21 usually the first nonsurgical treatment that your
22 doctor will recommend," and it is your opinion that
23 they would only recommend it based on the severity of
24 the cervical spondylosis.  Is that your testimony?
25    A.  It is, and that's--that's the whole point of

Page 115

1 this, this article you are showing.
2    Q.  Well, I mean there's a whole list of
3 treatments listed, possible treatments listed under
4 that section.  Is that correct?
5    A.  Yes.
6    Q.  And that list includes nonsurgical
7 treatments; correct?
8    A.  Yes.
9    Q.  And those include physical therapy,
10 medications, soft cervical collar, ice, heat, and
11 other modalities, steroid-based injections, those are
12 listed under nonsurgical treatments; correct?
13    A.  Yes.
14    Q.  And then there's a section for surgical
15 treatments; correct?
16    A.  Yes.
17    Q.  And under surgical treatment, it says,
18 "Surgery is commonly recommended for cervical
19 spondylosis and neck pain unless your doctor
20 determines, number 1, a spinal nerve is being pinched
21 by a herniated disc or bone, cervical radiculopathy,
22 or your spinal cord is being compressed, cervical
23 spondylitic myopathy" (sic).
24    A.  Myelopathy.
25    Q.  Myelopathy; thank you, sir.

Page 116

1    So those are the cases where surgery may be
2 recommended; correct?
3    A.  Yes.
4    Q.  All right.  All right, it also says, if you
5 look at the last paragraph, "Surgery may also be
6 recommended if you have severe pain that has not been
7 relieved by nonsurgical treatment."  Right?
8    A.  Yes.
9    Q.  And you agree with that, right?
10    A.  Yes.
11    Q.  Let me hand you what's been marked as
12 Petrovich Deposition Exhibit 9 and ask you if you
13 can--well, for the record, this is another publication
14 from the AAOS?  Is that correct?
15    A.  Yes.
16    Q.  And this deals with lumbar spinal stenosis.
17    A.  Yes.
18    Q.  And to your knowledge, does Mr. Burt have
19 lumbar spinal stenosis?
20    A.  No.
21    Q.  What is lumbar spinal stenosis?
22    A.  "Stenosis" means narrowing.  Lumbar spinal
23 or spinal stenosis means narrowing of the spinal
24 canal, period, so--
25    Q.  Can you determine that from an x-ray?

Page 117

1    A.  You can get an idea of it, you can get an
2 idea of it, and then that, in conjunction with a
3 history and physical examination, would further--would
4 further--could further possibly confirm that.
5    Q.  How do you get an idea of it from an x-ray?
6    A.  You will see, you will see with significant
7 degenerative disc changes, you will then see
8 degenerative facet joint changes which he talks about
9 posteriorly.  You might start to see some what is
10 called foraminal narrowing, some narrowing of those
11 little foramen where the nerves come out of, so that's
12 all going to be significant.
13    Q.  You can see all that on an x-ray?
14    A.  On plain x-rays you can, yes.  On plain
15 x-rays, you can see all of that.
16    Q.  Okay.
17    A.  Okay, so that's--that's bone.  We're talking
18 about you can see degenerative disc changes, you can
19 see degenerative changes in the facet joints, those
20 joints posterior, in--
21    Q.  Correct.
22    A.  --the back of the spine.
23    Q.  Right.
24    A.  And then on the oblique view, you can see
25 some narrowing of the, of the neural foramen where the

30 (Pages 114 - 117)

Page 118

1 nerves come out, so you can see all that on plain
2 x-rays, and then if it's clinically indicated, if
3 somebody's history and physical exam indicates,
4 indicates it, then you would need to do further
5 evaluation.
6    Q.   Well, we see degenerative disc change with
7 Mr. Burt; correct?
8    A.   You see--you see very mild degenerative disc
9 changes--
10    Q.   Right.
11    A.   And you don't see anything else, though.
12    Q.   Nothing else that would indicate to you that
13 he has lumbar spinal stenosis?
14    A.   Now, we're talking about a lumbar, as
15 opposed to cervical now?  Is that right?
16    Q.   Well, I'm talking about lumbar spinal
17 stenosis, which is--
18    A.   It's the same--it's the same thing.  There's
19 cervical spinal stenosis, too, so stenosis just means
20 narrowing of the canal, so you can have cervical
21 spinal stenosis, lumbar spinal stenosis, et cetera, so
22 in Mr. Burt's case, he's got some degenerative changes
23 at the L5-S1 level,--
24    Q.   Right.
25    A.   --but there are no other radiographic

Page 119

1 findings to indicate any--to indicate any--any
2 stenosis in his lumbar spine.
3    Q.   Okay, and so that would be in the lumbar
4 spine or--I mean in this case, we're talking about
5 lumbar spine, so nothing--
6    A.   You mentioned the lumbar spine, but it would
7 be the same thing with the cervical spine.
8    Q.   Right.
9    A.   I mean, you could have cervical spinal
10 stenosis, but if you have that, you would have other,
11 you would have other--you would have physical findings
12 consistent with that.
13    Q.   Okay.  All right, go to page 3.  It says, at
14 the first top--the top paragraph, it says, "Another
15 response to arthritis in the lower back is that
16 ligaments around the joints increase in size."  Do you
17 see that?
18    A.   Okay, where are you reading from, sir?
19    Q.   The top paragraph on page 3.
20    A.   Okay.
21    Q.   Do you see that?
22    A.   Yes.
23    Q.   And the ligaments, can you see whether or
24 not ligaments have increased in size on an x-ray?
25    A.   You cannot specifically see the ligaments,

