## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

RONALD E. BURT, #N-60788,    )
                )
     Plaintiff,      )
                )
  vs.           )  Case No. 3:13-cv-794-NJR-DGW
                )
S. NWAOBASI, et al.,     )
                )
    Defendants.     )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

For over a decade, and following a series of falls on wet surfaces while in IDOC custody, Plaintiff Ronald Burt has suffered from and continually complained about severe and chronic neck and back pain. Nevertheless, even though each doctor who has testified in this case has admitted the severe pain described by Burt is not consistent with Burt's x-ray reports (which merely suggest mild disc degeneration) and that they do not know exactly what is causing the severe pain, Defendants have cavalierly refused to order an MRI or a CT scan for Burt. At a minimum, such diagnostic testing is necessary to ascertain whether something else is going on in his neck, back and spine that might be causing the severe neck and back pain (something that might not be revealed on an x-ray). Defendants also have refused to have Burt seen by a specialist, even though the treatment that has so far been provided has been insufficient to remedy his ongoing pain.

The record evidence establishes that both Dr. Nwaobasi and Dr. Trost have been deliberately indifferent to Burt's complaints of severe pain by assuming those complaints result from mild disc degeneration, despite Burt's documented history of trauma based on various slip and fall incidents, in addition to their refusal to order an MRI or CT scan or have Burt examined by a specialist. Wexford's unwritten "absolute necessity" standard policy likewise reflects its own deliberate indifference and that of Drs. Nwaobasi and Trost.

Defendants' motion for summary judgment should be denied.

## **STATEMENT OF MATERIAL FACTS**

Plaintiff submits the following as his Statement of Material Facts ("SMF"), each of which is either undisputed or calls into dispute facts on which Defendants' rely in support of their motion. The statements below refute the following Statement of Undisputed Material Facts listed in Defendants' Summary Judgment Memorandum: paragraphs 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 27, 28, 29, 31, 32, 33, 34, 36, 39, 41, and 43.

1.     As Defendants acknowledge, on two occasions, once on October 6, 1996, and again on May 13, 2009, Burt advised the correctional facilities that he sustained injuries to his neck and back when he, while incarcerated, slipped on water in a prison shower and years later on a Stateville gym floor. (Defendants' Memorandum in Support of Motion for Summary Judgment (Doc. No. 214), pp. 2-3, paragraphs 2 and 3 (hereinafter referred to as "Defendants' Memorandum"); Exhibit 1, Depo. of Ronald Burt, pp. 53-54.

2.      Following the October 6, 1996, incident, on October 24, 1996, x-rays of Burt's cervical spine were taken, which resulted in a diagnosis from the radiologist of scoliosis and torticollis.   (Defendants' Memorandum, p. 2, paragraph 2; Defendants' SJ Exhibit 1 [Doc.# 214-1, page 49 of 49).  These x-rays showed no evidence of disc degeneration.   (Defendants' Memorandum, p. 2, paragraph 2; Defendants' SJ Exhibit 1 (Doc.# 214-1, page 49 of 49).   The scoliosis diagnosis was repeated in Burt's medical records following this initial diagnosis (Exhibit 6, Burt Selected Medical Records (MR) 001, 003, 004, 005, 006, 007, 008, 018, 020, 021, 027, 030, and 047).

3.      As a result of the May 13, 2009, incident, Burt described neck and back pain to a doctor as a "10" on a scale of 1-10. Exhibit 1, Depo. of Ronald Burt, pp. 55-57; Exhibit 6, Burt Selected (MR) 011-013.  In describing the pain, Burt stated that "it felt like you were taking a fire poker and stabbing it into my spine." Exhibit 1, Depo. of Ronald Burt, pp. 55-57.  Burt also testified that when he fell on the wet gym floor, his back popped so loud that other inmates could hear it.  Exhibit 1, Depo. of Ronald Burt, p. 61.

4.      On July 8, 2009, an x-ray of Burt's thoracic spine was taken, and that x-ray was negative for factures, dislocations and arthritis. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 86-87; Exhibit 6, Burt Selected (MR) 014.  There is no indication in that x-ray report that Burt suffered from disc degeneration. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 86-87; Exhibit 6, Burt Selected (MR) 014. According to Dr. Nwaobasi, arthritis and disc degeneration are "the same thing". Exhibit 2, Dr. Nwaobasi Depo., pp. 69-30.   So, Burt exhibited no disc

degeneration of the thoracic spine based on this July 8, 2009, x-ray. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 86-87; Exhibit 6, Burt Selected (MR) 014.  However, Burt was complaining of back and neck pain prior to July 8, 2009, which complaints continued through the timeframe that he was treated by both Dr. Nwaobasi and Dr. Trost.  Exhibit 1, Depo. of Ronald Burt, pp. 119-121; 125; Exhibit 6, Burt Selected (MR) 005.

5.     Both Dr. Nwaobasi and Dr. Trost have assumed that the severe back and neck pain is tied to the disc degeneration despite the fact that Burt's back and neck pain would have predated any radiological evidence of disc degeneration per the July 8, 2009, x-ray.   Exhibit 2, Depo. of Dr. Nwaobasi, pp. 69-70; Exhibit 3, Depo. of Dr. Trost, pp. 51-53; 55-56, 73.[1]

6.     In the Outpatient Progress Notes dated 12/2/07, it states that Burt is having "pain in neck and middle part of his back" and that "Pain has been going on for past 4-5 yrs pretty consistently." Exhibit 6, Burt Selected (MR) 005.

7.     Numerous times, from 2009 through 2014, Mr. Burt complained of the ongoing pain in his neck and back and the need for treatment.  Exhibit 6, Burt Selected (MR) 005, 008, 011, 012, 013, 015, 018, 020, 022, 023, 028, 029, 032, 034, 035, and 043.  Some of those requests were to seen by the medical staff, and some were in the form of grievances.  Exhibit 7, Grievance Documents.

