IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RONALD BURT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:13-cv-794-NJR-DGW |
| | ) |
| DR. SAM NWAOBASI, DR. JOHN | ) |
| TROST, WEXFORD HEALTH SOURCES, | ) |
| INC., and JACQUELINE LASHBROOK, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

A Motion for Summary Judgment filed by Defendants Samuel Nwaobasi, John Trost, and Wexford Health Sources, Inc. ("Wexford") (Doc. 213) is currently pending before the Court. Appointed counsel for Plaintiff Ronald Burt filed a response in opposition to the motion (Doc. 217), to which Defendants filed a reply (Doc. 219). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Ronald Burt is an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at the Menard Correctional Center ("Menard"). He filed this suit *pro se* in August 2013 pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. (Doc. 1). Counsel was appointed to represent Burt on January 17, 2014 (*see* Doc. 57). With the assistance of counsel, Burt is currently proceeding on a third amended complaint, filed on March 27, 2017. (Doc. 205). Burt alleges, in pertinent part, that two doctors at Menard, Samuel Nwaobasi and John Trost, were deliberately indifferent to his severe and

persistent back and neck pain. Burt alleges that Doctors Nwaobasi and Trost refused to provide him with proper medication to deal with his severe pain and instead simply continued to prescribe ineffective drugs. Burt further alleges that Doctors Nwaobasi and Trost refused to order diagnostic testing or to refer him to a specialist outside of the IDOC in order to determine and properly treat the underlying cause of his pain. As for his claim against Wexford, Burt alleges Wexford maintained a policy and practice of providing only "absolutely necessary" medical care in order to save money. Wexford, Nwaobasi, and Trost now seek summary judgment on Burt's claim. Defendant Alex Jones,[1] the Acting Warden at Menard, is being sued in his official capacity and has not filed a motion for summary judgment.

Defendants' arguments for summary judgment center on their claim that although Burt complained about extreme back and neck pain, he only suffers from mild degenerative disk disease, a condition that is neither severe nor one that would require additional diagnosis or medication. Burt counters that while he may suffer from mild degenerative disk disease, his subjective complaints of extreme and persistent pain warranted additional diagnostic testing including an MRI, a CT scan, and a referral to a specialist. While Burt cannot pinpoint the exact condition he suffers from, he argues that Defendants should have done more to discern, and eventually treat, that condition. Finally, Burt claims that instead of having a policy of providing treatment that is medically necessary, Wexford employs a policy of only providing costly medical care (such as an MRI) if it is "absolutely necessary."

---

[1] Burt originally filed this action against Jacqueline Lashbrook in her official capacity as Menard's warden. During the course of litigation, Ms. Lashbrook left that position. Alex Jones is the current Acting Warden at Menard and shall be substituted for Jacqueline Lashbrook.

Burt contends that such a policy qualifies as deliberate indifference to his need for medical care in violation of the Eighth Amendment.

**BACKGROUND**

Burt's neck and back problems began before his incarceration, when he was involved in more than one motorcycle accident in the 1980s. (Doc. 214-1, p. 34; 214-9, pp. 4, 9–10). He injured his neck and back again in 1996, while incarcerated, when he fell in the shower. (Doc. 214-4, p. 1). Following the 1996 fall, an x-ray of Burt's cervical spine was taken, which revealed torticollis, a "muscle contraction in the neck that typically occurs with flexion, extension and rotation causing the head to tilt," and scoliosis, "a disease that causes a curvature of the spine and does not typically cause pain." (Doc. 214-1, p. 49; Doc. 214-4, p. 2).