Page 120

1 per se, on the x-rays, but you could see the
2 surrounding structures, and what they're talking
3 about, when the ligaments will, will start to
4 hypertrophy, you will typically with that see some
5 bone spurs from forming, and so you can see the bone
6 spurs forming which would indicate that.
7    Q.   Okay, but ligaments you can't see on x-ray.
8 Is that correct?
9    A.   You cannot see the specific ligaments,
10 themselves, on the x-rays.
11    Q.   All right, it says, "This also lessens space
12 for the nerve."  Do you see that?
13    A.   Yes.
14    Q.   And they're talking about the increased size
15 and the ligaments lessening the space for the nerves;
16 is that correct?
17    A.   Yes, and that's what I was talking about
18 earlier, is that the--you know, I mentioned the spinal
19 canal, I mentioned the neural foramen where the nerves
20 come out of the spinal canal.
21    Q.   Okay, and it says, "Once the space has
22 become small enough to irritate spinal nerve, painful
23 symptoms can result."  Is that correct?
24    A.   Yes.
25    Q.   And this is all happening in the disc joint,

Page 121

1 or in the joint that contains the disc?  Is that where
2 all this is happening?
3    A.   It's happening, it's happening--it's
4 happening more than that.  It's happening--spinal
5 stenosis means narrowing of the spine.
6    Q.   Right.
7    A.   That's what it means, so whether it be any
8 portion of the spine, the spine--the canal being
9 narrowed, that's what the word "stenosis" means.
10    Q.   So it can be at the disc or the bone level?
11    A.   Well, typically--what I said is, it's
12 secondary to the disc.  The disc, you get some
13 degeneration, some desiccation; the disc will start to
14 settle.  As it starts to settle, off the side of the
15 disc, you have the, neural foramen there.  They
16 will start to settle with it.  The facet joints in the
17 back will start to settle a little bit, and that's all
18 part of--that's all part of the degenerative process,
19 and then secondary to that, you will start to
20 typically get some, some extra motion there, you will
21 get some ligamentum, ligamentous hypertrophy which
22 starts to react to that, and putting all that
23 together, then you can get some narrowing, some
24 stenotic changes, and that's all--that's all part of a
25 prolonged, prolonged degenerative, chronic condition,

31 (Pages 118 - 121)

Page 122

1 pretty far along.
2    Q.   Got you.  Let me hand you what's been marked
3 as Plaintiff's Exhibit 11 in a prior deposition, and
4 let's take a look at that.  Now, this, Plaintiff's
5 Exhibit 11 talks about cervical degenerative disc
6 disease.  Do you see that?
7    A.   Yes.
8    Q.   And in the second paragraph, it says,
9 "Nonetheless, a fall or a twisting injury to the disc
10 space can spur degeneration, and accumulated wear and
11 tear on the disc over time can lead to neck pain
12 caused by disc degeneration."  Do you agree with that
13 statement?
14    A.   Yes.
15    Q.   And then the last paragraph on that page, it
16 says, "Cervical disc degeneration can also contribute
17 to spinal stenosis, more specifically the development
18 of cervical stenosis and other progressive conditions,
19 as well as a more sudden herniated disc."  Do you
20 agree with that?
21    A.   Yes.
22    Q.   Let me hand you what's what has been
23 previously marked in another deposition as Plaintiff's
24 Exhibit Number 3 and ask you if you can take a look at
25 that for me, and this Plaintiff's Exhibit 3 relates to

Page 123

1 or purports to relate to degenerative disc disease
2 treatment guidelines.  Do you see that?
3    A.   Yes.
4    Q.   And the first paragraph says, "The goals for
5 treatment of degenerative disc disease usually include
6 a combination of three areas; pain control, exercise,
7 and rehabilitation."  Do you see that?
8    A.   Yes.
9    Q.   Do you agree with that?
10    A.   Yes.
11    Q.   Okay.  Number two, "Exercise and
12 Rehabilitation," it says, "The goals of exercise are
13 both to help the back heal and to prevent or reduce
14 further reoccurrences of pain."  Do you see that?
15    A.   Yes.
16    Q.   Do you agree with that?
17    A.   Yes.
18    Q.   "For people with symptomatic degenerative
19 disc disease, exercises are usually best done under
20 the guidance of a physical therapist or other
21 appropriately trained healthcare professional."  Do
22 you see that?
23    A.   Yes.
24    Q.   Do you agree with that?
25    A.   I agree with that, again under appropriate

Page 124

1 circumstances after putting everything together that
2 I've already talked about.
3    Q.   Okay, and you go down--skip a paragraph.
4 The next paragraph says, "Exercise is best done in a
5 controlled, progressive manner and with the help of a
6 trained health professional such as a--
7    A.   Physiatrist.
8    Q.   --physiatrist, physical therapist, or
9 chiropractor."
10    A.   Yes.
11    Q.   Correct?  Do you agree with that?
12    A.   No.  It's--this is a kind of a blank
13 statement here, repeating just what you said.  Very
14 often, people do exercises on their own.  They don't
15 need to do exercises necessarily with a--with somebody
16 else there.  When you instruct people in exercise, I
17 think that's what this really means, so somebody is
18 instructing exercises, and then people do them on
19 their own.
20    Q.   Okay, so you disagree with that statement?
21    A.   Well, I think the way you are using the
22 statement, you are taking it out of the context.
23    Q.   Well, no, let me restate this, Doctor.
24    A.   The statement the way you read it right
25 here, I would add, I would add, because you are taking