---

[1] The fact that Burt's severe back and neck pain existed prior to any radiological evidence of disc degeneration (as confirmed by the July 8, 2009, x-ray) constitutes evidence from which a jury could conclude that the disc degeneration is not the cause of Burt's severe back and neck pain and the fact that both Dr. Nwaobasi and Dr. Trost assumed that it was the cause in light of the medical records constitutes deliberate indifference.

Numerous of those complaints were directed towards the defendants.  Exhibit 7, Grievance Documents, 020-022, 027-031, 043, 045-049, 053, 074-079, 081.

8.     During a November 26, 2013, medical visit following complaints of neck and back pain, Burt told a nurse that his back pain was severe (10 on the scale) and again described the feeling as being stabbed in the spine with a hot poker just as he described following the May 2009 slip and fall incident. Exhibit 6, Burt Selected (MR) 032; Exhibit 1, Depo. of Ronald Burt, pp. 119-121; 125.

9.     Wexford's corporate designee, Dr. Roderick Matticks, acknowledged that the medical records demonstrate that Burt has a history of suffering from scoliosis and migraines and acknowledges that Burt's migraines could be related to Burt's back and neck pain. Exhibit 4, Depo. of Dr. Matticks, pp. 53, 57.

10.     The specialists that deal with back and neck injuries include an orthopedic surgeon or a neurosurgeon.    Exhibit 2, Depo. of Dr. Nwaobasi, pp. 22-23; Exhibit 3, Depo of Dr. Trost, pp. 21-22.  Referrals would be made to such specialists because they are trained in dealing with problems of the spinal cord.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 22-23; Exhibit 3, Depo of Dr. Trost, pp. 21-22.  If there is an injury in the spinal cord, then a neurologist would need to be involved because there could be destruction of the bone that would cause pressure on the spinal cord. Exhibit 2, Depo. of Dr. Nwaobasi, p. 28.

11.     Dr. Nwaobasi agreed that if a particular disease is more than what a doctor can handle, then that doctor should refer the matter out to a specialist. Exhibit 2, Depo. of Dr. Nwaobasi, p. 26. Dr. Nwaobasi also acknowledged that in situations involving degenerative disc disease, a specialist in orthopedics

specializing in degenerative diseases at the C4 and C5 level would have determine the proper course of treatment because that would be outside of Dr. Nwaobasi's expertise. Exhibit 2, Depo. of Dr. Nwaobasi, p. 77.  According to Defendants, Burt has degenerative diseases at the C4 and C5 level.  However, Burt was never referred to a specialist by either Dr. Nwaobasi or Dr. Trost.

12.    Under Wexford's written policies, Wexford was obligated "To ensure all patients receive **medically necessary** and **timely medical/dental care** at the **appropriate level of service**."  Exhibit 8, Excerpt from Wexford Policy Manual (**SUBMITTED UNDER SEAL**)(emphasis added).  Medical necessity must meet the needs of the patient's diagnosis and treatment plan, and the standard is same in correctional health care as in the medical profession.  Exhibit 4, Depo. of Dr. Matticks, pp. 29-30.

13.    If a particular treatment is medically necessary and that treatment is not provided, that would be improper from a medical standpoint and would be improper under Wexford's written medical policies.   Exhibit 2, Depo. of Dr. Nwaobasi, p. 59; Exhibit 4, Depo. of Dr. Matticks, pp. 29-30; Exhibit 5, Depo. of Dr. Petkovich, pp. 43-45.

14.    However, Wexford had an unwritten policy that prohibited a physician from referring to an outside specialist for outside diagnosis unless the particular referral was "absolutely necessary."  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 30-31.   Dr. Nwaobasi admitted that Wexford maintains such a policy.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 30-31.   Dr. Nwaobasi acquired this

understanding of the Wexford policy based on his experience at Wexford. Exhibit 2, Depo. of Dr. Nwaobasi, p. 28.

15.     Dr. Trost has no idea whether or not Wexford imposes an absolute necessity standard for treating inmate patients.  Exhibit 3, Depo. of Dr. Trost, pp. 27-28.   However, according to Dr. Trost, he applied neither the required medical necessity standard nor an absolute necessity standard.  Exhibit 3, Depo. of Dr. Trost, pp. 25-27.  Instead, Dr. Trost applied a "show me" standard whereby a patient would have to prove to him that he was suffering pain, and even played down the significance of Burt's pain by cavalierly stating "he's [Burt] got some pain. Everybody does." Exhibit 3, Depo. of Dr. Trost, pp. 58-59, 131-132.

16.     Wexford does not know if Dr. Nwaobasi's refusal to refer Burt to an outside specialist relates to the unwritten policy at Wexford, which provided that an outside specialist referral would not happen unless it was absolutely necessary.  Exhibit 4, Depo. of Dr. Matticks, pp. 76-77.

17.     Wexford has acknowledged that the standard of absolute necessity would be inconsistent with medical training provided to physicians because there are no absolutes in medicine and so one should not require absolute necessity.  Exhibit 4, Depo. of Dr. Matticks, pp. 76-77.  Instead, only medical necessity is required under the standards governing medical practice. Exhibit 4, Depo. of Dr. Matticks, pp. 76-77. P. 78-79.  Application of absolute necessity standard in treating inmates would be inconsistent with a physician's obligations to provide adequate treatment. Exhibit 4, Depo. of Dr. Matticks, pp. 78-79.