Although Burt has been incarcerated since 1992, the medical records in this case date back only to 2007. (*See* Doc. 214-1).[2] During 2007 and 2008, Burt's diagnosis of scoliosis repeatedly appeared in his medical records. (Doc. 214-1, pp. 3–8). He also complained of pain in his neck and back on multiple occasions. In the 2007 and 2008 medical records alone, there are at least three notations indicating long term back and neck pain.[3]

In May 2009, Burt once again injured his neck and back when he slipped in a puddle of water in the gymnasium and fell. (Doc. 214-1, pp. 11-12; Doc. 214-9, pp. 14–15). A physical examination was conducted, he was given ice, a prescription for Motrin, and an x-

---

[2] The only medical record that predates 2007 is a one-page x-ray report from 1996. (Doc. 214-1, p. 49).

[3] For example, in December 2007, Burt complained to a physician's assistant of pain in his neck and the middle part of his back, that had "been going on for past 4-5 [years] pretty consistently." (Doc. 214-1, p. 5). As another example, in January 2008, Burt indicated that he had "frequent back pain" (Doc. 214-1, p. 8). Furthermore, it appears from the medical records that he basically had a standing prescription for Motrin throughout 2007 and 2008. (Doc. 214-1, pp. 4–7, 9).

ray of his thoracic spine was taken. (Doc. 214-1, p. 13). The x-ray revealed no "negative findings," meaning no fractures, dislocations, or arthritis. (Doc. 214-1, pp. 13–14; Doc. 214-2, p. 23).

In 2010 and 2011, Burt's scoliosis diagnosis continued to appear in his medical records, and he continued to complain about neck and back pain. (Doc. 214-1, pp. 16–20). In fact, in August 2011, Burt stated that he had "pain all the time [secondary] to the scoliosis" and that he "want[ed] it fixed. It's been 10 years now." (Doc. 214-1, p. 18). His complaints continued into 2012, which is when Dr. Samuel Nwaobasi became involved in his care.

On November 3, 2012, Dr. Nwaobasi performed a "jacket review" regarding the continuation of Motrin for Burt's "alleged back pain [secondary] to scoliosis." (Doc. 214-1, p. 22; Doc. 214-2, pp. 21–22). Dr. Nwaobasi noted there was no recent x-ray of Burt's spine showing he had scoliosis, so the doctor ordered an x-ray of Burt's thoracic, lumbar, and sacral spine (but not cervical). (Doc. 214-1, p. 22; Doc. 214-2, p. 22). The doctor also prescribed a three-week supply of Motrin 400 mg and indicated that Burt should be seen for a follow-up appointment in three weeks. (Doc. 214-1, p. 22).

Four days after the "jacket review," Dr. Nwaobasi cancelled the x-ray after noting that a "recent x-ray . . . show[ed] no evidence of scoliosis" (Doc. 214-1, p. 22; Doc. 214-2, pp. 22–23). At his deposition, however, Dr. Nwaobasi could not identify which "recent" x-ray he reviewed as a basis for his determination that additional x-rays or other diagnostic tests were not needed. (Doc. 214-2, pp. 22–26). Also, four weeks went by before Burt was seen by Dr. Nwaobasi, indicating that he went without pain medication for at least a week. (Doc. 214-1, p. 23)

Dr. Nwaobasi saw Burt in person for the follow-up appointment on December 1, 2012. (Doc. 214-1, p. 23). It was at this point that the doctor noted Burt had a history of cervical spine pain, not lumbosacral spinal pain. (Doc. 214-1, p. 23). Because there were no recent cervical spine x-rays, he ordered one to assess whether Burt had degenerative osteoarthritis of his cervical spine or scoliosis. (Doc. 214-1, pp. 23, 48). There is no description of Burt's current level of pain or any notes regarding an examination, testing, or observations of Burt's physical capabilities. (Doc. 214-1, p. 23). Dr. Nwaobasi increased Burt's Motrin to 600 mg and ordered a two-month supply; he also ordered a follow-up visit in two months (Doc. 214-1, p. 23). The x-ray revealed degenerative changes only and no scoliosis.[4] (Doc. 214-1, pp. 24, 48). It appears from the records, however, that these results were not shared with Burt for over six months. (Doc. 214-1, p. 28).