Page 125

1 it out of context, this statement--
2    Q.   Well, let me say this, Doctor.  I'm
3 reading--
4        MR. DUGAN:  Let him finish his answer.
5        MR. NORWOOD:  Well, let me defend what he's
6 saying.  He's attacking me and saying I'm taking it
7 out of context.
8 BY MR. NORWOOD:
9    Q.   I'm just reading from a statement, and I'm
10 just asking you if you agree or disagree with it.  I'm
11 not saying anything, I'm not--
12        MR. DUGAN:  And he's answering your question
13 and you are cutting--
14        MR. NORWOOD:  Well--
15        --MR. DUGAN:  --him off.
16        MR. NORWOOD:  Well, no, he's saying I'm
17 taking it out of context.
18 BY MR. NORWOOD:
19    Q.   I'm trying to just ask you the simple
20 question of do you disagree with the statement or not.
21 If you don't agree with the statement, that's fine,
22 too.  That's all I want to know.
23    A.   I, I--sir, I agree with, I agree with that
24 statement, taken in context with what this piece of
25 paper is trying to get to.

32 (Pages 122 - 125)

Page 126

1    Q.   Okay, so you agree with it in the context of
2  how it's iterated here?
3    A.   Yes.
4    Q.   Okay, fair enough.
5        Let me hand you what has previously been
6  marked as Plaintiff's Exhibit 4 and ask you to take a
7  look at that one, and this one deals with cervical
8  disc pathology and artificial disc surgery, and let
9  me--if you go to the second paragraph, right under the
10 photo, it says, "Fortunately, many of these changes
11 seen on x-ray images can be considered a general aging
12 phenomenon and not pathological (problematic), as many
13 people with degenerative changes do not have any pain
14 or other symptoms."  Do you agree with that?
15   A.   Yes.
16   Q.   All right, so that I could be sitting here
17 with degenerative disc changes, and I probably am at
18 57, but I'm not experiencing any pain, and that would
19 be what they're talking about here, correct?
20   A.   That's exactly what they're--that's exactly
21 what they're talking about, and I'm sure you do have
22 some degenerative disc changes.
23   Q.   Okay.
24   A.   As I do, also.
25   Q.   Okay, and as you indicated before, that's

Page 127

1  part of the natural aging process.
2    A.   Yes.
3    Q.   All right, and then it goes further and
4  says, "However, in some patients, the disc
5  degeneration can result in a herniation of the disc
6  and osteophyte bone spur formation."  Do you agree
7  with that?
8    A.   Yes.
9    Q.   All right, and on the next page, it talks
10 about when neck surgery may be considered.  It says,
11 "Most instances of pain and other symptoms from
12 cervical degenerative disc disease and/or a cervical
13 disc herniation will resolve on their own and not
14 require any type of interventional treatment."  You
15 agree with that, right?
16   A.   Yes.
17   Q.   But you also agree that there are other
18 occasions where surgery might be necessary, depending
19 on the circumstances; correct?
20   A.   Yes.
21   Q.   All right.  Let me hand you what is marked
22 as Petkovich Deposition Exhibit 10.  I don't know if I
23 have that in your pack or not.  I think I got all the
24 copies here.  Let me see.  I just have one extra copy.
25       MR. DUGAN:  Thank you.

Page 128

1        MR. NORWOOD:  You'll have to deal with that.
2  BY MR. NORWOOD:
3    Q.   (Continuing)  First of all, have you seen
4  this document before?
5    A.   Not--no, not that I recall.
6    Q.   Are you familiar with the Spinal Cord Tumor
7  Association, Inc.?  Does that ring a bell?
8    A.   Yes.
9    Q.   What is that?
10   A.   That's a--some type of a--well, maybe I'm
11 not familiar with it.  It's some type of a--obviously,
12 some type of a spinal cord tumor--looks like a
13 registry, but I don't know that I've ever seen this
14 before.
15   Q.   Okay.
16   A.   I don't think I've ever seen this name
17 before.
18   Q.   Okay, it talks about Tony M.'s story, and
19 that story is of a 35-year-old individual with some
20 condition.  Help me out with this type.  What is that?
21 Intra--
22   A.   Intramedullary ependymoma.
23   Q.   What is that?
24   A.   That's just a--it's a type of a tumor.  It's
25 a spinal cord tumor.

Page 129

1    Q.   And just reading from this exhibit, it says,
2  "Hi.  My name is Tony M. from St. Louis.  I was
3  diagnosed with intermedullary spinal cord tumor from
4  C3 to C7 on April 17, 2007," and for your purposes,
5  let me skip through it, and it talks about, and if you
6  look on the second page, the third full paragraph,
7  this patient says, "My next step was to call a
8  specialist.  I contacted Dr. Frank Petkovich in
9  St. Louis, an orthopedic surgeon dealing with the
10 spine.  He ordered more x-rays but from more angles.
11 When Dr. Petkovich examined the x-rays, he could not
12 see anything the matter with the vertebrae in my
13 cervical area.  He then ordered an MRI and prescribed
14 PT."  Do you see that?
15   A.   Yes.
16   Q.   Do you recall this particular case?
17   A.   Let me read it.  Let me read it.
18   Q.   Yeah, go right ahead.
19       (Witness peruses said document.)
20   A.   I might remember it.  These are rare tumors.
21 I may remember it.
22   Q.   Okay.
23   A.   I think I do, actually.
24   Q.   And just to kind of cut to the chase on this
25 one, it appears this is a situation where this patient

33 (Pages 126 - 129)