18.     When Burt saw Dr. Nwaobasi on November 3, 2012, Burt told him he was suffering from back and neck pain. Exhibit 1, Depo. of Burt, pp. 83-84; 89-90.  Burt stated that the only physical exam administered by Dr. Nwaobasi was feeling his neck with his hands. Exhibit 1, Depo. of Burt, pp. 83-84; 89-90. Dr. Nwaobasi examined Burt's neck and felt an indentation where Burt told him where the neck pain was.  Exhibit 1, Depo. of Burt, pp. 90-93.  Dr. Nwaobasi told Burt that Dr. Nwaobasi felt something abnormal in his neck and he could feel a bowing of the spine. Exhibit 1, Depo. of Burt, p. 95.  In response to Burt's complaints and this neck abnormality, Dr. Nwaobasi prescribed pain medication in the form of Motrin and ordered an x-ray on December 1, 2012.  Exhibit 1, Depo. of Burt, pp. 90-93.

19.     In reviewing the medical records, Dr. Nwaobasi stated Burt had tingling in his hands.  Exhibit 2, Depo. of Dr. Nwaobasi, p.  130.  The October 17, 2014 Radiology Report also indicates that Burt has a history of "Numbness of the right leg."  Exhibit 6, Burt Selected (MR) 045.  Numbness and tingling can suggest that a patient has something severe, like a tumor.  Exhibit 2, Depo. of Dr. Nwaobasi, p. 138.  Degenerative disc disease coupled with numbness could indicate that there is pressure on the nerve that could also cause pain. Exhibit 2, Depo. of Dr. Nwaobasi, p. 138.

20.     Dr. Nwaobasi acknowledged that if Burt had numbness and pain, it could suggest that there were nerve issues such as nerve impingement, which would suggest that more detailed testing like an MRI or CT scan would be necessary. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 165.  In addition to back and

neck pain, the medical records indicate that Burt also complained of numbness and tingling in his legs. Exhibit 6, Burt Selected (MR) 032, 043, 045.

21.     An entry in the medical record dated October 17, 2014, indicates the numbness and tingling in Burt's leg was like his leg was falling asleep while he was walking.  Exhibit 6, Burt Selected (MR) 043; Exhibit 4, Depo. of Dr. Matticks, p. 94.  Burt also felt dizziness and disorientation as part of that medical complaint. Exhibit 4, Depo. of Dr. Matticks, p. 94.

22.     After being presented with a second medical record dated October 6, 2014, which notes that Burt sought treatment for numbness and tingling in his right leg, Dr. Matticks (Wexford's corporate designee) admitted that low back pain could cause numbness and tingling in the right leg and that the numbness and tingling in Burt's right leg could be related to the complaints regarding his back and neck. Exhibit 4, Depo. of Dr. Matticks, p. 92.

23.     Wexford has acknowledged that other issues that could cause numbness and tingling in the right leg could be chronic neurologic issues, new or developing neurologic issues and other causes. Exhibit 4, Depo. of Dr. Matticks, pp. 92-93.

24.     An x-ray would not show if there was impingement on the spinal nerve. Exhibit 2, Depo. of Dr. Nwaobasi, p. 138. If there is pain in the spine, a physician would not know if there is an impingement on the nerve or something else until an MRI or a CT scan is performed.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 138-139.  Dr. Nwaobasi admitted that he could not determine what exactly was going on with Mr. Burt unless an MRI or CT scan was performed.  Exhibit 2,

Depo. of Dr. Nwaobasi, pp. 140-141.  However, neither an MRI nor a CT scan was done for Mr. Burt.  Exhibit 2, Depo. of Dr. Nwaobasi, p. 139.

25.    A doctor has a responsibility to discuss treatment options with a patient, and it would be unusual for a doctor not to discuss treatment options. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 61-62; Exhibit 4, Depo. of Dr. Matticks, pp. 112-113.  The reasons such treatment options should be discussed is to develop the most appropriate treatment plan for a patient. Exhibit 4, Depo. of Dr. Matticks, pp. 112-113.  If Dr. Nwaobasi discussed the treatment options with Mr. Burt, it would be his practice to write those treatment options in the patient medical record.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 62-63.  However, Dr. Nwaobasi did not note any treatment options in his entries.  Exhibit 6, Burt Selected (MR) 022-023.

26.    A medical record entry dated November 26, 2013, notes that the pain being experienced by Burt at that time was "severe."  Exhibit 6, Burt Selected (MR) 032.  Wexford does not know if the severity of the pain being experienced by Burt at that time was a level 10 on a scale of 1 to 10 as reported by Burt.  Exhibit 4, Depo. of Dr. Matticks, pp. 84-85.

27.    One of the treatment options for degenerative disc disease, where there is pressure on the spinal cord, would be for an orthopedic surgeon or a neurosurgeon to go in and try to put something in the spine to remedy it. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 62-63.

28.    The medical records Dr. Nwaobasi reviewed to make a determination that there was no evidence of scoliosis were comprise of an x-ray and x-ray report

10

that are missing from the medical records.  Exhibit 2, Depo. of Dr. Nwaobasi, p. 95.

29.    After reviewing x-rays in November 2012 that are now missing from the medical records and after having concluded that Mr. Burt did not have scoliosis, Dr. Nwaobasi's assessment was possible degenerative osteoarthritis of the cervical spine and scoliosis of the spine. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 106-108.  Dr. Nwaobasi wrote "possible scoliosis of the spine" because he was not sure if Burt had scoliosis after reviewing the missing x-rays and x-ray report.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 106-108.

30.    As of December 1, 2012, Dr. Nwaobasi had not ruled out scoliosis for Burt.  Exhibit 2, Depo. of Dr. Nwaobasi, p. 112.  Nwaobasi was unable to say whether the slight curvature reflected in the December 5, 2012, x-ray that he ordered would be evidence of scoliosis. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 151-152.  Even though Dr. Nwaobasi had no idea whether that curvature consisted of scoliosis, and despite the prior radiology report that first diagnosed scoliosis, Dr. Nwaobasi did not recommend that Burt be referred to a specialist. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 151-152.