Even though Burt was supposed to have a follow-up visit two months later, that visit did not happen. Burt sent four letters addressed to Dr. Nwaobasi, dated February 13, 2013, March 3, 2013, April 12, 2013, and May 19, 2013, noting that he was not seen for the follow-up visit. (Doc. 217-7, pp. 9-11, 17). The lack of a follow-up visit and Burt's chronic neck pain were also the subject of a grievance dated May 16, 2013. (Doc. 217-7, p. 13).

Finally, Burt was seen on July 17, 2013. (Doc. 214-1, p. 28).[5] He was not seen by Dr. Nwaobasi, however; instead, he was seen by a nurse practitioner. (Doc. 214-1, p. 28). In fact, Dr. Nwaobasi never saw Burt again. (Doc. 214-2, p. 31). The medical record indicates that the nurse practitioner discussed the December x-ray results with Burt and conducted a

---

[4] The x-ray report states "[t]here is narrowing of the disc at C4-C5 level suggestive of degenerative process." (Doc. 214-1, p. 48).
[5] No party provided the Court with an exact history of where Burt was housed at all times relevant to this lawsuit, but it appears that he was housed at Stateville Correctional Center from February 22, 2011, to April 16, 2012 (Doc. 214-1, pp. 17, 21), during the month of June 2013 (*Id.* at pp. 26-27), and from September 13, 2013, to October 2, 2013 (*Id*. at p. 30-31).

physical exam. (Doc. 214-1, p. 28). Burt was able to perform straight-leg raises without difficulty and was able to bend well at the waist. (Doc. 214-1, p. 28). The nurse practitioner did not note any signs of pain, such as grimacing or activity limitations. (Doc. 214-10, p. 17). Burt was diagnosed with "chronic back pain" and given a four-month supply of Motrin (400 mg). (Doc. 214-1, p. 28; Doc. 214-10, p. 17). Burt was seen again three weeks later by a doctor for low back pain, but the medical note is largely illegible. (Doc. 214-1, p. 29).

On November 26, 2013, Burt was seen at nurse sick call for continuing back pain. (Doc. 214-1, p. 32). He indicated that the pain was in his neck and his back, and he rated it as a "10+" on a 10-point scale (*i.e.* worst pain possible). (Doc. 214-1, p. 32). The nurse indicated that Burt did not have limitations with movement, that he denied pain with lifting but reported pain with "writing" and "artwork." (Doc. 214-1, p. 32). Thus, notwithstanding Burt's report of severe pain, she only offered conservative treatment (200 mg of Motrin to be taken three times per day as needed) and a referral to the doctor. (Doc. 214-1, p. 32).

Burt was seen by a doctor on November 30, 2013. (Doc. 214-1, p. 34). The record from that visit indicates that Burt had good range of motion but with pain. (Doc. 214-1, p. 34). Again, only conservative treatment was directed—Motrin and exercise—but another x-ray of Burt's thoracic and lumbar was ordered. (Doc. 214-1, p. 34). The x-ray was performed on December 4, 2013, and revealed minor degenerative changes at the L5-S1 level. (Doc. 214-1, pp. 36-37).[6]

---

[6] The x-ray report states "[t]hree views of the lumbar spine demonstrate minor degree of degenerative change at L5-S1 level. There is no compression fracture or subluxation. There is no spondylolysis or spondylolisthesis" (Doc. 214-1, pp. 36, 37).

Dr. Trost[7] saw Burt for the first time on December 24, 2013, at which time Burt complained again about neck pain. (Doc. 214-1, p. 38). At his deposition, Dr. Trost indicated that assessing a patient who has been complaining of back and neck issues for years should begin with a physical exam and "a good detailed history." (Doc. 214-3, p. 12). Despite that, Dr. Trost admitted that it was "unlikely" he reviewed anything but the most recent records when he saw Burt. (Doc. 214-3, p. 20). He did review the December 2012 x-ray and determined that Burt had "some mild narrowing at the C4-5." (Doc. 214-3, p. 20; Doc. 214-1, p. 38). The record is silent as to whether he was aware of the x-ray indicating degenerative changes at the L5-S1 level. Dr. Trost conducted a physical exam and noted that Burt was alert, in no acute distress, and had an intact range of motion in his neck. (Doc. 214-1, p. 38). He continued the current treatment, but added a prescription for Meloxicam (Mobic), which is a non-steroidal anti-inflammatory drug like Ibuprofen. (Doc. 214-1, p. 38).