Page 130

1 was--had various complaints which included pain that
2 suggested to him maybe he had a bulging disc or
3 something and then it turned out that he, in fact, had
4 some type of tumor in his spine?
5        MR. DUGAN:  I'm going to object to the
6 question to the extent that it calls for the
7 disclosure of another patient's medical information
8 which is private, beyond what's contained in your
9 exhibit here.
10        MR. NORWOOD:  Well, and just for the record,
11 this is Tony M., whoever that might be, and I'm not
12 asking him to identify that patient, and this
13 particular document is from a public website.
14        MR. DUGAN:  I understand.  To the extent
15 that the patient's history is included in the website,
16 that's fine if you want to ask him questions about
17 that, but asking him to disclose information as to
18 what he might remember about Tony M. beyond what's in
19 that is privileged information under the--
20        MR. NORWOOD:  I'm not asking him to remember
21 anything beyond what's in here.
22        MR. BOOSE:  I join by our side.
23 BY MR. NORWOOD:
24    Q.  Do you remember parts of what's referenced
25 in here?

Page 131

1    A.  Yeah, I do.  This is--this is 2007.
2    Q.  Right.  I understand.
3    A.  This is April 2007.
4    Q.  Right.
5    A.  This is the first time I've--you are showing
6 this to me today.
7    Q.  Right.
8    A.  I actually do remember this,--
9    Q.  Okay.
10    A.  --because this is a--I remember this
11 individual.  This is a very rare thing.
12    Q.  Right, but the only point I'm making is that
13 you couldn't find this in an x-ray, this particular
14 tumor.
15    A.  No.  You don't see it on x-ray, but I
16 actually remember--you asked me--I remember this guy.
17 He had--I mean, it was very obvious that there was
18 something going on.
19    Q.  Okay.  Right, but my only point is, the
20 x-ray didn't show what was going on.
21    A.  No, the plain x-rays, the plain x-rays
22 didn't show what was going on, and--
23    Q.  And you had to have an MRI, and then based
24 on the MRI, that's when you advised him, according to
25 this, that--well, it says you put the results of the

Page 132

1 MRI on an x-ray screen and it showed a mass growing
2 inside his spinal cord from C3 to C7.
3        MR. BOOSE:  At this point, I don't have it
4 in front of me, but I do raise the previous objections
5 raised by Mr. Dugan.
6        MR. DUGAN:  Join.
7 BY MR. NORWOOD:
8    Q.  (Continuing)  Subject to that, that's what
9 this shows, right?
10    A.  Well, again, I haven't--this is ten years
11 ago, and I have this piece of paper in front of me.
12 I'm scanning through this.
13    Q.  Right.  Right.
14    A.  As I recall, this man shows up in my office
15 and, you know, he had some bizarre history.
16 Obviously, there was something going on.
17    Q.  Right.  Well, my only point--and I'm going
18 to make it easy--this tumor, you couldn't see it on an
19 x-ray, for whatever reason.
20    A.  You could not see it on plain x-rays.
21    Q.  And you had to get an MRI in order to find
22 out exactly--well, to find out that he had a tumor,
23 right?
24    A.  Yes.
25        MR. NORWOOD:  Okay.  Well, I have no further

Page 133

1 questions at this time.
2              EXAMINATION
3 QUESTIONS BY MR. DUGAN:
4    Q.  I have a couple.  Doctor, you have reviewed
5 the medical records on Mr. Burt that we provided to
6 you, have you not?
7    A.  Yes.
8    Q.  And you have reviewed at least certain of
9 the x-ray films of his neck and lower back, right?
10    A.  Yes.
11    Q.  And that would include--I think we indicated
12 before, you were unable to find the 1996, right?
13    A.  Yes.
14    Q.  But you do have, I think, some 2012's and
15 13's?
16    A.  Yes.
17    Q.  Doctor, in your opinion, is an MRI or CT
18 scan indicated for Mr. Burt?
19    A.  No.
20    Q.  Why?
21    A.  There are no--there are no--there are no
22 physical examination findings and no objective
23 physical findings to indicate further evaluation of a
24 CT or MRI, and his subjective complaints are not
25 consistent with any indications for further evaluation

34 (Pages 130 - 133)

Page 134

1 with a CT or MRI.
2    Q.   Are there any risks associated with those
3 studies, CT in particular?
4    A.   Well, CT puts out a lot of radiation, so
5 that's--an MRI does not, but a CT puts out a lot of
6 radiation.
7    Q.   Doctor, during the period of time Mr. Burt
8 was under the care of Dr. Nwaobasi and Dr. Trost, do
9 you believe he was a candidate for narcotic pain
10 medications?
11    A.   No.
12    Q.   Why not?
13    A.   I think that his pain was not severe enough.
14 I would have treated him with a--as I stated earlier,
15 with a mild over-the-counter antiinflammatory
16 medication, and I would have increased the dose if I
17 had to.
18    Q.   In your opinion, Doctor, is Mr. Burt a
19 candidate for surgery?
20    A.   No.
21    Q.   Why not?
22    A.   In this case, we're talking about his
23 cervical spine and his lumbar spine.  He's got only
24 some mild degenerative changes with no objective
25 physical findings to show any type of neurologic