31.    Once Dr. Nwaobasi received an x-ray report based on a December 5, 2012, x-ray that indicated Burt had degenerative process and a degenerative disc issue, Dr. Nwaobasi never communicated that information to Mr. Burt. Exhibit 2, Depo. of Dr. Nwaobasi, pp 115-116.  Nor did Dr. Nwaobasi make a note in his medical records that he had felt an abnormality and indentation in Burt's neck when he examined Burt. Exhibit 6, Burt Selected (MR) 022-023.

32.     Even though he scheduled Burt for a follow up visit in two months, Dr. Nwaobasi never followed up with Mr. Burt regarding the findings from the December 5, 2012, x-rays, never followed up with the nurse to determine why Burt was not brought in for a follow up, and never saw Mr. Burt again after December 2012. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 122-124.

33.     Even though Dr. Nwaobasi understood that physical therapy could help with what he diagnosed as arthritis and degenerative processes, Dr. Nwaobasi never sought to refer Burt to physical therapy.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 126-128.

34.     Until an MRI or CT scan is performed, Dr. Nwaobasi would not know what kind of pressure disc degeneration might be placing on Burt's spine because that pressure would not show up on an x-ray.  Exhibit 2, Depo. of Dr. Nwaobasi, p. 144.  Dr. Trost likewise acknowledged that a plain x-ray would not show if there was impingement on a spinal nerve. Exhibit 3, Depo. of Dr. Trost, p. 49.  Dr. Trost also admitted that to figure that out, either an MRI or CT scan would be required. Exhibit 3, Depo. of Dr. Trost, p. 49.

35.     Defendants' expert, Dr. Petkovich, acknowledged that anytime there is disc degeneration, there would be a bulging disc that cannot be detected on an x-ray.  Exhibit 5, Depo. of Dr. Petkovich, pp. 59-60 and 75.  Dr. Petkovich does not know the amount of disc bulging currently experienced by Burt.  Exhibit 5, Depo. of Dr. Petkovich, p. 75.  The only way to determine the amount of bulging in Burt's disc is to have an MRI.  Dr. Petkovich testified that x-rays do not show soft tissue, and it is even possible to have a small bone spur

12

or bulging of a disc that is not picked up by an x-ray.  Exhibit 5, Depo. of Dr. Petkovich, pp. 59-61.

36.    In fact, Dr. Petkovich has had situations where a review of an x-ray showed nothing and then there ultimately turned out to be some severe condition that existed that was not picked up by that x-ray.   Exhibit 5, Depo. of Dr. Petkovich, pp. 79-80.  In those situations, it was only because an MRI was performed that the condition was discovered. Exhibit 5, Depo. of Dr. Petkovich, pp. 79-80.

37.    Most patients seek orthopedic care for neck pain because orthopedists are specifically trained to diagnose, treat and prevent problems involving the muscles, bones, joints, ligaments and tendons.  Exhibit 5, Depo. of Dr. Petkovich, pp. 108-108.

38.    If Burt is having issues involving soft tissue or bulging of the disks, such issue would not be picked up on an x-ray, but could only be ascertained through an MRI.  Exhibit 5, Depo. of Dr. Petkovich, pp. 60-62.

39.    Although Dr. Trost acknowledged that one of the reasons or uses for an MRI or CT scan is to try to figure out exactly what is causing pain, he believed the fact that Burt had been complaining for years about severe back and neck pain would not be an indication for an MRI or CT scan. Exhibit 3, Depo. of Dr. Trost, pp. 46-48.  However, Dr. Trost agreed that if a doctor does not know what is causing Mr. Burt's pain and if the objective is to try to make a determination as to the cause of that pain, an MRI or CT scan might help

facilitate an understanding as to what the problem is. Exhibit 3, Depo. of Dr. Trost, pp. 48-49.

40.    Dr. Nwaobasi acknowledged that an orthopedic specialist would be necessary to determine whether the slight curvature reflected on the December 5, 2012, x-ray constitutes scoliosis.  Exhibit 2, Depo. of Dr. Nwaobasi, pp. 154-155.  However, even though it was beyond his expertise, he did not send the x-rays off to a specialist to review. Exhibit 2, Depo. of Dr. Nwaobasi, pp. 154-155.

41.    Dr. Trost noted that in one of the medical records, Burt complained of numbness/tingling in his right leg for three days along with pain.  Exhibit 3, Depo. of Dr. Trost, pp. 80-81.  In a later visit on October 14, 2014, Burt saw a physician provider in a follow up visit wherein he complained of numbness and tingling like his leg is asleep times one week.  He also reported getting dizzy and disoriented that day.  Exhibit 3, Depo. of Dr. Trost, p. 84-85.

42.    However, Dr. Trost testified that if a patient presents with numbness and tingling in his legs and he looked at an x-ray and could not find the cause of it on an x-ray, he would not go to the next step of trying to do an MRI or CT scan to see if something else is going on. Exhibit 3, Depo. of Dr. Trost, p. 58.

43.    Dr. Trost testified that if a patient presented with subjective complaints of tingling, numbness and pain, he would make a patient prove that the patient had numbness, tingling and pain. Exhibit 3, Depo. of Dr. Trost, pp. 59-60.

44.    Dr. Trost had no reason to believe that Mr. Burt is exaggerating his pain symptoms.  Exhibit 3, Depo. of Dr. Trost, pp. 71-72.  In fact, Dr. Trost did

not have any question about whether Burt was experiencing the pain symptoms that he described. Exhibit 3, Depo. of Dr. Trost, pp. 71-72.

45.    Dr. Trost does not know if Burt would benefit from physical therapy to address his back and neck disc issues. Exhibit 2, Depo. of Dr. Trost, pp. 99. Wexford's corporate designee admitted he has seen nothing in the medical records to suggest that Burt's pain cannot be eliminated with treatment.  Exhibit 4, Depo. of Dr. Matticks, pp. 31-32.  The Wexford corporate designee also testified that he could not say what level of pain Burt is experiencing and cannot make that assessment based on medical records reviewed. Exhibit 4, Depo. of Dr. Matticks, p. 33.