Burt sent Dr. Trost a letter dated March 20, 2014, in which he complained about his Meloxicam not being renewed automatically and having to go to nurse sick call to have it refilled. (Doc. 217-7, p. 25). The next day, Burt was seen at nurse sick call, and he indicated that the Meloxicam provided relief, but did not "take the pain away." (Doc. 214-1, p. 40). The nurse referred Burt to the doctor to get his prescription renewed. (Doc. 214-1, p. 40). Dr. Trost saw Burt a week later, on March 27, 2014 (Doc. 214-1, p. 40-41). At that appointment, Dr. Trost noted that Burt had normal range of motion in his neck (Doc. 214-1, p. 41), and that Burt had "relief [with] Mobic" (Doc. 214-1, p. 41; 214-3, p. 30). The medical record indicates that Dr. Trost wrote a six-month renewal for Burt's prescription for Mobic, and

---

[7] During his deposition, Dr. Trost stated that he had no independent recollection of the visits with Burt (Doc. 214-3, p. 21), thus the medical records appear to be the best evidence of Dr. Trost's medical services.

according to Dr. Trost, that meant the Mobic "must have been working pretty well." (Doc. 214-1, p. 40; Doc. 214-3, p. 34). Six months later, Burt filed a grievance again complaining about his Meloxicam not being renewed automatically and having to go to nurse sick call to have it refilled. (Doc. 217-7, p. 26).

On October 6, 2014, Burt put in a sick call for pain and tingling in his right leg, and was referred to Dr. Trost. (Doc. 214-1, p. 42). At this visit, Burt informed Dr. Trost he had experienced the numbness and tingling in his right leg for the past three days. (Doc. 214-1, pp. 42; Doc. 214-3, p. 22). Dr. Trost conducted a physical examination and noted that Burt was alert and in no acute distress, his vital signs were stable, there were no abnormalities or deficits in his neurological examination or his vascular examination, and he was ambulating well. (Doc. 214-1, p. 42; Doc. 214-3, p. 22). Consequently, Dr. Trost decided that nothing but a follow-up appointment in one week was necessary. (Doc. 214-1, p. 42; Doc. 214-3, p. 22). At that follow-up visit, which was conducted by a different doctor, Burt was found to have a steady gait and to be neurologically intact. (Doc. 214-1, p. 43). The doctor ordered an x-ray of Burt's lumbosacral spine. (Doc. 214-1, p. 42). Once again, the x-ray revealed only mild degenerative disc changes at the L5-S1 level with no compression fracture or other abnormality. (Doc. 214-1, p. 45).[8]

---

[8] Defendants present expert testimony by Dr. Frank O. Petkovich, an orthopedic surgeon, stating "[a]ny subjective complaints of excruciating or unbearable pain are not supported by the medical records."(Doc. 214-1, p. 3). Presumably, this evidence is being introduced to suggest that Burt is lying about the severity of his pain. Whether Burt's pain was as bad as he describes, however, is a credibility determination for the jury and not a basis for granting summary judgment. *See Beard v. Obaisi,* No. 11-cv-3360, 2014 WL 3864415, *4 (C.D. Ill. 2013).

Subsequent letters from Burt to Dr. Trost complained about his medication not being automatically renewed and explained that his "neck, it is driving me crazy and hurts badly." (Doc. 217-7, pp. 25, 32).