Page 135

1 deficit or anything, so there are no indications for
2 any type of surgical intervention.
3    Q.   Doctor, we talked earlier about the concept
4 of arthritis, and you defined it for us.  If arthritis
5 progresses to a state that it is sufficiently severe,
6 can you see that on a plain film x-ray?
7    A.   Yes.
8    Q.   Would that include the x-rays of the back
9 and neck?
10    A.   Yes.
11    Q.   Talking about films, we established before
12 that you are not a radiologist, right?
13    A.   That is correct.
14    Q.   But as part of your practice as an
15 orthopedic surgeon, do you regularly review and
16 interpret plain films?
17    A.   I regularly review plain films commonly, all
18 the time.  That's part of any orthopedic surgeon's
19 training, is reviewing, reviewing radiographic
20 studies, plain x-rays, et cetera, CT's, MRI's.
21      I would go further to state that probably
22 most--let me step back.
23      Radiology is a specialty of medicine where--
24 for the interpretation of radiographic studies.
25 Radiologists are trained to do a broad spectrum of

Page 136

1 looking at radiographic studies, and in recent years,
2 radiologists have coned down, becoming more specified
3 in certain areas, but what I'm trying to say, my point
4 is that I think that most orthopedic surgeons are more
5 adept at reading musculoskeletal films than the
6 average radiologist, and I would say that most spine
7 surgeons are most--are more adept at reading spine
8 radiographic studies than general radiologists,
9 period, and that's not to criticize radiologists,
10 that's just the way, the way the advance of
11 technology, the advance of knowledge, et cetera, et
12 cetera, I think most radiologists would agree with
13 that, too.
14    Q.   Doctor, there was some talk earlier about
15 the concept of scoliosis, and we just established that
16 you looked at the 2012 and '13 spinal films.  When you
17 looked at those, did you see any evidence of scoliosis
18 on those films?
19    A.   No.
20    Q.   Does scoliosis, if left untreated, correct
21 itself with the passage of time?
22    A.   No.
23    Q.   If Mr. Burt had had scoliosis in 1996 as
24 that radiology report suggests, would you have seen
25 that on the 2012 and 2013 films that you looked at?

Page 137

1    A.   Yes.
2    Q.   And you didn't see any scoliosis, right?
3    A.   There was no--there was no evidence on those
4 latter films.  He did not have scoliosis.
5    Q.   Doctor, there was some talk earlier about
6 numbness and tingling possibly being a symptom of a
7 spinal problem among many other things.  Do you recall
8 that?
9    A.   Yes.
10    Q.   You have reviewed Mr. Burt's medical
11 records?
12    A.   Yes.
13    Q.   Was numbness and tingling a recurring or
14 persistent theme within his medical records?
15    A.   No.
16    Q.   If it had been a recurrent or persistent
17 theme, how would that have impacted your opinions
18 here, today?
19    A.   If he--if an individual, in this case
20 Mr. Burt, had persistent, subjective complaints with
21 regard to numbness and tingling and had objective
22 physical findings to substantiate that, then I would
23 work that up further with the tests we talked about
24 earlier.
25    Q.   And I think my last question, Doctor--and we

35 (Pages 134 - 137)

Page 138

1 touched on this in some of the literature that you
2 looked at--are there risks to the patient associated
3 with spinal surgery?
4    A.   Yes.
5    Q.   What are those risks?
6    A.   There are a lot of risks.  Like any, the
7 risk of any, the risks of any surgical procedure are
8 obviously anesthesia risk, infection, and then going
9 beyond that, as far as spinal surgery, the anesthesia
10 risk, infection, there is neurologic compromise, there
11 is possible paralysis, possible death.
12    Q.   In the context of back problems, is running
13 to the surgeon to have a surgical procedure the first-
14 line option for patients?
15    A.   No.
16    Q.   Where in the spectrum of treatments or
17 therapies does surgery fall for back patients?
18    A.   It's generally the last-line option.
19    Q.   For the reasons you just described?
20    A.   Yes.
21       MR. DUGAN:  That's all the questions I have
22 for you, Doctor.  Thank you.
23       MR. NORWOOD:  Let me have some--I have a few
24 follow-up--
25       MR. BOOSE:  If I can have a chance to--

Page 139

1       MR. NORWOOD:  I'm sorry, go ahead.  I keep
2 forgetting about you.  I'm sorry.
3       MR. BOOSE:  It's easy enough.
4       MR. NORWOOD:  You are important.
5       MR. NORWOOD:  Thank you.
6       MR. NORWOOD:  Gone but not forgotten.
7          EXAMINATION
8 QUESTIONS BY MR. BOOSE:
9    Q.   Dr. Petkovich, you mentioned that you would,
10 given what you reviewed, you would treat with
11 over-the-counter antiinflammatory medications;
12 correct?
13    A.   Yes.
14    Q.   Given the documents you've been provided
15 today at the deposition, does the review of those
16 documents change your attitude as far as the course of
17 treatment?
18    A.   No.
19    Q.   You also mentioned you are not familiar with
20 the term, "absolute necessity," or policies relating
21 to the use of that term.  Do you remember talking
22 about that?
23    A.   Yes.
24    Q.   Similarly to that, you also talked about the
25 term "chronic," and pardon me if I'm wrong, but I

Page 140

1 believe you stated you don't consider that as
2 specifically defined in the medical context.  Is that
3 fair to say?
4    A.   Well, I'm not--I'm not sure how to answer
5 that question.  I mean "chronic," "chronic" means
6 longstanding.
7    Q.   But specifically when asked about a specific
8 time frame for that,--
9    A.   Yes.
10    Q.   --that isn't really established as a term of
11 art.  Is that correct or incorrect?
12    A.   No, you are correct.  I said that I can't
13 give you a specific time defining it, period.
14    Q.   So similarly to "absolute necessity" and
15 policies related to the use of that term, are you
16 aware of that term being used medically or triggering
17 certain policies or procedures medically?  I'm
18 referring to "chronic" now.
19    A.   Okay, I don't understand your question.
20    Q.   I can try to fix it.  You said the term
21 "absolute necessity," you are not aware of policies
22 that relate to that term, so if somebody says
23 "absolute necessity" at some point, that doesn't
24 immediately bring to mind that you need to do X, Y, or
25 Z medically, right?