46.    Wexford does not know if the cause of the pain in Burt's neck and back is because of narrowing of the disc at C4 – C5 or degenerative processes. Exhibit 4, Depo. of Dr. Matticks, pp. 74-75, 90.  Wexford also admitted that an orthopedic specialist would be able to assist in determining if, in fact, the narrowing of the disc at C4 – C5 is the cause of Mr. Burt's back and neck pain. Exhibit 4, Depo. of Dr. Matticks, pp. 74-75. However, no specialist was engaged to assist in making that assessment for Mr. Burt. Exhibit 4, Depo. of Dr. Matticks, p. 75.

47.    When Wexford refers a patient out to an outside consultant, Wexford is required to pay for that outside consultant.  Exhibit 4, Depo. of Dr. Matticks, pp. 96-97.  The more outside consultant referrals made by Wexford physicians, the more Wexford pays for that service.  Exhibit 4, Depo. of Dr. Matticks, pp. 96-97.

48.     Steps that Wexford has taken to address the budgetary issues associated with not getting paid from the State of Illinois include borrowing money to continue its operations.  Exhibit 4, Depo. of Dr. Matticks, pp. 97-99. As of January 2017, the State of Illinois owed Wexford approximately $180 million for services provided to the Illinois Department of Corrections. Exhibit 4, Depo. of Dr. Matticks, pp. 97-99.

49.     Although Wexford is obligated to pay for and provide physical therapy to patients as needed, Mr. Burt has not been referred to physical therapy to address his back and neck pain. Exhibit 4, Depo. of Dr. Matticks, pp. 101-102.

50.     Wexford has admitted that it would be improper, from a medical standpoint, not to have a diagnostic test performed that would be useful in determining what may be causing a particular medical condition for a patient if there are questions one could not answer, based upon subjective and objective findings in the medical records. Exhibit 4, Depo. of Dr. Matticks, pp. 113-114.

51.     Wexford has admitted it would be improper from a medical standpoint to refuse medication or to refuse to prescribe medication to alleviate pain if a patient reported pain in the physical exam. Exhibit 4, Depo. of Dr. Matticks, pp. 114-115.

52.     Wexford has admitted it would improper from a medical standpoint not to consider surgery as an option if the surgery would improve the condition of a patient. Exhibit 4, Depo. of Dr. Matticks, pp. 114-115.

16

53.     The fact that Burt has consistent complaints of back and neck pain at a pain level of 9 to 10, on a 1 to 10 scale, when the x-rays simply show a narrowing of the disc at C4 and C5, suggests that something else is going on that you cannot see on an x-ray. Exhibit 4, Depo. of Dr. Matticks, pp. 119-120.

54.     Wexford does not know whether Burt is exaggerating or lying about his pain. Exhibit 4, Depo. of Dr. Matticks, pp. 117-118.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment should be granted only if the defendants show there is no genuine dispute as to any material fact and the defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Daniel v. Cook County*, 833 F.3d 728, 733 (7th Cir. 2016).  This Court, when reviewing defendants' motion for summary judgment, is to construe all facts and draw all reasonable inferences in favor of Mr. Burt.  *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### II.     Eighth Amendment Deliberate Indifference Standard

The United States Supreme Court has held "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment to the United States Constitution.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153 (1976)).  The Supreme Court explained that deliberate indifference covers not just the denial of care that rises to the level of "torture or

a lingering death", but it covers, as well, situations in which the "denial of medical care…result[s] in pain and suffering…" *Estelle*, 429 U.S. at 103.

There are two elements of a claim for deliberate indifference: (1) an objectively serious medical condition and (2) the defendant's deliberate indifference to that condition. *See, e.g., Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). "Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Id.* (citations omitted). "Delaying treatment may constitute deliberate indifference if such delay 'exacerbated the injury or unnecessarily prolonged an inmate's pain.'" *Id.* (citations omitted). "'Even a few days delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference.'" *Id.* (citations omitted).

## III. Delaying Treatment Or Diagnosis And Thereby Prolonging Pain Exhibits Deliberate Indifference To A Serious Medical Need

### A. Pain Is A Serious Medical Need And Prolonging Pain Demonstrates Deliberate Indifference

In order to be a serious medical need, "[t]he medical condition need not be life-threatening: 'it could be a condition that would result in… unnecessary and wanton infliction of pain if not treated.'" *Gomez v. Randle*, 680 F.3d at 865 (citations omitted) (prisoner who had bruising and bleeding from a shotgun pellet in his arm not treated for four days).

Deliberate indifference covers delays in treatment that prolong pain even if the delay did not adversely affect the inmate's underlying condition. *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007). In *Williams*, the plaintiff inmate

18

was suffering high blood pressure and was experiencing pain in his chest. The inmate's complaints went unheeded by the prison guards for six hours, until he passed out. *Id.* at 712-13. The Seventh Circuit had to determine whether there was sufficient evidence of harm to the plaintiff in the absence of any expert testimony and in the absence of any evidence, expert or otherwise, about whether the delay caused some degree of harm apart from the additional six hours of discomfort. *Id.* at 714-15. The Seventh Circuit held, "a reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure." *Id.* at 716 (citation omitted). *See also, Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004).