Burt did not see any medical provider for back or neck pain in 2015 or 2016. (Doc. 214-9).

**LEGAL STANDARD**

Summary judgment is proper only if the moving party can demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Any doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). In determining whether summary judgment is appropriate, however, a court "may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d

581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)).

## Discussion

**I. Doctors Nwaobasi and Trost**

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, a plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-92. Second, the plaintiff must establish that the individual prison officials were deliberately indifferent to that condition. *Id.*

With respect to the first requirement, minor aches and pain do not constitute a serious medical need, but "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" constitute a serious medical need. *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

As for the second requirement, in order to show that prison officials acted with deliberate indifference, a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). This subjective standard requires more than negligence; it

"approaches intentional wrongdoing." *Id.* at 1073.

Prison medical professionals are entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Accordingly, a plaintiff must show more than simple medical malpractice. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish deliberate indifference. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005).

### A. Serious Medical Need

Defendants first argue that degenerative disk disease and associated back pain is a common ailment and thus does not qualify as a "serious medical need." (Doc. 214, p. 21–23). The Seventh Circuit recently rejected a similar argument, however, explaining that "turning a blind eye to a prisoner's complaints of readily treatable pain can constitute an Eighth Amendment violation, even if the condition is not life–threatening and the failure to treat does not exacerbate the condition." *Diaz v. Godinez*, No. 16-2639, 2017 WL 2116175, at *2 (7th Cir. May 15, 2017) (rejecting argument that chronic back pain due to mild degenerative changes in the spine is not a serious medical need). Burt described his back and neck pain as chronic and, at times, excruciating. (Doc. 217, p. 1). It necessitated diagnostic and clinical assessment, as well as pain medication. (Doc. 214-1, pp. 4–7, 9). Thus, Burt has established a material issue of fact as to whether his condition was objectively serious.

### B. Deliberate Indifference—Dr. Nwaobasi

Dr. Nwaobasi argues he was not deliberately indifferent to Burt's medical needs because Burt's condition did not necessitate care beyond what Dr. Nwaobasi provided, and he is not responsible for the lapses in care that Burt experienced due to administrative oversights. (Doc. 214, pp. 23-25). Again, the Court is unpersuaded by this argument.

Dr. Nwaobasi first began treating Burt on November 3, 2012, by performing a "jacket review" of his medical records. (Doc. 214-1, p. 22). Those records included a well-documented history of neck and back pain, a diagnosis of scoliosis, and two falls in 1996 and 2009.[9] Following his review, Dr. Nwaobasi continued Burt's prescription for 400 mg of Motrin for three weeks (Doc. 217-6, p. 20),[10] and ordered an x-ray and a follow-up visit in three weeks (Doc. 214-1, pp. 22).

Dr. Nwaobasi suggests these treatment decisions were based on his physical examination of Burt's neck. (Doc. 214, pp. 3, 23–24). Unfortunately, however, the medical records do not support a finding that an in-person visit took place. First, Dr. Nwaobasi explained that the purpose of the jacket review was "*to review the record*" regarding Burt's care, because he had been on Motrin for so long and there are complications that can arise from long-term use of that medication. (Doc. 214-2, p. 18) (emphasis added). There were no vital signs recorded in the medical record, such as Burt's weight, blood pressure, pulse, or temperature, and there were no notes regarding Dr. Nwaobasi's observations from any type of physical exam. (*See* Doc. 214-1, p. 22). Thus, as best the Court can tell, Dr. Nwaobasi did not see Burt on November 3, 2012.

---

[9] There is no evidence that any doctor, after either of Burt's falls (or after any other injury to his back), performed or ordered any diagnostic testing other than an x-ray and/or a physical examination.

[10] In a letter directed to the "HCU-Doctor" and dated November 1, 2013, Burt states that he was taking 800 mg of Ibuprofen (Doc. 217-1, p. 8).