Page 141

1    A.   That's correct.
2    Q.   Would that be the same or different in terms
3 of the term "chronic"?
4    A.   Well, "chronic" means to me something that's
5 been going on for a period of time.
6       MR. BOOSE:  Okay, that's--that's all the
7 questions I have.
8          FURTHER EXAMINATION
9 BY MR. NORWOOD:
10    Q.   Okay, I just have a few follow-up questions.
11 So--so we talked about this, but in your opinion,
12 there's no scoliosis, and part of that opinion is
13 based on the fact that regardless of whatever the
14 radiologists were looking at in 1996, that wouldn't
15 have changed or cured itself by the time x-rays were
16 taken in 2012 and 2013; is that correct?
17    A.   What I'm saying is that if this--if someone
18 had scoliosis in 1996, okay, scoliosis, if you have
19 true scoliosis, it's not going to go away.
20    Q.   Right.
21    A.   It would have been present on the latter
22 x-rays.
23    Q.   So that means the same radiologist who
24 looked at the x-rays in '96 could have looked at those
25 same 2013 x-rays and determined the same thing, that

36 (Pages 138 - 141)

Page 142

1 in his opinion, there was some form of scoliosis;
2 correct?
3       MR. DUGAN:  Form, foundation.
4    A.  Well, I can't speak for that radiologist.  I
5 looked at the x-rays, I looked at the latter x-rays,
6 and this man does not have scoliosis.
7 BY MR. NORWOOD:
8    Q.  But you didn't look at the '96 x-rays.
9    A.  Well, no, I didn't.  I didn't look at the
10 '96 x-rays, as I testified to earlier, I think,--
11    Q.  Right.
12    A.  --but I looked at the latter x-rays, and he
13 does not have scoliosis.
14    Q.  In your opinion.
15    A.  Well, it's obviously my opinion.  I've
16 stated that,--
17    Q.  Right.  That's what I'm saying.
18    A.  --but I'm positive that's the case.
19    Q.  And I'm--I suggest do you think that the
20 doctor who looked at the '96 x-rays was less positive
21 when he rendered his assessment about scoliosis?
22       MR. DUGAN:  Foundation.
23    A.  I don't have any idea who that radiologist,
24 who that person is.  That could be some radiologist
25 that was working on the weekends that looks at MRI's

Page 143

1 all day long and never--or--I have no idea who that
2 is.
3 BY MR. NORWOOD:
4    Q.  Or it could have been someone who graduated
5 from Harvard Medical School and also--
6    A.  I have no--I don't have any idea.
7       MR. DUGAN:  Foundation.
8       MR. BOOSE:  Foundation.
9       MR. NORWOOD:  Fair enough.  Okay.
10       One second.  One, one minute.  We're--I
11 think we've got three, maybe four minutes left.
12       (Thereupon, Mr. Norwood and Mr. Lipman
13        exited the deposition room briefly and
14        returned.)
15 BY MR. NORWOOD:
16    Q.  Just one or two more follow-ups and we'll be
17 done, subject to them following up on my follow-up.
18       If a patient comes to you--well, let me put
19 it in context of Mr. Burt.  In your view, Mr. Burt is
20 exaggerating his pain, based upon what you see in the
21 medical records, correct?
22    A.  Yes.
23    Q.  All right, and you are relying on those
24 medical records in formulating your opinion, correct?
25    A.  I'm relying on the medical records and the

Page 144

1 radiographic studies.
2    Q.  And the radiographic studies, so that all
3 assumes that those medical records are accurate.
4    A.  Yes.
5    Q.  All right, and we've already determined that
6 at least in certain cases, there are repeated
7 references to scoliosis in those medical records,
8 right?
9    A.  Well, I think there's really only one
10 reference is that radiology report you are talking
11 about, and I think somebody along the line keeps
12 dragging that through there, but I think there's
13 really only one reference to it.
14    Q.  Well, there's only one radiological
15 reference, but the records, themselves, are replete
16 with references to scoliosis.  You agree with that,
17 right?
18    A.  Well, I--I think what I said, I don't think
19 it's really--I don't think--I think it
20 started what you mentioned in 1996--
21    Q.  Right.
22    A.  --and kind of carried on there,--
23    Q.  Right.
24    A.  --but I don't think anybody has really taken
25 it apart.