In *Gil*, the Seventh Circuit reversed a district court's grant of summary judgment for a defendant who was a prison employee whose job was to dispense medicine. The prison employee refused to give the plaintiff an antibiotic that had been prescribed for an infection. The plaintiff only had to wait one additional day to start taking the medication. *Gil v. Reed*, 381 F.3d at 661-62. There was no evidence of any harm other than the additional day of pain and discomfort from the infection, which started to improve shortly after the plaintiff began taking the antibiotic. *Id.* at 653. The Seventh Circuit ruled that even though the infection cleared up without any long-term harm once the antibiotics were taken, the mere one-day delay causing an extra day of discomfort was enough for the plaintiff's claim to survive summary judgment. *Id.* at 662. *See also, Ford v. Ghosh*, 2014 WL 4413871 (Sept. 8, 2014, N.D. Ill.), *7 (harm can be shown by

19

demonstrating a delay in treatment "caused the inmate prolonged and unnecessary pain" and expert testimony "is not necessary" to show harm from delay).

In *Gomez v. Randle*, the Seventh Circuit held deliberate indifference could be shown by a delay, even though the "delay did not exacerbate Gomez's injury, [because] he experienced prolonged, unnecessary pain as a result of a readily treatable condition." *Gomez v. Randle*, 680 F.3d at 865-66. The Seventh Circuit continued, "[w]e have previously upheld similar claims for relief. *See, e.g., Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 882 (7th Cir. 2009) (prisoner complaining of severe pain from his IV was not treated for four days); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (prisoner who dislocated his finger was not treated for two days); *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (prisoners beaten and maced by prison guards were not treated until the following day))." *Id.* at 866.

In the present case, it is undisputed that Burt has continually complained of back and neck pain, which pain is sufficient to support a claim for deliberate indifference. (SMF ## 1, 3, 6, 7, 8, 10, 15, 18, 26, 39, 41, 44, 45, 46, 53 and 54.)

**B.    Failing To Send An Inmate For Tests Or To See A Specialist When The Cause Of Pain Is Unknown Also Constitutes Deliberate Indifference**

In *Foster v. Ghosh*, the court granted a prisoner's motion for a preliminary injunction where the prisoner suffered from cataracts and requested a visit with a specialist. *Foster v. Ghosh*, 4 F. Supp. 3d 974, 979 (N.D. Ill. 2013). The court

20

in *Foster* noted that the prisoner was "not asking for any specific treatment, just to see an ophthalmologist and obtain … treatment aligned with the ophthalmologist's recommendation." *Id.* at 981.   Such a request, the court explained, is "not expensive, unconventional, esoteric, or experimental." *Id.*

The court went on to say:

> When the limits of Dr. Patterson's care were reached but Foster's symptoms continued to worsen, Dr. Patterson should have referred him to a consultation with an ophthalmologist and Dr. Ghosh should have approved this referral.  Absent this action, Dr. Patterson was "persisting in a course of treatment . . . known to be ineffective," demonstrating deliberate indifference to Foster's serious medical need.

*Id.* (quoting *Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011)).

As discussed by the court in *Foster*, it is well established that referral of a patient to a specialist does not require a life threatening condition before the refusal to do so amounts to deliberate indifference. The court in *Foster* granted the plaintiff's motion for an injunction for evaluation by a specialist and treatment consistent with the specialist's recommendations.   *See Foster v. Ghosh,* 4 F. Supp. 3d at 984.

As the courts have ruled, "[a] prison doctor cannot avoid liability by continuing to prescribe ineffective treatment and refusing to order tests or referrals needed to properly diagnose a condition."  *Beard v. Obaisi,* 2013 WL 3864415 (C.D. Ill., July 25, 2013), at *4. ("If Plaintiff's pain was as bad as Plaintiff describes, then arguably more was required to at least confirm Dr. Obaisi's diagnosis…")

"A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d. 435, 441-42 (7th Cir. 2010) (finding deliberate indifference where "the medical records and Berry's steady complaints of escalating pain indicate that the delay unreasonably prolonged Berry's suffering."). Deliberate indifference exists where a prison doctor chooses the "easier and less efficacious treatment" for a serious medical condition, *Id.* at 441,[2] or where defendants subject a prisoner to years of "repeated, long-term negligent treatment of his medical condition." *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (plaintiff stated a claim for deliberate indifference where he alleged that "the defendants were repeatedly negligent in their treatment of his condition for a three-year period" through clinic personnel's refusal to allow plaintiff to see a doctor, doctor's cursory examination, and repeated prescription of the same ineffective treatment).

## IV.   Defendants Have Been Deliberately Indifferent To Mr. Burt's Serious Medical Needs

### A.   Mr. Burt's pain is a serious medical need

As explained in Section III.A., above, pain is a serious medical need. Mr. Burt has been complaining to medical personnel in the IDOC system about his severe neck and back pain since at least 1996. (SMF #1.) His complaints have

---

[2] The court in *Berry* noted, "[a]lthough the doctor did not completely ignore the plaintiff's pain, a doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment." *Id.*

been made on many occasions to Wexford employees.  (SMF ## 1, 3, 6, 7, 8, 10, 15, 18, 26, 39, 41, 44, 45, 46, 53 and 54.) These employees have included Defendants Nwaobasi and Trost.  (SMF ##4, 5, 7, 18.)  The complaints have included complaints that Mr. Burt's pain is often a nine or ten on a ten point scale, including pain that feels like a fire poker stabbing into his spine.  (SMF #2.) He has also experienced tingling and numbness in his hands and legs. (SMF ## 19, 20, 21 and 41.)  These subjective complaints are enough to establish a question of fact with regard to whether Mr. Burt was, indeed, in such pain, and therefore, whether he has a serious medical need.  However, Trost has admitted he believes Mr. Burt is not exaggerating his pain.  (SMF #44.)  Wexford  has admitted it does not know if Burt is exaggerating his pain.  (SMF ## 26 and 54.)

**B.  Defendants Trost and Nwaobasi have shown deliberate indifference to Mr. Burt's serious medical needs.**

Despite their knowledge that Burt has been experiencing severe back and neck pain, which could be caused by a host of maladies that could only be observed by an MRI or CT scan, Defendants have refused to order such testing despite years (not just hours, days, weeks or months, but years) of failing to adequately address Burt's severe pain, which has resulted in the exact cause of that severe pain being undetermined.  This deliberate indifference (among other indifference) was no doubt facilitated by Wexford's "absolute necessity" policy.