Just a few days after it was ordered, Dr. Nwaobasi cancelled the x-ray. (Doc. 214-1, p. 22). At his deposition, Dr. Nwaobasi was unable to provide a coherent explanation for why the x-ray was cancelled. (Doc. 214-2, p. 22-25). Also, four weeks went by before Burt was able to obtain the follow-up appointment with Dr. Nwaobasi. (Doc. 214-1, p. 23). Thus, Burt went at least one week without any pain medication.

At the follow-up appointment, Dr. Nwaobasi thought Burt's complaint had changed and that Burt was now indicating he had neck pain, not back pain. (Doc. 214-1, p. 23). But again, Burt's history of neck *and* back pain were well-documented throughout his medical records, which Dr. Nwaobasi claimed to have reviewed. The medical records indicate that Dr. Nwaobasi took Burt's vital signs at this appointment, but there is no indication that he examined or tested Burt's physical capabilities. (Doc. 214-1, p. 23). Dr. Nwaobasi ordered an x-ray of Burt's cervical spine, gave Burt a two-month prescription for an increased dosage of Motrin (600 mg), and ordered a follow-up visit in two months. (Doc. 214-1, p. 23).

But Burt was never scheduled for a follow-up appointment, and Dr. Nwaobasi *never* saw him again. Burt sent multiple letters to Dr. Nwaobasi seeking a follow-up appointment and complaining of "chronic pain I'm being left with," suggesting he was without adequate pain medication for months. (Doc. 217-7, p. 10-11). Dr. Nwaobasi also never informed Burt of the results of his cervical spine x-ray; instead, a nurse discussed the x-ray with Burt for the first time over six months later. (Doc. 214-1, p. 28).

Standing alone, the cancelling of the x-ray, the two missed follow-up appointments, or the lapses in pain medication, could be simply instances of neglect. When coupled with Dr. Nwaobasi's limited in-person interaction and examination of Burt, as well as his flawed understanding of Burt's medical history, however, a jury could conclude the treatment

ordered by Dr. Nwaobasi was not based on medical judgment at all. Accordingly, Dr. Nwaobasi's request for summary judgment is denied.

### C. Deliberate Indifference—Dr. Trost

Unlike Dr. Nwaobasi, Dr. Trost appears to have conducted several physical examinations of Burt. (Doc. 214-1, p. 38, 40-42). He did not, however, ever refer him for additional diagnostic testing beyond x-rays, or to an orthopedic specialist. Thus, the issue is whether these failures permit an inference Dr. Trost was deliberately indifferent to Burt's medical needs.

A significant delay in obtaining effective medical treatment may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain. *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008) (reversing summary judgment for defendants where plaintiff did not receive treatment for painful broken nose for nearly two days). A prison doctor cannot avoid liability by continuing to prescribe ineffective treatment and refusing to order tests or referrals needed to properly diagnose a condition. *Greeno v. Daily,* 414 F.3d 645, 655 (7th Cir. 2005) ("dogged persist[ence] in a course of treatment known to be ineffective can be an Eighth Amendment violation"); *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (summary judgment unwarranted where physician failed to refer an inmate to an expert despite unremitting and unexplained tooth pain).

Defendants rely on *Pyles v. Fahim,* 771 F.3d 403 (7th Cir. 2014), to argue that Dr. Trost's actions are not deliberate indifference. In *Pyles,* the Seventh Circuit held a doctor's refusal to order a requested MRI or provide a referral to a specialist were not deliberate indifference, stating an "MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a "classic example of a matter for medical judgment.'" *Id.* at 411 (quoting