Page 145

1    Q.  So '96 through up to 2012, those records and
2 the treatment was based upon, it appears, this
3 suggestion about scoliosis, correct?
4       MR. BOOSE:  Objection to form.
5    A.  I think the reference to scoliosis is in
6 there as you stated, okay?  So--
7 BY MR. NORWOOD:
8    Q.  Repeatedly.
9    A.  It is.  Yes, it is.
10    Q.  Okay.
11    A.  But that has not changed the treatment.  His
12 treatment would--he was being treated for a mild
13 degenerative condition.
14    Q.  Well, but my point is that according to you,
15 these medical records are wrong, right?
16       MR. BOOSE:  Objection to form.
17    A.  Well, I don't know that I would use--
18 BY MR. NORWOOD:
19    Q.  As it relates to scoliosis.
20       MR. BOOSE:  Same objection.
21    A.  I don't know that I would use the word
22 "wrong."  I think the original radiology report is
23 wrong, and I think that that word, "scoliosis," has
24 been carried through there.
25    Q.  And therefore, it's wrong, in your view,

37 (Pages 142 - 145)

Page 146

1 because there's no scoliosis; right?
2    A.  Well, there is no scoliosis, and the word--
3 let's put it this way:  I think the word "scoliosis"
4 from the beginning was incorrect,--
5    Q.  Right.
6    A.  --and I think they continued to keep that
7 word in there.
8    Q.  And that carried over for decades; correct?
9    A.  Well,--
10      MR. DUGAN:  Form.
11   A.  --it carried on for a period of time.
12      MR. BOOSE:  Form.
13   A.  (Continuing)  It carried on for a period of
14 time.
15 BY MR. NORWOOD:
16   Q.  Well, between 1996 and 2013, we've got some
17 decades in there.  You agree with that?
18   A.  Yes, we do.
19      MR. DUGAN:  One and change.
20      MR. NORWOOD:  All right.
21 BY MR. NORWOOD:
22   Q.  So to the extent that those medical records
23 ain't accurate, that would mean that in any way, that
24 could change your opinion, right?  If those medical
25 records are inaccurate, right?

Page 147

1    A.  Well, no, I don't--it's not going to change
2 my opinion.  I don't know--
3    Q.  Well, but your opinion is based on medical
4 records, right?
5    A.  My opinion is based upon medical records,
6 it's based upon the radiographic studies.
7    Q.  Right, and if anything about that is false,
8 would that change your opinion?
9       MR. DUGAN:  Improper, incomplete
10 hypothetical and depends on what?
11      MR. BOOSE:  Join.
12 BY MR. NORWOOD:
13   Q.  Subject to that objection, if the
14 radiological reports and findings are wrong, that
15 could change your opinion; correct?
16   A.  Well, I looked at the x-rays.
17   Q.  Right.
18   A.  I looked at all the other x-rays, so my
19 opinion is not going to change on the other x-rays
20 because I saw those.
21   Q.  Well, you saw an x-ray that purports to be
22 Mr. Burt's x-ray, right?
23      MR. DUGAN:  Is there some question that it's
24 not?
25      MR. NORWOOD:  Well, I mean that's what I'm

Page 148

1 saying.
2 BY MR. NORWOOD:
3    Q.  I mean, you don't know, your whole opinion
4 is based upon the strength of these medical records,
5 right?
6       MR. DUGAN:  Form and foundation;
7 argumentative.
8       MR. BOOSE:  Join.
9 BY MR. NORWOOD:
10   Q.  Is that right?
11   A.  Well, obviously, obviously, it's based upon
12 everything, yes.
13   Q.  Well, but particularly in his, Ronald Burt's
14 case, all you've got, you've never seen him, you've
15 never talked to him, you don't know what he'd look
16 like if he walked in here today; true?
17   A.  True.
18   Q.  All right, so everything is based on medical
19 records, the accuracy of which you are not attesting
20 that whether or not they're accurate, right?
21   A.  Well--
22   Q.  Is that right?
23   A.  Yes.  Yes.
24   Q.  Nor are you attesting to the fact that
25 whoever entered those records, be it one of these

Page 149

1 defendants or whatever, and described what was
2 purportedly being reported, you can't testify or
3 verify the accuracy of that information, correct?
4       MR. DUGAN:  Form, foundation, incomplete,
5 improper hypothetical.
6    A.  I obviously wasn't there when they entered
7 that, no.
8 BY MR. NORWOOD:
9    Q.  Right.  Okay, and you don't know whether or
10 not they had motivation to skew these medical records
11 in a way to suggest they wouldn't be liable to
12 Mr. Burt.  You wouldn't have any information about
13 that, either, would you?
14      MR. DUGAN:  Same objections; argumentative.
15   A.  I don't know those people.
16      MR. BOOSE:  Join.
17 BY MR. NORWOOD:
18   Q.  And if, hypothetically, just purely
19 hypothetical, if Mr. Ronald Burt has severe pain in
20 his neck and his back, if he has that, let's just
21 assume you believe him, would you do something
22 additional to what has already been done with respect
23 to try to figure out what is causing that severe neck
24 and back pain?
25      MR. DUGAN:  Form, foundation, improper,

38 (Pages 146 - 149)

Page 150

1 incomplete hypothetical.
2        MR. BOOSE:  Join.
3      A.  No, for the reasons I mentioned earlier,
4 sir.  You have to have, based upon his history, his
5 physical examination, putting all that together, he
6 would have--if he, if he just told me he had severe
7 pain with no objective physical findings to
8 substantiate that, then I would not work it up
9 further.
10 BY MR. NORWOOD:
11     Q.  Okay, so you are saying, then, that--first
12 of all, you are saying you don't believe Mr. Burt
13 because it doesn't appear to be supported by what you
14 see; correct?
15     A.  I don't know that I'd use the word I don't
16 believe him.  I said I think--I used the word that I
17 think he's exaggerating.
18     Q.  Yeah, he's exaggerating, but if you were
19 convinced that he wasn't exaggerating and that he was
20 he was really experiencing pain, what would you do in
21 that case?  You would just basically say "Here's your
22 over-the-counter medicine, I'm sorry"?
23     A.  I would have done what was done for him.  I
24 would have ordered an antiinflammatory medication.
25     Q.  And that's it, even if he's having severe,