**(1)  Trost has shown deliberate indifference to Mr. Burt's serious medical needs.**

In the present case, Mr. Burt has testified that he has been in excruciating pain for many years.  If Mr. Burt was in excruciating pain, whether for hours,

23

days, weeks, months or years, his pain is a serious medical need and prolonging it is deliberate indifference if the doctor knew of the pain or if it would have been obvious to anyone.  Trost has at times claimed that his own examination of Mr. Burt failed to substantiate Mr. Burt's excruciating pain.  However, Trost has contradicted that testimony (which serves as the purported reason for not providing Mr. Burt with further diagnostic testing, referral to a specialist and proper medication) when he admitted, after having examined Mr. Burt, that he believed Mr. Burt is not exaggerating his pain symptoms.  (SMF #44.)  In fact, Dr. Trost did not have any question about whether Burt was experiencing the pain symptoms that he described.  (*Id.*)  Trost further testified that if a doctor does not know what is causing Mr. Burt's pain and if the objective is to try to make a determination as to the cause of that pain, an MRI or CT scan might help facilitate an understanding as to what the problem is.  (SMF #34 and 39.)  Defendants' expert has agreed.  (SMF ## 35, 36 and 38.)

Dr. Trost likewise acknowledged that a plain x-ray would not show if there was impingement on a spinal nerve. (SMF #34.)  He also admitted that in order to figure that out, either an MRI or CT scan would be required, but he never ordered such diagnostic testing.  (SMF #39.)  Dr. Trost also played down the significance of Burt's pain by stating "he's [Burt] got some pain.  Everybody does."  (SMF #15.)

Although Dr. Trost denied that he was aware of or utilized the "absolute necessity" standard Dr. Nwaobasi testified existed, Dr. Trost also acknowledged that he did not utilize a medical necessity standard as reflected in Wexford's

written policy manual and established by the medical profession. (SMF #15). Instead, Dr. Trost utilized his own "show me" standard whereby an inmate patient like Burt would have to prove to him that the patient is in fact experiencing the pain about which he is complaining. (*Id.*)

However, "there is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (citing *Cooper v. Casey,* 97 F.3d 914, 916–17 (7th Cir.1996) ("the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it.... [S]ubjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.")).

Therefore, a jury question exists as to whether Trost has been deliberately indifferent to Mr. Burt's serious medical needs.

### (2)   Nwaobasi Was Deliberately Indifferent To Mr. Burt's Serious Medical Needs

Like Trost, and consistent with the "absolute necessity" standard that he testified was established by Wexford, Nwaobasi did not ever provide Mr. Burt with increased medication, diagnostic testing or referral to a specialist, despite Mr. Burt's ongoing pain.  (SMF ## 5, 6, 7, 11, 13, 14, 16, 17, 20, 21, 24, 29, 30, 31, 32, 33, 34, 40.)  Nor did Dr. Nwaobasi refer Burt out to physical therapy, even though he acknowledged that physical therapy would help with arthritis and degenerative processes.  (*Id.*)  Like Dr. Trost, Dr. Nwaobasi assumed Burt's back and neck pain were tied to disc degeneration, even though Burt was

complaining of severe back and neck pain prior to any disc degeneration indications appearing on any x-ray findings.  (SMF ## 1, 2, 3, 4, 5 and 6.)

Nwaobasi, as well as defendants' expert, Petkovich, admitted that spinal injuries are highly specialized and should be referred to an orthopedic surgeon, neurosurgeon or neurologist if x-ray findings are not consistent with the level of pain exhibited by the patient.  (SMF ## 11, 12, 27 and 34.)  Nwaobasi admitted he is not a specialist in neck and back problems.  (SMF #11.)  Nwaobasi admitted, if a particular treatment is medically necessary and that treatment is not provided, that would be improper from a medical standpoint.  (SMF #13.)

Dr. Nwaobasi stated that Burt had tingling in his hands.  (SMF #19.) Numbness and tingling can suggest that a patient has something more severe like a tumor.  (*Id.*)  Degenerative disc disease coupled with numbness could indicate that there is pressure on the nerve that could also cause pain.  (*Id.*)

An x-ray would not show if there was impingement on the spinal nerve. (SMF ## 20, 24 and 34.)  If there is pain in the spine, a physician would not know if there is an impingement on the nerve or something else until an MRI or a CT scan is performed.  (SMF #24.)  Dr. Nwaobasi admitted that he could not determine what exactly was going on with Mr. Burt unless an MRI or CT scan was performed.  (SMF #34.)  However, neither an MRI nor a CT scan was done for Burt – even though in examining Burt, Dr. Nwaobasi noted an indentation in Burt's neck that he told Burt was "abnormal".  (SMF #18.)  In fact, Dr. Nwaobasi failed to even note in his medical records that in his physical examination of

26

Burt, he felt an indentation in Burt's neck that he described to Burt as "abnormal" (*Id.*)

Until an MRI or CT scan is performed, Dr. Nwaobasi would not know what kind of pressure disc degeneration might be causing for Burt because that pressure would not show up on an x-ray.  (SMF ## 20 and 24.)

Dr. Nwaobasi also admitted that a doctor has a responsibility to discuss treatment options with a patient, but he did not with Mr. Burt.  (SMF #25.)  Once Dr. Nwaobasi received an x-ray report based on a December 5, 2012, x-ray, which indicated that Burt had degenerative process and a degenerative disc issue, Dr. Nwaobasi never communicated that information to Mr. Burt.  (SMF ## 25 and 31.)  Despite the fact that Burt made repeated written request to see Dr. Nwaobasi for follow up, Dr. Nwaobasi never followed up with Mr. Burt regarding the findings from the December 5, 2012, x-rays and never saw Mr. Burt again after December 2012 (SMF #32), despite indicating in Burt's medical record that he should be seen for a follow up in 2 months, and despite Burt's repeated requests to be seen by Nwaobasi. (SMF ## 7, 32.)  Dr. Nwaobasi has admitted he has the authority to schedule a patient to see him.  (SMF #33.)