*Estelle,* 427 U.S. at 107). But the undersigned does not read the decision in *Pyles* to stand for the proposition that refusal to order diagnostic testing can never be a basis for finding deliberate indifference. In fact, such a reading would be contrary to the Seventh Circuit law discussed above. *See Greeno v. Daily,* 414 F.3d 645, 655 (7th Cir. 2005). Rather, the Court notes the inmate in *Pyles* had already had both a CT and MRI while in the hospital. *Id.* at 405. The Seventh Circuit found the inmate did not present evidence from which a jury could find the doctor's refusal to order a *second* MRI departed significantly from accepted professional norms. *See Id.* at 412 (emphasis added). Further, the Seventh Circuit found *Pyles* distinguishable from prior Seventh Circuit precedent because "there was no prior indication of a potentially serious long-term medical issue…" *Id.* at 412. Conversely, here Burt has never had either a CT or MRI, despite multiple years of pain and treatment. Thus, because the decision in *Pyles* was specific to facts that are not present in this case, the Court is not persuaded that Dr. Trost is entitled to judgment as a matter of law.

To the contrary, the Court finds that Burt has presented evidence upon which a jury could find Dr. Trost's failure to refer him for additional diagnostic testing or to an orthopedic expert constituted deliberate indifference. Dr. Trost first became involved with Burt's care on December 24, 2013. Dr. Trost admitted it was "unlikely" he reviewed anything but the most recent records when treating Burt. (Doc. 214-3, p. 20). This is despite admitting that assessing a patient who has been complaining of back and neck issues for years begins with a physical exam and "a good detailed history." (Doc. 214-3, p. 12). At that time, x-rays revealed mild degenerative changes in Burt's neck at the C4-C5 level and mild degenerative changes in Burt's back at the L5-S1 level. (Doc. 214-1, p. 38). Dr. Trost stated in his deposition that he was aware of the changes in Burt's neck, but the record is unclear as

to whether he was aware of the x-ray results of Burt's back. (Doc. 214-3).

Dr. Trost did conduct an examination of Burt, finding he was not in "acute distress" and that his range of motion was normal, despite Burt's complaints of acute pain. (Doc. 214-1, p. 38). Dr. Trost determined Burt had degenerative disk disease at C4-C5 (Doc. 214-1, p. 38) and continued the same course of treatment that had been ordered for years, but added a prescription for Meloxicam (Mobic)—a non-steroidal anti-inflammatory (Doc. 214-1, p. 38). When Dr. Trost saw Burt again on March 27, 2014, he noted that Burt had normal range of motion in his neck and that Burt had "relief [with] Mobic." (Doc. 214-1, p. 41). The medical records indicate, however, that Burt told the nurse at the prior sick call that the Meloxicam provided relief, but did "not take the pain away." (Doc. 214-1, p. 40). Thus, a jury could find that Burt's pain was not fully relieved by the prescription of Meloxicam.

On October 6, 2014, Burt put in a sick call for pain and tingling in his right leg, and he was referred to Dr. Trost. (Doc. 214-1, pp. 42, 43). In his deposition, Dr. Trost stated that x-rays do not generally show degeneration of the spine. (Doc. 217-3, p. 15). Despite the escalation of symptoms, however, Dr. Trost did not refer Burt for additional diagnostic testing or to a specialist. The medical record suggests the numbness and pain eventually subsided, but in a subsequent June 15, 2015 letter to Dr. Trost, Burt sought a refill of his medication stating his "neck, it is driving me crazy and hurts badly." (Doc. 217-7, pp. 25, 32).

Based on Burt's statement that the Naproxen did not relieve his pain, the apparent escalation of symptoms evidenced by the numbness and tingling in his leg, and Burt's ongoing complaints of severe pain, a jury could find that Dr. Trost continued to provide an

ineffectual treatment, which is evidence of deliberate indifference. Thus, Dr. Trost's Motion for Summary Judgment is denied.

**II. Wexford Health Sources, Inc.**

A private corporation providing essential government services, such as health care for prisoners, cannot be held liable under Section 1983 unless the constitutional violation was caused by a policy or custom of the corporation itself. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Accordingly, in order for Burt to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy.