Page 151

1 extreme pain that doesn't appear supported by what you
2 see on the x-ray and those medical records?
3      A.  Yes, and that's--I think you asked me the
4 question earlier about treating the patient in the
5 office.  I mean, you get to a point you work
6 something, you figure out, and if I can't substantiate
7 something, you know, I tell people, you know, that
8 that's--you know, there's, there's nothing else there.
9      Q.  Well, but what you are saying is that merely
10 from what you see, the degenerative disc condition you
11 see on the x-ray doesn't suggest the level of pain
12 that he is describing, correct?
13     A.  The amount of degenerative disc changes that
14 he has are not consistent with his subjective
15 complaints.
16     Q.  Right, and if his subjective complaints are
17 accurate, if what he's relating is accurate, could
18 that suggest something else other than this
19 degenerative disc disease might be going on?
20        MR. BOOSE:  Objection, form; incomplete
21 hypothetical.
22        MR. DUGAN:  Join.
23     A.  You would be concerned about that if you had
24 other physical findings, et cetera, to substantiate
25 that.

Page 152

1        MR. NORWOOD:  Okay, I have no further
2 questions.
3        MR. DUGAN:  Nothing.
4        MR. BOOSE:  I have a few.
5        FURTHER EXAMINATION
6 BY MR. BOOSE:
7      Q.  Doctor, scoliosis, when--when a medical
8 professional says that someone has scoliosis, that's
9 considered a diagnosis of the patient, right?
10     A.  Yes.
11     Q.  A diagnosis is the interpretation of
12 objective or subjective information about the patient;
13 correct?
14     A.  Yes.
15     Q.  You dispute that Plaintiff has scoliosis,
16 correct?
17     A.  Yes.
18     Q.  Do you dispute any other diagnoses of the
19 Plaintiff?
20     A.  That's--that is the only other diagnoses
21 (sic).  I--I think that initially, when this man had
22 these x-rays in 1996, he probably did have some muscle
23 spasm in his cervical area at that time, and so I
24 think at that time he did have that, and--
25     Q.  I apologize.  I believe you also said

Page 153

1 torticollis might not have been accurate; correct?
2      A.  What I said is torticollis is not really a
3 radiographic finding.  I said he may have had some--he
4 may have really had some muscle spasm after that
5 incident in 1996.  I wouldn't really--I wouldn't
6 really--I wouldn't really call that torticollis, but
7 he would have--he may have had some muscle spasm at
8 that time, so I think, I think torticollis is not
9 really an appropriate term to use for that.
10     Q.  And that's, that's an interpretation of the
11 radiological evidence, correct?  Torticollis?
12     A.  Yes.
13     Q.  Other than the interpretation of physical,
14 subjective, or radiological exams, other than those
15 interpretations, do you dispute the medical records?
16     A.  No.
17     Q.  All right, so in other words, the
18 information such as pulse, or the x-rays, things of
19 that nature that any physician could review, those do
20 you not dispute?
21     A.  That's correct.
22     Q.  Disagree with, rather.
23     A.  Yeah, that, what you said, yeah, that's
24 correct.
25        MR. BOOSE:  Thank you.

39 (Pages 150 - 153)

Page 154

1        MR. DUGAN:  Doctor, we're done here today.
2  You have the right to review the transcript to see if
3  it's been taken down correctly, or you can waive your
4  signature.  That choice is yours.  What's your
5  preference?
6        THE WITNESS:  I'll waive.
7        MR. DUGAN:  Signature waived.
8        MR. NORWOOD:  Thank you, sir.  Appreciate
9  it.
10        THE WITNESS:  Thank you.
11        (Thereupon, at 12:44 P.M., the
12          deposition was concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 156

1  propounded by counsel and remarks and objections of
2  counsel thereto, and is in all respects a full, true,
3  correct and complete transcript of the questions
4  propounded to and the answers given by said witness;
5  that signature of the deponent was waived by agreement
6  of counsel.
7        I further certify that I am not of
8  counsel or attorney for either of the parties to said
9  suit, not related to nor interested in any of the
10  parties or their attorneys.
11        Witness my hand and notarial seal at
12  St. Louis, Missouri, this 23rd day of May, 2017.
13
14
15
16
17
18
19              J. Bryan Jordan
20              Certified Court Reporter
21              State of Missouri No. 532
22
23
24
25

Page 155

1  State of Missouri.        )
2                            )  SS.
3  City of St. Louis        )
4        I, J. Bryan Jordan, a Notary Public in
5  and for the State of Missouri, duly commissioned,
6  qualified and authorized to administer oaths and to
7  certify to depositions, do hereby certify that
8  pursuant to Notice in the civil cause now pending and
9  undetermined in the Circuit Court of the City of
10  St. Louis, State of Missouri, to be used in the
11  hearing of said cause before said court, I was
12  attended at the offices of Petkovich Orthopedic and
13  Spine Care, LLC, 2821 North Ballas Road, Suite C70
14  St. Louis, Missouri, by the aforesaid witness and by
15  the aforesaid attorneys, on the 11th day of May, 2017.
16        The said witness, being of sound mind
17  and being by me first carefully examined and duly
18  cautioned and sworn to testify the truth, the whole
19  truth, and nothing but the truth in the case
20  aforesaid, thereupon testified as is shown in the
21  foregoing transcript, said testimony being by me
22  reported in shorthand and caused to be transcribed
23  into typewriting, and that the foregoing pages
24  correctly set forth the testimony of the
25  aforementioned witness, together with the questions

40 (Pages 154 - 156)