Defendants rely heavily on *Pyles v. Fahim*, in which the Seventh Circuit reviewed a grant of summary judgment in a case in which the plaintiff alleged he was suffering from back pain.  *Pyles*, however, is a road map for the treatment Mr. Burt should have received and should receive going forward.  Pyles injured his back when he slipped on wet stairs at Menard.  *Pyles v. Fahim*, 771 F.3d 403, 404 (7th Cir. 2014).  When Pyles fell, he hit his head, lost consciousness, was

temporarily paralyzed and injured his lower back.  *Id.* at 405.  Pyles was taken to a local hospital and given a CT scan that did not reveal spinal damage.  As a result of the negative finding, the physician at the local hospital recommended an MRI.  *Id.*  Pyles was airlifted to a second hospital and given an MRI and additional CT scans.  *Id.*  He was also seen by both a physical therapist and an occupational therapist, and he was prescribed physical therapy.  *Id.* at 405-06.  After two months of continuing to complain about pain, Pyles was taken off non-prescription ibuprofen and given a muscle relaxer and prescription painkiller, as well as advice on proper exercises.  A few months later, he was prescribed increased dosages of the medicines he had been taking, plus a corticosteroid, an anticonvulsant and a drug commonly used in treating osteoarthritis.  *Id.* at 406.

Neither Dr. Trost nor Dr. Nwaobasi took these additional diagnostic steps to determine the root cause of Burt's back and neck pain.  For all of the foregoing reasons, Dr. Nwaobasi (as well as Dr. Trost) was deliberately indifferent to Mr. Burt's serious medical needs and he should be denied summary judgment.

## V.  Wexford Maintains An Unconstitutional Policy That Showed Deliberate Indifference To Mr. Burt's Serious Medical Needs

### A.  Private Corporations Can Be Held Liable

A private corporation can be held liable under § 1983 if it maintains an unconstitutional policy or custom.  *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015).  Private corporations that contract to provide essential government services are subject to at least as much liability as local governments.  *See, e.g.,*

28

*Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014).[3]  "A plaintiff may establish a 'municipal liability' against a private corporation by showing that the unconstitutional act complained of is caused by : '(1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled,; or (3) an official with final policy-making authority.'"  *Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 985, 999 (N.D. Ill. 2015) (quoting *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010).  "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach."  *Glisson v. Indiana Dept. of Corrections*, 849 F3d 372, 379 (7th Cir. 2017) (*en banc*).  The plaintiff must show the custom caused his injury.  *Id.*

### B.    Wexford's Policy

With respect to referrals to outside specialists, Wexford had a policy that required that a physician would only refer someone out if a particular referral was absolutely necessary.  (SMF #14.)  Dr. Nwaobasi admitted that Wexford's policy suggesting that a physician should only refer an inmate patient to a specialist if it were absolutely necessary was an unwritten policy.   (*Id.*)

---

[3] As the Seventh Circuit explains in *Shields*, the legal arguments for limiting private corporations to liability for their unconstitutional policies rather than also allowing liability to be based on *respondeat superior* are weak, at best.  *Id.* at 789-94.  In the present case, Plaintiff intends to present evidence that would suggest Wexford is vicariously liable for the actions of its employees in the scope of their employment, as well as liable for the policies it maintains that have caused Plaintiff's rights to be violated, should the law change between now and the conclusion of trial that would permit such *respondeat superior* liability against such private actors.

Dr. Nwaobasi acquired this understanding of the Wexford policy based on his experience at Wexford.  (*Id.*)  Dr. Trost has no idea whether or not Wexford imposes an absolute necessity standard for treating inmate patients.  (SMF #15.) Wexford's corporate designee admitted that an absolute necessity standard is inconsistent with the obligations of a physician to provide medical treatment to a patient.  (SMF #16.)

In this case, a jury could conclude that the fact that the State of Illinois was behind more than $180 million in payments, coupled with its absolute necessity policy, was the driving force behind whether Drs. Trost and Nwaobasi refusing to conduct an MRI or CT scan, and their failure to refer him to specialist or physical therapist.

## **CONCLUSION**

Thus, based on various material facts that suggest that both Dr. Trost and Dr. Nwaobasi were deliberately indifferent to Burt, and that Wexford's "absolute necessity" standard and the significant debt owed by the State of Illinois were factors in depriving Burt of necessary medical treatment, Defendants' motion for summary judgment should be denied.

30

Respectfully submitted,

**LEWIS RICE LLC**

By:   /s/ Ronald A. Norwood
    Ronald A. Norwood, #6197900
    Benjamin A. Lipman, #6209286

600 Washington Avenue, Suite 2500
St. Louis, MO  63101
(314) 444-7759
(314) 612-7759 (facsimile)
rnorwood@lewisrice.com
blipman@lewisrice.com

*Attorneys for Plaintiff Ronald E. Burt*


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was sent via electronic mail on this 10th day of July, 2017, to the following:

Max Boose
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
mboose@atg.state.il.us

*Attorney for Defendants Richard Harrington,*
*Angela Crain, Chad Frierdich, Kimberly Butler*

Timothy P. Dugan
Cassiday Schade LLP
100 North Broadway, Suite 1580
St. Louis, MO  63102
tdugan@cassiday.com

*Attorney for Defendants Sam Nwaobasi, MD*
*Angela Crain RN, Michael Moldenhauer, John Trost,*
*Lakesha Hamby and Wexford Health Sources, Inc.*

    /s/  Ronald A. Norwood

31