Burt claims Wexford has an unofficial policy of limiting referrals for additional diagnostic testing or to a specialist to those cases where it is "absolutely necessary," rather than medically necessary. (Doc. 217, p. 29). Dr. Nwaobasi provided some support for this argument in his deposition, testifying that Wexford has an unspoken policy of only referring inmate patients to a specialist when "absolutely necessary." (Doc. 217-2, p. 11). Not surprisingly, Wexford argues this is not its policy—and points to its written policy statement which lists "medically necessary" as its standard for referrals. (Doc. 214, p. 30). Standing alone, this would appear to create a material issue of fact for the jury.

In order to survive summary judgment, however, Burt must present some evidence that Wexford's policies, practices, or customs were the "moving force" behind the constitutional deprivations he suffered. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010); *Monell*, 436 U.S. at 694. When Dr. Nwaobasi's statements are read in their entirety and in context, they indicate he refers patients to specialists when he believes the medical

issue is beyond his expertise and additional opinions are warranted, regardless of any unofficial policy. (Doc. 217-2, p. 10).

> Q: Do you know if during the time you were at Wexford, Wexford had a particular policy which suggested when a physician should refer a patient, inmate patient to a specialist?
>
> A: To be frank with you, I always went with my clinical judgment.
>
> Q: I understand that. But my question, sir, is, are you aware of whether or not Wexford had a policy regarding when to refer an inmate to a specialist?
>
> A: Well, what I can say then is that generally the only advice as to refer somebody only when it is absolutely necessary and not to refer somebody out, you know, that type of – but, as I said, I'm the one on the heat. I'm the one going to answer the question so, when I feel that the patient is not getting well with regular pills that they are supposed to, then they have to see if they have something else more to offer.
>
> Q: I understand that. When you talked about this reference to referring a patient, inmate patient when absolutely necessary, was that pursuant to some policy that Wexford had in place?
>
> A: I would say generally it is no something written down, but the idea that as much as possible you don't refer patients if you don't have to, you know that type of thing.
>
> But, as I said, as a physician, I'm the one going to answer for what happens to that patient. So when I feel the patient is to be referred out I refer.

(Doc. 217-2, p. 10).

Thus, even if Wexford had an unwritten policy limiting referrals to when "absolutely necessary," Dr. Nwaobasi testified that his practice was to refer inmates when he felt it was medically necessary. Thus, Dr. Nwaobasi's treatment of Burt cannot be tied to any "absolutely necessary" policy, because he did not apply that policy in this case. Further, because Dr. Trost denied being aware of any such policy (Doc. 214-3, p. 7), his medical

decisions—even if found by a jury to be deliberately indifferent—cannot be tied to an unofficial "absolutely necessary" policy. Thus, regardless of whether Wexford actually has a policy of "absolute necessity," Burt has failed to connect such a policy to any of the medical actors in his case. For this reason, summary judgement in favor of Wexford is appropriate.

## Conclusion

For the reasons set forth above, the motion for summary judgment filed by Defendants Nwaobasi, Trost, and Wexford on June 1, 2017 (Doc. 213) is **GRANTED in part and DENIED in part**. Judgment is **GRANTED** in favor of Wexford Health Sources, Inc. and **DENIED** as to Dr. Sam Nwaobasi and Dr. John Trost. This matter shall proceed to a jury trial on Burt's claims of deliberate indifference to a serious medical need against Dr. Nwaobasi, Dr. Trost, and Warden Jones.

The Clerk of Court is **DIRECTED** to **SUBSTITUTE** Alex Jones, the current Acting Warden at Menard, for Defendant Jacqueline Lashbrook. The Court **GRANTS** Defendant Jones's motion to join the co-defendants' motions *in limine* (Doc. 249). Also, for good cause shown and because trial has been continued, the Court **GRANTS** Defendant Jones's Motion for Leave to File Pretrial Disclosures (Doc. 240).

This matter is set for **JURY TRIAL** on **Tuesday, November 28, 2017**. Counsel shall appear no later than **8:30 a.m.**

IT IS SO ORDERED.

DATED:  September 14, 2017

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**